**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PANDA TEMPLE POWER, LLC, <u>et al.</u>, | : | Case No. 17-10839 (LSS) |
| | : | |
| Debtors. [1] | : | Joint Administration Pending |
| | : | |

---------------------------------------------------------- x

### DECLARATION OF ALISON R. ZIMLICH, CHIEF FINANCIAL OFFICER, CHIEF RISK OFFICER, AND TREASURER OF PANDA TEMPLE POWER, LLC IN <u>SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>

Under 28 U.S.C. § 1764, Alison R. Zimlich declares as follows under the penalty of perjury:

1.      I am the Chief Financial Officer, Chief Risk Officer, and Treasurer of Panda Temple Power, LLC ("**<u>Temple I</u>**"), which is incorporated in Delaware and is the subsidiary of Panda Temple Power Intermediate Holdings II, LLC (the "**<u>Parent</u>**" and, together with Temple I, the "**<u>Debtors</u>**").  I have served in this role since November 2013.  I am authorized to submit this declaration (the "**<u>First Day Declaration</u>**") on behalf of the Debtors in the above-captioned chapter 11 cases (collectively, the "**<u>Chapter 11 Cases</u>**").

2.      As Chief Financial Officer, Chief Risk Officer, and Treasurer, I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, and financial planning.  As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with

---

[1] The Debtors in these cases are Panda Temple Power, LLC and Panda Temple Power Intermediate Holdings II, LLC.  The last four digits of Panda Temple Power, LLC's federal tax identification number are 8214.  Panda Temple Power Intermediate Holdings II, LLC is a disregarded entity for federal income tax purposes and, as such, does not have a federal tax identification number. The Debtors' mailing address is 5001 Spring Valley Road, Suite 1150 West, Dallas, TX 75244.

the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.     On April 17, 2017 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

US-DOCS\83013106.11

uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.      Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

## I.    COMPANY AND BUSINESS OVERVIEW

6.      Parent is a holding company with no assets other than its ownership interests in Temple I.   A copy of a simplified organizational chart is attached hereto as <u>Exhibit A</u>.

7.      Temple I's main asset is the Panda Temple I Generating Station (the "**Temple I Project**"), a clean, natural gas-fueled, 758-megawatt combined-cycle electric generating facility located in Temple, Texas.  The Temple I Project utilizes advanced emissions-control technology, making it one of the cleanest natural gas-fueled power plants in the United States.  Employing "quick start" turbines, which can achieve 50% power production in 10 minutes and a full baseload capacity in 30 minutes, the Temple I Project can supply the power needs of up to 750,000 homes.

8.      The Debtors are participants in the competitive wholesale electricity market operated by the Electric Reliability Council of Texas, Inc. ("**ERCOT**"), as described in further detail in Section D below.

### A.    Company History

9.      Panda Power Generation Infrastructure Fund, L.P. and its affiliated funds (collectively, "**Panda Funds**") are part of a Dallas-based private equity firm that develops,

constructs, owns, operates, and manages investments in clean energy.  It was established in 2010 by former senior management of Panda Energy International Inc. ("**PEII**"), an independent power development company that was founded in 1982.  PEII financed, developed, built and operated 9,000 megawatts of large-scale power generation projects in the United States, equating to approximately $6 billion of aggregate capital, including two of the largest natural gas-fueled power plants ever built in the United States—the 2,250 megawatt Gila Bend, Arizona and the 2,250 megawatt El Dorado, Arkansas generating stations.   Nearly all of PEII's senior management and energy professionals transitioned to Panda Funds in 2010.

10.     Panda Funds is focused on domestic power development, acquisition and expansion in the United States.  Panda Funds currently has five combined-cycle power plants in operation in Texas and Pennsylvania, one of which is the Temple I Project.  In addition to these five plants, Panda Funds also has one combined-cycle power plant in the commissioning phase in Virginia, one combined-cycle power plant currently under construction in Pennsylvania, and a power project in Maryland in advanced development.  The Panda Funds' power plants are stand-alone projects financed by separate secured loan facilities that do not cross-default to each other.

**B.     Overview of Operations and Revenues**

11.     The Temple I Project was originally financed with approximately $377 million of secured debt and $375 million of equity.  Approximately $100 million of the equity investment was provided by Panda Funds, with the remaining $275 million provided by third party co-investors.   Construction of the Temple I Project began in July 2012 and commercial operations commenced in July 2014.  As discussed in further detail below, in March 2015, the original secured debt was refinanced with approximately $400 million of secured debt under the Prepetition Credit Agreement (as defined below).

12.     The Temple I Project utilizes combined-cycle generation, in which heat exhaust from two natural gas-fueled combustion turbines is captured and used to create steam, which, in turn, is supplied to a steam turbine.  Pairing the different generating technologies together (natural gas and steam) allows for maximum operating efficiency.  In order to operate the Temple I Project, the Debtors rely on a steady supply of natural gas from a natural gas reservoir located in Texas and known as the "Katy Hub."  The Debtors are party to various long-term contracts pursuant to which third parties deliver natural gas from the Katy Hub to the Temple I Project via two Texas intrastate gas pipeline systems.  In addition, Temple I is party to a Long Term Program Contract, dated as of March 20, 2012 (as amended), pursuant to which Siemens Energy, Inc. provides certain major equipment, parts, and long-term maintenance services necessary to the operation of the Temple I Facility.

13.     Temple I is also party to that certain Energy Management Agreement (the "**EMA**") with Twin Eagle Resource Management, LLC ("**Twin Eagle**"), dated July 17, 2012, which governs certain power, fuel, and risk management services that Twin Eagle provides to the Temple I Project as its energy manager.  Temple I pays a fixed monthly fee to Twin Eagle under the EMA.

14.     As energy manager for Temple I, Twin Eagle serves as a conduit between Temple I and the market by selling the power generated by the Temple I Facility to utility companies and  other third party entities in the industry.  Such companies then sell the power directly to the retail market in Texas.  Twin Eagle collects the revenue generated by such sales and, after setting off amounts owed by Temple I to Twin Eagle, pays such net revenues to Temple I on a monthly basis.

15.    In 2016, the Debtors' total revenue from energy sales was approximately $71.9 million and its EBITDA was $17.8 million.

### C.    Operating and Management Agreements

16.    The Debtors do not hire or retain any employees directly, but instead rely on certain non-debtor affiliates for the day-to-day operation of the Temple I Facility.  Pursuant to that certain Operation and Maintenance Agreement between Temple I and non-debtor affiliate PPG-O&M Panda Temple Power, LLC ("**Panda O&M**"), dated April 17, 2012 (as amended, the "**O&M Agreement**"), Panda O&M serves as operator of the Temple I Facility and its sister facility, non-debtor Panda Temple Power II, LLC, providing services such as operation, maintenance and repair, supply of personnel, initial staffing, startup and testing, coordination of emergency actions, procurement of tools, equipment, consumables and other materials, management of inventory, development of plans and procedures, maintenance of records, delivery of reports and notices, compliance with regulatory, utility and safety requirements, metering, management of hazardous waste, and procurement and maintenance of certain permits and licenses that are necessary for the operation and maintenance of the Temple I Facility.  Temple I pays a fixed monthly fee to Panda O&M under the O&M Agreement, which was approximately $340,000 per month in 2016.

17.    Temple I is also party that certain Amended and Restated Services Agreement with non-debtor affiliate PPG Fund I, LLC ("**PPG Fund**"), dated as of April 28, 2011 (as amended, the "**Services Agreement**"), pursuant to which PPG Fund provides Temple I with general project development and operation and asset management services, including human resources administration, government reporting, accounting services, employee health and safety-related services, financial services, general corporate services, legal services, and development, construction and facilities services.  Compensation for services under the Services

Agreement is based on a scheduled hourly rate and third party charges are billed to Temple I at cost.  In 2016, the Debtors paid an average of approximately $130,000 per month to PPG Fund under the Services Agreement.

**D.    ERCOT**

18.    As noted above, the Debtors are participants in the electricity market operated by ERCOT, which is subject to oversight from the Public Utility Commission of Texas and the Texas legislature.  ERCOT is an independent system operator that manages the flow of electric power to 24 million customers in the state of Texas, representing approximately 90 percent of Texas' electrical load.  ERCOT ensures that electrical supply equals demand in the market by regulating the power generated by various power plants.  ERCOT bases its regulations on future projections, which it sets forth in its capacity, demand, and reserves reports ("**CDR Reports**").

19.    On February 29, 2016, the Debtors and certain of their affiliates filed a lawsuit against ERCOT alleging that ERCOT sponsored false and misleading CDR Reports in 2011 and 2012 concerning the need for capacity in the ERCOT market that induced the Debtors and their affiliates to invest nearly $2.2 billion to build new power plants in Texas.  The Debtors and their affiliates assert claims against ERCOT for, among other things, negligent misrepresentation, fraud, and breach of duty.  In April 2016, ERCOT filed an answer to the Debtors' complaint, in which it denied each of the allegations.  The lawsuit is currently pending in the District Court of Grayson County, Texas under the caption *Panda Power Generation*

US-DOCS\83013106.11

*Infrastructure Fund, LLC (d/b/a Panda Power Funds), et al. v. ERCOT*, No. CV-16-0401 (the "**ERCOT Lawsuit**").  A trial has been scheduled for February 6, 2018.[3]

> **E.**     **Summary of Prepetition Debt**

> 20.     <u>Prepetition Credit Agreement</u>. As discussed above, the original secured debt of Temple I  was refinanced by that certain Credit Agreement, dated as of March 6, 2015 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), with Wilmington Trust, National Association, as successor administrative agent (in such capacity, the "**Prepetition Administrative Agent**"), MUFG Union Bank, N.A., as collateral agent (the "**Prepetition Collateral Agent"**), Credit Suisse AG, Cayman Islands Branch, as Project L/C Issuing Bank, Credit Suisse Issuing Bank and Goldman Sachs Bank USA, each as a DSR L/C Issuing Bank, and certain lender parties thereto (collectively, the "**Prepetition Lenders**").  Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders have provided (i) a Term Facility in an aggregate principal amount of $380 million, (ii) a Revolving Facility in an aggregate principal amount of $5 million (which was fully drawn as of the Petition Date), (iii) a Project Letter of Credit Facility in an aggregate principal amount of $10 million (which has since been reduced to $5 million and which has not been drawn as of the Petition Date) and (iv) a DSR Letter of Credit Facility in an aggregate principal amount of $16.625 million (which was fully drawn as of the Petition Date) (collectively, the "**Prepetition Credit Facility**").  The obligations arising under the Prepetition Credit Agreement are secured by senior, first priority security interests in, and liens upon, substantially all of Temple I's assets and 100% of the equity interests in Temple I owned by Parent.  Other than Parent, no other

---

[3] The Debtors reserve any and all rights in connection with the ERCOT Lawsuit and any other claims or causes of action against ERCOT.  Nothing herein shall constitute an admission or waiver of any kind by the Debtors with respect thereto.

affiliate of Temple I has provided a guarantee or pledged its assets in connection with the Prepetition Credit Agreement.

21.     On December 31, 2016, Temple I informed the Prepetition Administrative Agent and the Prepetition Collateral Agent that an Event of Default under the Prepetition Credit Agreement had occurred due to the fact that the Debtors had failed to maintain a debt service coverage ratio of not less than 1.10:1.00 for the relevant measurement period as required under the Prepetition Credit Agreement.  In connection therewith, the existing equity holders had the ability, pursuant to the terms of the Prepetition Credit Agreement, to "cure" the default by making an equity contribution to Temple I of approximately $15 million (the "**Equity Cure**").  In January 2017, Temple I submitted a notice that an Equity Cure was intended to be made, however, the equity holders ultimately did not make the Equity Cure.  As a result, the Debtors entered into Forbearance Agreements, dated as of January 12, 2017 and February 13, 2017, with the Prepetition Lenders in order to allow time for the Debtors to explore various strategic alternatives, as described in Section II below.

22.     On March 31, 2017, Temple I failed to make a scheduled interest payment under the Prepetition Credit Agreement of approximately $7.35 million and a scheduled principal payment of $950,000.  As of the Petition Date, there is approximately $398.7 million in principal outstanding under the Prepetition Credit Facility, including drawn balances under the DSR Letter of Credit Facility and the Revolving Facility (the "**Prepetition Secured Obligations**").

23.     Trade Debt.  In the ordinary course of their businesses, the Debtors incur trade debt with certain vendors in connection with the operation of the Temple I Facility.  The

Debtors believe that, as of the Petition Date, their unsecured trade debt is approximately $4.2 million[4] in the aggregate on account of prepetition goods and services provided to the Debtors.

### F.    Summary of 3M Revenue Put Agreement

24.    Temple I is party to a four-year 600 MW commodity hedging agreement (the "**3M Revenue Put Agreement**") with Employee Retirement Income Plan Trust of Minnesota, Mining and Manufacturing Company ("**3M**"), which protects Temple I against deterioration in market conditions through a revenue put.  The 3M Revenue Put Agreement allows the Temple I Facility to benefit from cash flow upside while placing a floor on annual gross margin.  Under the 3M Revenue Put Agreement, Temple I made an upfront payment to 3M in exchange for certain baseline gross margins through 2018 (the "**Strike Price**").  If market conditions change so that gross margin under the 3M Revenue Put Agreement in any year is below the Strike Price, then 3M must pay Temple I an amount equal to the difference between gross margin under the 3M Revenue Put Agreement and the Strike Price.  If market conditions are such that actual gross margin in a year is above the Strike Price, then no payment is due by either party.  While payments under the 3M Revenue Put Agreement are calculated on an annual basis, 3M is required to make interim quarterly settlements in each of April, July, and October. At year end, to the extent Temple I has received excess payments as a result of the quarterly settlements, it must then make a "true up" payment to 3M.

## II.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

25.    During 2015 and 2016, the Debtors began to experience revenue, cash flow, and liquidity challenges due in large part to deteriorating market conditions within ERCOT.  The increasing strain on the Debtors' liquidity has prevented them from meeting the

---

[4] This amount does not include certain expenses deferred by Temple I in accordance with the terms and conditions of the Long Term Program Contract with Siemens Energy, Inc.

financial covenants under the Prepetition Credit Agreement and threatened their ability to continue to service their debts.  As noted above, on December 31, 2016, the Debtors failed to maintain a debt service coverage ratio of not less than 1.10:1.00 for the relevant measurement period, and ultimately on March 31, 2017, Temple I failed to make a scheduled interest payment under the Prepetition Credit Agreement.  As of the Petition Date, the Debtors had only approximately $2,000 of cash on hand.

   26. <u>Current State of the ERCOT Market</u>.  As discussed above, ERCOT is charged with ensuring that electrical supply equals demand in the market by regulating the power generated by various power plants.  ERCOT bases its regulations on future projections set forth in their CDR Reports.  At the time of construction of the Temple I Facility, ERCOT's CDR Reports depicted a scarcity of supply (meaning forecasts reflected the potential for generators to earn high scarcity prices).  However, after the commencement of construction of the Temple I Facility, ERCOT changed its forecasting methodology and inputs to depict an oversupply of electric energy in the market.  This had the effect of depressing the price of power in the spot market, which also had the effect of depressing prices in the forward market.  As a result, large commercial purchasers of power had less need to hedge against higher energy prices by locking in a price for future power with generators like Temple I.  As discussed more fully in the ERCOT Lawsuit, the Debtors believe that the CDR Reports sponsored by ERCOT prior to the Debtors' construction of the Temple I Facility were false and misleading and, as a result, the Debtors have asserted claims against ERCOT for, among other things, negligent misrepresentation, fraud, and breach of duty.  The damage caused by ERCOT's actions is one of the principal causes of the Debtors' financial hardships and the lower than forecast pricing has had significant negative impacts on the Debtors' revenue, cash flows and liquidity.  Even with

the 3M Revenue Put Agreement in place, these challenges, among others, have caused a significant decline in the Debtors' financial health and liquidity.

27.    <u>The Debtors' Restructuring Efforts</u>.  As discussed above, Temple I entered into Forbearance Agreements, dated as of January 12, 2017 and February 13, 2017, with the Prepetition Lenders in order to allow time for the Debtors to explore various strategic alternatives. However, despite the Debtors actively pursuing and examining a number of potential strategic alternatives, they ultimately proved unsuccessful.

28.    Specifically, in January 2017, the Debtors, as a result of the first forbearance agreement agreed to with the Prepetition Lenders and with the assistance of their advisors, initiated a process to evaluate and consider various potential strategic and financial alternatives with a view to maximizing value and for the purpose of deleveraging their business, including, among other alternatives, a debt or equity financing.  While certain third parties indicated a willingness to refinance a large portion of the Prepetition Secured Obligations, no party was willing to refinance the Prepetition Secured Obligations in full and there remained a substantial refinancing gap.  Moreover, despite extensive efforts by the Debtors, no third party offered or proposed to fill this refinancing gap with junior secured debt, unsecured debt, or equity infusions.

29.    After full consideration of the Debtors' potential strategic and financial alternatives (with the assistance of their advisors) and discussions with certain potential investors, including existing equity holders, it became clear that there were no viable out-of-court refinancing or restructuring options for the Debtors to pursue.  Faced with a lack of viable financing options and dwindling liquidity, and after extensive discussions with their advisors, the Debtors determined that filing for chapter 11 was in their best interest and in the best interest of

their creditors.  The Debtors retained Ducera Partners LLC ("**Ducera**") as financial advisor pursuant to engagement letters dated January 7, 2017[5] and March 2, 2017, and Latham & Watkins LLP ("**Latham**") as counsel pursuant to an engagement letter dated March 28, 2017, to assist in the Debtors' restructuring efforts.

30.     Given the lack of alternatives and the fact that the vast majority of claims against the Debtors arise from the Prepetition Credit Facility, the Debtors focused their restructuring efforts on discussions with an ad hoc group of the Prepetition Lenders.  The Debtors' main goal in those discussions was to maximize estate value through a conversion of the Prepetition Credit Facility to equity in the reorganized Debtors under a consensual plan of reorganization supported by their Prepetition Lenders.  To that end, the Debtors, with the assistance of their advisors, commenced extensive, good-faith discussions with the ad hoc group of Prepetition Lenders regarding a potential in-court restructuring of the Debtors' obligations under the Prepetition Credit Facility, as well as the terms of a debtor in possession financing that would provide the Debtors with sufficient liquidity to continue to operate their businesses during the Chapter 11 Cases.  In the course of these negotiations, the Debtors and the ad hoc group of Prepetition Lenders exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals.

31.     As a result of such extensive negotiations, the parties reached the agreement memorialized in that certain Restructuring Support Agreement, dated as of April 17, 2017, by and among the Debtors, Panda Temple Power Intermediate Holdings I, LLC, Panda

---

[5] Ducera was originally engaged by the Debtors in January 2017 to advise the Debtors in connection with their pursuit of various strategic alternatives, as discussed above.

US-DOCS\83013106.11

O&M, PPG Fund I, LLC (a non-debtor affiliate), and certain of the Prepetition Lenders (the

"**RSA**").  The key terms of the RSA are as follows:[6]

- The Prepetition Lenders will acquire 100% of the ownership interests in the reorganized Debtors through a consensual plan of reorganization (the "**Plan**").

- Certain of the Prepetition Lenders will provide debtor in possession financing in the principal amount of $20,000,000 (the "**DIP Facility**").[7]

- The proceeds of the DIP Facility will be used solely in accordance with a budget in form and substance satisfactory to the Requisite Lenders (the "**Approved Budget**").

- Other than pursuant to critical vendor payment or similar first day relief, holders of general unsecured claims will not receive any recovery under the Plan on account of such claims.

- Holders of equity interests in Parent will not receive any recovery under the Plan on account of such equity interests.

- The Debtors have agreed to comply with the following Restructuring Milestones:

    (i)     entry of the Interim DIP Order by April 21, 2017;

    (ii)    filing of a Plan, Disclosure Statement, and Disclosure Statement Motion by April 26, 2017;

    (iii)   filing of an RSA Assumption Motion by April 27, 2017;

    (iv)    entry of the Final DIP Order by May 12, 2017;

    (v)     entry of the Disclosure Statement Order by May 31, 2017;

    (vi)    commencement of Plan Solicitation by June 2, 2017;

---

[6] The following is a summary of certain key terms of the RSA and is qualified in its entirety be reference to the RSA.  If there are any inconsistencies between this summary and the terms of the RSA, the RSA shall govern in all respects.  Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the RSA.

[7] A detailed description of the DIP Facility is set forth in the *Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief*, filed concurrently herewith.

US-DOCS\83013106.11

(vii)    entry of the Confirmation Order by July 7, 2017;

(viii)    the Debtors' and Panda O&M's entry into an Amended O&M Agreement by July 7, 2017; and

(ix)    the occurrence of the Plan Effective Date by July 14, 2017.

- The Debtors' obligations under the RSA are subject to a "fiduciary out," pursuant to which the Debtors may terminate the RSA as necessary in accordance with their fiduciary duties.

## PART II

32.     In furtherance of the objective of a value-maximizing reorganization of the Debtors, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.

33.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimum interruptions and disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

## I.    ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.    Joint Administration Motion

34.     The Debtors seek the joint administration of their two Chapter 11 Cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect both of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications,

orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

**B.**      **Retention Applications**

35.      I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, during these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins LLP, as co-counsel; (b) Richards, Layton & Finger, P.A., as co-counsel; (c) Prime Clerk LLC, as claims and noticing agent and administrative advisor; and (d) Ducera Partners LLC as financial advisor.  I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

**II.**      **BUSINESS OPERATION MOTIONS**

**A.**      **Cash Management Motion**

36.      In the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms, subject to certain modifications described in the Cash Management Motion; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion; and (iii)

16

authorizing, but not directing, the Debtors to continue to maintain and use certain deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b).  The Debtors also request that the Court authorize and direct all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts.

37.      As further described below, the Debtors maintain an integrated network of bank accounts (the "**Cash Management System**") that enables the Debtors to collect and disburse cash generated by Temple I, which I believe is integral to the operation and administration of the Debtors' business.  The Cash Management System is governed by the terms and conditions of Temple I's Prepetition Credit Agreement and the related certain Security Deposit Agreement, dated as of March 6, 2015, by and among Temple I, the Prepetition Agent, and Union Bank, as collateral agent and depositary (the "**Security Deposit Agreement**").

38.      The Debtors' Cash Management System has been in effect since the their formation approximately three years ago.  Historically, the Debtors maintained 15 bank accounts (the "**Prepetition Bank Accounts**"), of which 14 are at Union Bank and the other is at Bank of Texas.  All of the Prepetition Bank Accounts are held in the name of Temple I.

39.      Prior to the Petition Date, Twin Eagle, the Debtors' energy manager, collected substantially all revenue generated by Temple I's operations and transferred those receivables  monthly to Temple I's Revenue Account (as defined below) (net of amounts owed to Twin Eagle by Temple I).  Each month, Temple I submitted a withdrawal certificate to Union Bank requesting that money be withdrawn from the Revenue Account and deposited in the remaining Prepetition Bank Accounts in accordance with a waterfall (the "**Waterfall**") set forth in the Security Deposit Agreement.  Once deposited in the appropriate Prepetition Bank Account

in accordance with the Waterfall, funds in such accounts were then used to pay various expenses of the Debtors in the ordinary course of business.

40.    By the Cash Management Motion, the Debtors are not seeking authority to continue the Cash Management System in the manner maintained prepetition (i.e., distributing all revenue in the Revenue Account in accordance with the Waterfall).  Rather, the Debtors have opened a new bank account (the "**New Operating Account**" and, together with the Prepetition Bank Accounts, the "**Debtor Bank Accounts**") and will direct all revenue received or generated postpetition to be deposited directly into the New Operating Account.  The New Operating Account is at Bank of Texas, which is a U.S. Trustee-approved depositary.

41.    Twin Eagle will continue to collect revenue generated from Temple I's operations and will deposit such revenue in the New Operating Account.  In addition, all amounts funded pursuant to and in accordance with the DIP Facility will be deposited into the New Operating Account.  The Debtors' use of all cash deposited in the New Operating Account will be subject to the Approved Budget, in form and substance satisfactory to the Required Lenders (as defined in both the Prepetition Credit Agreement and the DIP Credit Agreement).

i.    The Debtors' Prepetition Cash Management System and the Prepetition Bank Accounts

42.    The Debtors' prepetition Cash Management System has historically been managed by the Debtors at their headquarters in Dallas, Texas, where they oversaw the administration of the Prepetition Bank Accounts to effect the collection, disbursement, and movement of cash.  The Debtors' cash was reconciled daily for all active accounts, and the Prepetition Bank Accounts were otherwise reconciled monthly.  The Debtors intend to manage the Cash Management System, as modified in the manner described below, in the same way postpetition.

US-DOCS\83013106.11

43.    A detailed schedule of the Debtor Bank Accounts is annexed to the Cash

Management Motion as <u>Attachment 1</u>, a summary of which is included in the chart below:

| Account Name[8] | Financial Institution | Account Number |
|---|---|---|
| Revenue Account | Union Bank | ******4526 |
| Operating Account | Union Bank | ******4527 |
| Interest Payment Account | Union Bank | ******4528 |
| Principal Payment Account | Union Bank | ******4529 |
| Insurance Proceeds Account | Union Bank | ******4530 |
| Title Event Account | Union Bank | ******4531 |
| Liquidity and Major Maintenance Reserve Account | Union Bank | ******4532 |
| Term DSR Account | Union Bank | ******4533 |
| Prepayment Account | Union Bank | ******4534 |
| Permitted Debt Payment Account | Union Bank | ******4535 |
| True-Up Account | Union Bank | ******4536 |
| Project L/C Cash Collateral Account | Union Bank | ******4537 |
| DSR L/C Cash Collateral Account | Union Bank | ******4538 |
| Punch List Expenses Sub-Account | Union Bank | ******4539 |
| Local Operating Account | Bank of Texas | ******1990 |
| New Operating Account | Bank of Texas | ******9952 |
| Utilities Adequate Assurance Account[9] | Bank of Texas | ******9941 |

44.    <u>Prepetition Waterfall</u>.  As discussed above, I understand that the Cash

Management System was instituted in accordance with the requirements set forth in the Credit

Agreement and allowed for the revenues generated by Temple I to be allocated consistent with

the Waterfall established by the Security Deposit Agreement.    Generally, all revenues and

proceeds arising from the operation of Temple I were deposited in the Revenue Account.

Pursuant to the Waterfall, those amounts were then deposited into various accounts in order to

make payments on account of, among other things, operating and maintenance costs, debt service

payments under the Credit Agreement, voluntary prepayments under the Credit Agreement,

payments in connection with interest rate hedge agreements or commodity agreements, and

---

[8] Capitalized terms used in this column shall refer to the account referred to in the corresponding row.

[9] As discussed below, the Debtors have also opened a segregated utilities adequate assurance account.

US-DOCS\83013106.11

permitted tax distributions.  A detailed summary of the Waterfall and diagrams depicting the prepetition and postpetition Cash Management Systems are annexed to the Cash Management Motion as Attachments 2 and 3, respectively.  All funds deposited in the Prepetition Bank Accounts were only permitted to be invested in liquid investments and/or cash equivalents.

45.    Extraordinary Revenue.  Pursuant to the Security Deposit Agreement, in the event Temple I received certain extraordinary payments prior to the Petition Date, such payments were not deposited into the Revenue Account but were instead deposited in separate accounts, as set forth in the following chart:

| Type of Proceeds | Account |
| --- | --- |
| Insurance proceeds resulting from a casualty, eminent domain, or condemnation event | Insurance Proceeds Account |
| Insurance proceeds in connection with any defect of title or lien on Debtors' property | Title Event Account |
| Proceeds from the incurrence of permitted debt under the Credit Agreement | Prepayment Account |
| Proceeds in excess of $15,000,000 received from the sale of certain assets | Prepayment Account |
| Payments received in connection with any unwind, termination, or sale of the revenue put under the Debtors' Initial Commodity Agreement (as defined in the Credit Agreement) | Prepayment Account |

To the extent any such extraordinary proceeds are received postpetition, I understand that the Debtors intend to deposit such amounts in the New Operating Account.

ii.    Continued Use of the Debtors' Existing Cash Management System and the Debtor Bank Accounts, Subject to Certain Modifications

46.    I believe the Debtors' ability to maintain the Cash Management System and implement necessary changes to such system, including opening the New Operating Account, is important to the Debtors' business operations during the Chapter 11 Cases and their

20

goal of maximizing value for the benefit of all parties in interest.  To require the Debtors to adopt an entirely new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  I believe that any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.  Moreover, such a disruption would be wholly unnecessary because the deposit of substantially all revenue into the New Operating Account is a simple and efficient way for the Debtors to manage their collections.  In addition, to the best of my knowledge, Union Bank and Bank of Texas are each financially stable institutions insured by the Federal Deposit Insurance Corporation ("**FDIC**").  Therefore, I believe that maintenance of the existing Cash Management System, with the modifications discussed above, is in the best interests of the Debtors, their estates, and all interested parties.

47.    Accordingly, the Debtors request that they be allowed to (i) maintain and continue to use the Debtor Bank Accounts, including but not limited to those accounts listed on Attachment 1 to the Cash Management Motion, in the same manner and with the same account numbers, styles, and document forms as are currently employed; (ii) pay ordinary course bank fees in connection with the Debtor Bank Accounts, including any fees arising prior to the Petition Date; (iii) perform their obligations under the documents and agreements governing the Debtor Bank Accounts; (iv) for all purposes, treat the Debtor Bank Accounts as accounts of the Debtors in their capacities as debtors in possession; and (v) deposit funds into and disburse funds from the New Operating Account in the ordinary course by all usual means, including checks, wire transfers, ACH transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the New Operating Account.

48.    If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.    To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the banks at which the Debtor Bank Accounts are maintained (each a "**Bank**" and, collectively, the "**Banks**") to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.

49.    The Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.    I believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services to the Debtors.

50.    In the Cash Management Motion, The Debtors further request that the Banks be authorized to deduct from the appropriate Debtor Bank Accounts the Banks' fees and expenses (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Account take

22

priority over the Bank Fees and Expenses except as set forth in any deposit agreements between the Debtors and the Banks.

51.     Additionally, I understand that both Union Bank and the Bank of Texas are party to a Uniform Depository Agreement with the U.S. Trustee.  Accordingly, within fifteen (15) days of the date of entry of an Interim or Final Order granting the Cash Management Motion, the Debtors will (i) contact each Bank, (ii) provide each Bank with the Debtors' employer identification numbers, and (iii) identify each of their accounts held at such Bank as held by a debtor in possession in a bankruptcy case.  Nevertheless, in the event that the Debtors hold one or more accounts at a Bank that is not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors will use their good faith efforts to cause such Bank to execute a Uniform Depository Agreement in a form prescribed by the Office of the U.S. Trustee within forty-five (45) days of the date of entry of an Interim or Final Order granting the Cash Management Motion.

52.     In the interest of maintaining the continued and efficient operation of the Cash Management System, as modified, during the pendency of the Chapter 11 Cases, the Debtors request that all Banks be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses), and, when requested by the Debtors in their sole discretion, to honor any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Account on account of a claim against the Debtors arising on or after the Petition Date.

53.     The Debtors further request in the Cash Management Motion that they be authorized to implement such additional reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**Additional New Accounts**") wherever the Debtors deem that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware.   I understand that, notwithstanding the foregoing, any Additional New Accounts that the Debtors open will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and any Additional New Account that the Debtors open will be (i) at one of the existing Banks or with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (ii) designated a "Debtor in Possession" account by the relevant bank.   The Debtors request that the relief sought by the Cash Management Motion extend to any Additional New Accounts and that any order approving the Cash Management Motion provide that the Additional New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I understand the Debtors will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that they close or Additional New Accounts that they open.  In furtherance of the foregoing, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Debtor Bank Account(s) or Additional New Account(s).

US-DOCS\83013106.11

iii.    Continued Use of the Debtors' Existing Checks and Business Forms

54.    While I understand that the Debtors generally do not contemplate using the Prepetition Bank Accounts after the Petition Date, to the extent any withdrawals are necessary and authorized by this Court, in order to minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.

55.    I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

iv.    Waiver of Certain Requirements of the U.S. Trustee

56.    In the Cash Management Motion, the Debtors further request that this Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the Cash Management System, as modified, or (ii) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter

25

11 Cases.  I have been informed that, in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  It is my understanding that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession," (b) the bankruptcy case number, and (c) the type of account. I have been informed that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.  Thus, I believe that the opening of the New Operating Account and the discontinued use of the Prepetition Bank Accounts serves, in large part, the objectives sought to be achieved by the UST Requirements.  In addition, as set forth above, the Debtors submit that (i) they are able to work with the Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcement of certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

57.    In light of the complexity of the Cash Management System, I believe that it would be onerous for the Debtors to meet the UST Requirement to close all existing bank accounts and open new debtor in possession accounts.  Indeed, I believe this requirement would unnecessarily inconvenience the Debtors.

58.    Further, I believe it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for

tax payments and to deposit to such accounts sufficient funds to pay any tax liability (when incurred). I believe the Debtors can pay their tax obligations most efficiently from New Operating Account, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such account. I believe that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

59. In addition, I believe it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. As set forth in the Debtors' motion for approval of debtor in possession financing and authority to use cash collateral filed contemporaneously herewith, the Debtors have provided significant safeguards (negotiated in good faith with parties in interest) to ensure that parties with security interests in the Debtors' cash are adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

v. Continued Deposit Practices

60. As part of the Cash Management System, as modified, the Debtors expect that (i) funds will be deposited into the New Operating Account on a regular basis and (ii) the remaining Prepetition Bank Accounts will be maintained but unused during the Chapter 11 Cases (the "**Deposit Practices**"). In the Cash Management Motion, the Debtors request (i) authorization to deposit funds in the New Operating Account, as set forth above, and to maintain the Debtor Bank Accounts in accordance with existing practice under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of Bankruptcy Code Section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices. For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtors' routine deposits into any of the Debtor

27

Bank Accounts may be regarded as investment activity, the Debtors seek authorization to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of Bankruptcy Code Section 345(b).

**B.**     **Insurance Motion**

61.     In the Insurance Motion the Debtors request entry of an order authorizing, but not directing, the Debtors to (a) continue to administer the Insurance Policies (as defined below) and pay their Prepetition Insurance Obligations, to the extent the Debtors determine in their absolute discretion that such payments are necessary or appropriate; (b) in the ordinary course of business, pay all postpetition premiums, administrative fees, deductibles, and other obligations relating to their Postpetition Insurance Obligations, as such payments become due; (c) renew, revise, extend, supplement, or change the Debtors' insurance coverage as needed in the ordinary course of business, and (d) maintain or renew current, or enter into new, postpetition financing arrangements with respect to insurance premiums.  The Debtors propose to limit the aggregate amount of payments for Prepetition Insurance Obligations under the Insurance Motion to $15,000 unless further authorization is obtained from this Court.

In addition, although the Debtors do not believe Court approval is required to maintain their existing Insurance Policies or to amend, extend, or renew the Insurance Policies in the ordinary course of business, out of an abundance of caution, the Debtors request entry of an order authorizing them to take such actions and to pay their Postpetition Insurance Obligations where necessary to maintain their Insurance Policies.

i.     The Debtors' Insurance Obligations

62.     In the ordinary course of the Debtors' businesses, the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "**Insurance Carriers**"), which provide coverage for, among other things, general liability,

umbrella liability, excess umbrella liability, automobile liability, pollution liability, and property liability (collectively, the "**Insurance Policies**").  A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance Motion as Exhibit B.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

63.    AON Risk Services Southwest, Inc. (the "**Broker**") serves as the Debtors' insurance broker and also manages the Debtors' relationships with the Insurance Carriers. Among other things, the Broker assists the Debtors in selecting the appropriate carriers (subject to the approval of the Debtors) and represents the Debtors in their negotiations with the Insurance Carriers.  It is my understanding that the employment of the Broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize savings in the procurement of such policies.  The Broker is paid a commission, plus certain additional administrative fees, in connection with the placement of each Insurance Policy.  I have been informed that, in 2016, the Debtors paid approximately $176,500.00 in the aggregate to the Broker in connection with such services.  It is my understanding that that there are no accrued and unpaid commissions or fees owed to the Broker as of the Petition Date.

64.    I believe that the maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses.  In addition, I have been informed that, in many cases, it is required under

the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "**Operating Guidelines**"), the federal laws and regulations applicable to the Debtors' businesses, Texas state law, and the Debtors' various contractual commitments.  Thus, I believe that the Debtors should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of their businesses.

65.    In the Insurance Motion, the Debtors request authorization to pay any Prepetition Insurance Obligations to the extent that the Debtors determine, in their sole discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies, and to maintain good relationships with the various Insurance Carriers and the Broker.  I believe the Debtors' maintenance of their relationships with the Insurance Carriers and the Broker is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.  The Debtors additionally request, out of an abundance of caution, authority to renew or replace the Insurance Policies as they may expire or lapse in the ordinary course.

66.    The Debtors will need to continue their insurance coverage throughout the duration of these Chapter 11 Cases.  I believe that the maintenance of their existing Insurance Policies falls squarely within their ordinary course of business and have only sought relief within the Insurance Motion out of an abundance of caution.  To reduce both the administrative burden on these Chapter 11 Cases and the expense of operating as debtors in possession, through the Insurance Motion, the Debtors request authorization to maintain, amend, extend or renew the Insurance Policies, as necessary, in the ordinary course of business.

US-DOCS\83013106.11

67.     I understand the total amount paid on account of annual premiums and payments associated with the Insurance Policies is approximately $1,400,000.  I have been informed that each of the Debtors' Insurance Policies, with the exception of the Debtors' pollution liability policy, is an annual policy that expires on July 11, 2017.  The Debtors' pollution liability policy is a three-year policy that expires on September 22, 2017.  I have been further informed that premiums under the general liability, automobile, umbrella, and excess umbrella policies are paid in quarterly installments through the Broker.  The final quarterly installment payments for such policies were paid on March 31, 2017.  The premiums for the Debtors' property insurance policies and the pollution policy were due in full at the beginning of the applicable policy period.  The pollution policy premium was paid by the Debtors in full, while the premiums for the property insurance policies were financed pursuant to a premium financing agreement as discussed more fully below.

68.     It is my understanding that the Debtors are not aware of any pending requests for payment under the Insurance Policies.  However, in the event that a request for payment of amounts attributable to the period prior to the Petition Date is outstanding or is received by the Debtors in accordance with the Insurance Policies, the Debtors request authority in the Insurance Motion to pay such prepetition amounts in their sole discretion.

69.     Moreover, I believe that it is in the best interests of the Debtors' creditors and estates to continue their business relationship with the Broker.  As noted above, I believe that there are no accrued and unpaid commissions or fees owed to the Broker as of the Petition Date.

ii.    The Premium Financing Agreements

70.     As noted above, in connection with the operation of their businesses and management of their properties, the Debtors maintain various property insurance policies.  I understand that, because it is often not economically advantageous for the Debtors to pay their

insurance premiums on a lump-sum basis, and in an effort to manage cash flows most efficiently, the Debtors have historically financed their property insurance premiums pursuant to premium financing arrangements with Aon Premium Finance, LLC ("**AFCO**").  I have been informed that the current property insurance policies were financed pursuant to a Commercial Insurance Premium Finance and Security Agreement between the Debtors and AFCO (the "**Property PFA**").

71.    I understand that, under the Property PFA, the Debtors made an initial down payment of $329,295.58, which is equal to approximately 25% of the premiums due under the relevant Insurance Policies for the policy period running from July 11, 2016 through July 11, 2017.  The Debtors paid the remaining balance in three (3) quarterly payments of $329,295.58, each of which included interest at a rate of 3.890%.  I believe that, as of the Petition Date, no amounts are due and owing to AFCO in connection with the Property PFA.

C.    **Utilities Motion**

72.    In the Utilities Motion, the Debtors request entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "**Utility Companies**"), while allowing the Debtors to avoid the threat of imminent termination of electricity, water, telephone, internet, and similar utility products and services (collectively, the "**Utility Services**") from the Utility Companies.  Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $52,512 (which is approximately fifty percent (50%) of the estimated monthly cost of the Utility Services based on historical averages over the preceding twelve (12) months) into a newly created, segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (b) approving the additional adequate

32

assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment to Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services to or discriminating against the Debtors except as may be permitted by the proposed procedures.

73.     It is my understanding that, as of the Petition Date, four Utility Companies provide Utility Services to the Debtors.  The Utility Companies service the Debtors' power generating facility in Temple, Texas.  On average, prior to the Petition Date, the Debtors incurred approximately $105,000 each month for utility costs.  I have been informed that ENCOA Energy Company and Heart of Texas Electric Cooperative, Inc. invoice the Debtors directly for the Utility Services, while Time Warner Cable, the City of Temple and AT&T (collectively, the "**O&M Utilities**") invoice the Debtors' affiliate, Panda O&M, jointly for services provided to both Panda Temple Power, LLC and one of its non-debtor affiliates.  Panda O&M pays the O&M Utilities the full amount invoiced in the ordinary course of business. Thereafter, Panda O&M apportions an appropriate amount to Panda Temple Power, LLC (based on its share of the Utility Services) and then seeks reimbursement from Panda Temple Power, LLC for such amounts.  On average, prior to the Petition Date, I understand the Debtors incurred approximately $1,050 each month for costs to Time Warner Cable, $50,300 each month for costs to the City of Temple, and $2,950 each month for costs to AT&T.  I also understand that the Debtors owe approximately $186,000 to the Utility Companies as of the Petition Date.  Based on the timing of the filings in relation to the Utility Companies' billing cycles, I believe there may be some prepetition utility costs that have been invoiced to the Debtors for which payment is not yet due and prepetition utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

74.    I believe the Utility Services are crucial to the continued operations of the Debtors' business.  As described above, the Debtors operate a clean, natural gas-fueled, 758-megawatt combined-cycle power plant facility.  The Debtors generate the entirety of their revenues through the operation of the power plant, which cannot be done without the Utility Services.  Accordingly, I believe uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, therefore, to the success of these Chapter 11 Cases.  Should the Utility Companies refuse or discontinue service, even for a brief period, I believe that Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.  I believe it is, therefore, critical that the Utility Services continue uninterrupted during the Chapter 11 Cases.

75.    The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors have proposed certain protections and procedures in the Utilities Motion.  Accordingly, I believe that the relief sought in the Utilities Motion is in the best interests of the Debtors and appropriately protects the interests of the Utility Companies.

## II.    CONTINUING VENDOR MOTIONS

### A.    Critical Vendor Motion

76.    In the Critical Vendor Motion, the Debtors seek entry of interim and final Orders granting them authority to pay the prepetition fixed, liquidated, and undisputed claims (the "**Critical Vendor Claims**") of certain critical suppliers of goods and services, with whom the Debtors continue to do business and whose goods and services are essential to the Debtors' operations (the "**Critical Vendors**").

34

77.     Although the Debtors conduct business with most of their Critical Vendors on a purchase order basis without long-term contracts, it is my understanding that certain of the Critical Vendors that the Debtors seek to pay pursuant to the Critical Vendor Motion have executory contracts with the Debtors.  I believe that the goods and services that those Critical Vendors supply to the Debtors are so vital to the Debtors' business and operations that any loss of access to, or delay in the delivery of, such goods and services resulting from the Critical Vendors' termination or threatened termination of those contracts (or the delay associated with the Debtors' attempt to enforce the contracts in the event that the Critical Vendors refuse to perform thereunder) would materially, if not irreparably, harm the Debtors' operations. Accordingly, the Debtors seek authority, but not direction, to honor their prepetition obligations to Critical Vendors where such party may, in the Debtors' reasonable business judgment, be capable of terminating its contract, refusing to perform under its contract, or where the delay associated with the Debtors' attempt to enforce the applicable contract would threaten the viability of the Debtors' operations.

78.     While the majority of the Critical Vendors invoice the Debtors directly for their goods and services, I understand that certain Critical Vendors occasionally invoice the Debtors' non-debtor affiliate, Panda O&M, jointly for goods and services provided to both Panda Temple Power, LLC and one of its other non-debtor affiliates (Panda Temple Power II, LLC). Upon receipt of the applicable invoice, Panda O&M pays such Critical Vendors the full amount invoiced in the ordinary course of business and, thereafter, apportions the appropriate amount to Panda Temple Power, LLC for reimbursement based on its share of the goods and/or services. The Debtors seek to continue to reimburse Panda O&M for these amounts in the ordinary course of business (and in compliance with the Approved Budget), and any prepetition amounts owed to

35

Panda O&M for reimbursement are included in the cap set forth in the Critical Vendor Motion. Without prompt reimbursement by Panda Temple Power, LLC, the I believe that Panda O&M will not have sufficient resources to pay the Critical Vendors directly.

79.    I have been informed that, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "**Outstanding Orders**") with several suppliers (collectively, the "**Suppliers**") for goods and services that had not yet been delivered as of the Petition Date and which the Debtors believe are integral to the Debtors' ongoing business operations.  Accordingly, in the Critical Vendor Motion, the Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (a) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (b) the provision of services to the Debtors on and after the Petition Date at the Debtors' request will be entitled to administrative expense priority status.

80.    As described above, the Debtors' entire business is dependent upon their ability to continue to operate the Temple I Facility, which, in turn, is dependent upon the Debtors' access to various essential goods and services.  I believe that payment of the Critical Vendor Claims is vital to their ability to continue their operations and, thus, to their effort to preserve and maximize value for all stakeholders.

81.    I believe that some of the Debtors' vendors and service providers will continue to do business with them after commencement of these cases because doing so simply makes good business sense.  In many cases, however, I anticipate that certain Critical Vendors may: (a) refuse to deliver goods and services without payment of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors.  Accordingly, I

believe it is essential that the Debtors receive authorization to pay the Critical Vendor Claims of such vendors and service providers, subject to the criteria specified in the Critical Vendor Motion, because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value.

vi.     <u>Criteria Used to Identify Critical Vendors</u>

82.     I have been informed that to ensure that the Debtors correctly identify their Critical Vendors, certain of the Debtors' management and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services.

83.     I understand that, as part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine which of the Debtors' vendors and service providers are Critical Vendors: (a) whether the vendor or service provider is a sole-source or limited-source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether geographic constraints, quality requirements, customizations, or other specifications prevent the Debtors from obtaining the necessary goods or services from alternative sources within a reasonable timeframe; (d) whether, if the vendor is not a sole source provider, the Debtors have insufficient inventory of goods to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider is contractually obligated to continue to provide goods and services but the Debtors cannot afford the time and expense of an enforcement action if the vendor or service provider wrongfully refuses to perform, and in fact refuses to perform; (f) whether a vendor or service provider has possession of goods, products, or other deliverables as to which they are able to

claim a possessory lien and, thus, to decline to deliver such items to the Debtors without payment; (g) whether a vendors' prepetition claim is entitled to administrative expense status under Bankruptcy Code Section 503(b)(9); and (h) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (g) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is likely financially unable to, provide goods or services to the Debtors on a postpetition basis if the prepetition balances are not paid.  I am confident that this process has appropriately identified, and will continue to appropriately identify, only those vendors and service providers that are critical to the estates.  In addition, I understand that the Debtors will cooperate with the Required Lenders in analyzing such criteria to determine which of the Debtors' vendors and service providers are Critical Vendors.

ii.   Types of Goods and Services Giving Rise to Critical Vendor Claims

84.   Among the types of Critical Vendors identified by the Debtors are certain providers of fuel, chemicals and other consumables, specialized equipment and parts, and technical maintenance and repair services essential to the Debtors' operation of the Temple I Facility.  I believe that these vendors are critical to the Debtors' businesses because they (i) possess unique technical knowledge regarding the Temple I Facility, (ii) have familiarity with the Debtors' equipment, (iii) provide unique materials and services to the Debtors that are vital to the Debtors' operations, or (iv) provide some combination of the foregoing.

85.   I believe that the Debtors have limited alternatives when seeking replacement goods and services.  In many instances, the Critical Vendors are limited-source providers of specialized chemicals and consumables, equipment, or technical services.  In addition, the Temple I Facility is located approximately one hour north of Austin, Texas and is not in close proximity to alternative suppliers.  Thus, I believe that even in those instances where the Debtors could potentially find a replacement vendor to provide the goods or services

necessary to maintain and operate their businesses, the increased costs and other factors involved in replacing such Critical Vendors would be disruptive and, in certain instances, impossible.

86.     As discussed above, the Debtors derive all of their revenue from the operation of the Temple I Facility.  Therefore, I believe that any delay in the provision of integral goods, equipment, or maintenance and repair services, and any disruption to the relationship between the Debtors and the Critical Vendors, would cause irreparable harm to the Debtors' businesses.

87.     In addition, I have been informed that many of the Critical Vendors are third party shippers, transporters, or independent operators of storage facilities that provide services to the Debtors in connection with the transportation and storage of natural gas and other materials. Other Critical Vendors are contractors, subcontractors, mechanics or materialmen who provide essential goods and services in connection with the operation and maintenance of the Temple I Facility.  It is my understanding that these parties may be able to assert possessory or other statutory liens against the Debtors' property under applicable state law (collectively, the "**Liens**") on account of their prepetition claims.  Moreover, I believe that the amount of these Critical Vendor Claims is likely less than the value of any property securing those claims and, therefore, I have been informed that any such party holding a Lien arguably is a fully secured creditor.

88.     It is my understanding that vendors and service providers of the nature described above, and others that satisfy the criteria described in the Critical Vendors Motion, fall under the rubric of Critical Vendors.  I believe that there is a high likelihood that such Critical Vendors would no longer do business with the Debtors if they are not paid on account of any outstanding prepetition claims.  Any refusal by the Critical Vendors to provide essential goods or

perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtors' businesses.

89.    Under the circumstances, I believe that paying the Critical Vendor Claims is both necessary and essential to the Debtors' ability to achieve their chapter 11 objectives and preserve value for their various constituencies.

90.    I have been informed that approximately $2,600,000 is owed to Critical Vendors as of the Petition Date.  Accordingly, in the Critical Vendor Motion the Debtors request authority to make payments on account of Critical Vendor Claims in an aggregate amount of up to $2,800,000, in accordance with, and subject to, the Approved Budget, in the event that certain Critical Vendors did not provide the Debtors with invoices prior to the Petition Date for all prepetition amounts owed.

iii.    Proposed Terms and Conditions for Payment of Critical Vendor Claims

91.    I understand that the Debtors will attempt to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the 60 day period prior to the Petition Date (the "**Customary Trade Terms**").  The Debtors reserve the right to negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor as a condition to payment of any Critical Vendor Claim; provided that the Debtors will first obtain the consent of the Required Lenders before agreeing to any Minimum Credit Terms.

92.    I understand that to ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a letter agreement (a "**Trade Agreement**"), substantially in the form attached as Exhibit C to the

40

Critical Vendor Motion, be sent to the Critical Vendors for execution, together with a copy of the order granting the Critical Vendor Motion.

93.     In the Critical Vendor Motion, the Debtors request only the authorization to enter into Trade Agreements when the Debtors determine (with the consent of the Required Lenders), that payment of such Critical Vendor Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements are advisable.  The Debtors also request authorization to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if the Debtors determine, in their business judgment (with the consent of the Required Lenders), that failure to pay such Critical Vendor Claims will result in harm to the Debtors' business operations and there is no reasonable likelihood that the Debtors will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

94.     I understand that by agreeing to provide Customary Trade Terms or Minimum Credit Terms, the Critical Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors.  I have been advised that such Customary Trade Terms or Minimum Credit Terms maintain the credit terms that the Debtors had prior to the Petition Date, or provide other acceptable credit terms, and may provide the Debtors with more favorable terms for unsecured credit than currently provided by the Critical Vendors or available elsewhere.  Accordingly, I believe that the treatment of the valid Critical Vendor Claims set forth herein in exchange for Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtors and their estates and should be approved.

95.     I understand that in the event that a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit Terms (or such other terms as are agreed by the parties) following receipt of

payment on its Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtors, the Debtors reserve their rights to return the parties to the positions they held immediately prior to entry of the Order approving the Critical Vendor Motion with respect to all prepetition claims.  Further, in the Critical Vendor Motion, the Debtors request authorization without further order of the Court to: (a) declare (with the consent of the Required Lenders) that any Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity; and (c) recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.  In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

96.     In the Critical Vendor Motion, the Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such a default, or the Debtors (with the consent of the Required Lenders) reach a favorable alternative agreement with the Critical Vendor.

97.     I believe that the relief requested in the Critical Vendor Motion is necessary to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from the from the Critical Vendors.

US-DOCS\83013106.11

**III.    CONCLUSION**

98.    The Debtors' ultimate goal in these Chapter 11 Cases is the maximization of estate value through a plan process contemplating a conversion of the Prepetition Credit Facility to equity in the reorganized Debtors.  In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a Chapter 11 plan will be substantially enhanced.

99.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

US-DOCS\83013106.11

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18 day of April 2017.

> Panda Temple Power, LLC
> Panda Temple Power Intermediate Holdings
> II, LLC
> *Debtors and Debtors in Possession*

> *Alison R. Zimlich*
> _____
> Alison R. Zimlich
> Chief Financial Officer, Chief Risk Officer,
> and Treasurer of Panda Temple Power, LLC

## **Exhibit A**

Panda Temple Organizational Chart

US-DOCS\83013106.11

**Panda Temple I Entity Organizational Structure**

