## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                        :    Chapter 11
                                              :
PANDA TEMPLE POWER, LLC, <u>et al.</u>,        :    Case No. 17-10839 (LSS)
                                              :
        Debtors. [1]                           :    Joint Administration Pending
                                              :
------------------------------------------------------------ x

**DEBTORS' MOTION (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES AND (D) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") pursuant to, among other things, sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**"):

(1)    authorizing the Debtors to (a) obtain postpetition secured debtor-in-possession financing in an aggregate principal amount of up to $10,000,000 on an interim basis and a total of $20,000,000 on a final basis (the "**DIP Facility**") pursuant to the terms and conditions of the Interim Order and that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement, substantially in the form attached to the Interim Order as <u>Exhibit A</u> (and as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**")[2], dated as of April [_], 2017 (the "**Closing Date**") by and among Panda Temple Power, LLC (the

---

[1] The Debtors in these cases are Panda Temple Power, LLC and Panda Temple Power Intermediate Holdings II, LLC. The last four digits of Panda Temple Power, LLC's federal tax identification number are 8214. Panda Temple Power Intermediate Holdings II, LLC is a disregarded entity for federal income tax purposes and, as such, does not have a federal tax identification number. The Debtors' mailing address is 5001 Spring Valley Road, Suite 1150 West, Dallas, TX 75244.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the applicable DIP Document (as defined herein).

"**Company**" or the "**Borrower**"), as borrower, Panda Temple Power Intermediate Holdings II, LLC ("**Parent**"), as guarantor, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, collectively, the "**DIP Agent**") and the lenders party thereto from time to time (the "**DIP Lenders**" and, together with the DIP Agent and any other party to which DIP Obligations (as defined herein) are owed, the "**DIP Parties**"), and (b) incur the "Secured Obligations" under the DIP Credit Agreement (such Secured Obligations, as provided for and defined in the DIP Credit Agreement, shall be referred to herein as the "**DIP Obligations**") (the DIP Credit Agreement, together with the Interim Order, any Final Order and any related agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**DIP Documents**");[3]

(2)    authorizing the Debtors to execute and enter into the DIP Documents (where applicable) and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable;

(3)    authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (and, solely as set forth in the Interim Order and the Final Order, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), to secure the DIP Obligations;

(4)    authorizing the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined below) solely as provided herein, and the provision of adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below), including Cash Collateral, solely as set forth in the Interim Order and the Final Order;

(5)    authorizing the Borrower to borrow under the DIP Facility up to an aggregate principal amount of $20,000,000 (up to $10,000,000 of which shall be available to the Debtors upon entry of the Interim Order and shall be drawn in a single draw by the Debtors on the Closing Date and, subject to the entry of the Final Order,

---

[3] Although the Debtors believe that the DIP Credit Agreement and the proposed Interim Order filed herewith are substantially complete, the Debtors and the DIP Lenders are still in the process of finalizing certain terms and conditions and the parties reserve all rights with respect thereto. The Debtors will file updated versions and redlines prior to the Interim Hearing (as defined below).

one additional drawing of the remaining balance of amounts committed under the DIP Facility), to be incurred in accordance with the terms and conditions of the DIP Documents to (A) finance, in accordance with the Approved Budget (as defined below), (x) the ongoing working capital needs of the Debtors, and (y) to otherwise fund the operations and administration of the Debtors during these Chapter 11 Cases, (B) make required adequate protection payments and (C) pay fees, costs and expenses in connection with the DIP Documents and these Chapter 11 Cases to the extent set forth in the Approved Budget, including, but not limited to, professional fees and expenses;

(6)     the scheduling of an interim hearing (the "**Interim Hearing**") on the Motion for this Court to consider entry of the Interim Order;

(7)     the scheduling of a final hearing (the "**Final Hearing**") on the Motion for a date that is before the thirtieth (30th) day after the Petition Date (as defined below) to consider entry of the Final Order, *inter alia*, authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto; and

(8)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order, and the Final Order.

In support of the Motion, the Debtors rely on the *Declaration of Alison R. Zimlich, Chief Financial Officer, Chief Risk Officer, and Treasurer of Panda Temple Power, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Zimlich Declaration**"), and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    General Background

2.    On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Zimlich Declaration and fully incorporated herein by reference.

3.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

### B.    The Debtors' Secured Prepetition Indebtedness

4.    Pursuant to (a) that certain Credit Agreement, dated as of March 6, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Credit Agreement**"), by and among the Company, as borrower, the Parent, as guarantor, the Lenders (as defined in the Credit Agreement, collectively, the "**Prepetition Lenders**"), Wilmington Trust, National Association, as administrative agent (as successor-in-interest to Goldman Sachs Lending Partners LLC), MUFG Union Bank, N.A., as collateral agent (the "**Collateral Agent**" and, collectively with Wilmington Trust, National Association, the "**Prepetition Agents**" and, together with the Prepetition Lenders, the "**Prepetition Secured Parties**") and the other financial institutions party thereto from time to time, and (b) the other "Loan Documents" (as defined in the Credit Agreement and, together with the Credit Agreement, the "**Prepetition Loan Documents**"), the Prepetition Lenders provided a fully perfected secured loan to and for the benefit of the Company.

5.      As of the Petition Date, the Debtors were indebted to the Prepetition Lenders and the Prepetition Agents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued in the aggregate outstanding principal amount under the Prepetition Loan Documents of not less than $398,708,500.00, plus accrued and unpaid interest and fees with respect thereto (which, as of April 16, 2017, was not less than $8,850,688.80, which amount, for the avoidance of doubt, does not include the Prepetition Agents' and the Prepetition Lenders' accrued and unpaid attorneys' fees, costs, and expenses, or any "Premium" (as defined in the Prepetition Loan Documents) or any other premium, make-whole or penalty payments otherwise required by the terms of the Prepetition Loan Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Debtors' obligations pursuant to the Prepetition Loan Documents, collectively the "**Prepetition Secured Obligations**").

6.      To secure the Prepetition Secured Obligations, (a) the Company granted to the Prepetition Agents and the Prepetition Lenders a security interest in and lien upon (the "**Prepetition Liens**") all "Collateral" under and as defined in the Prepetition Loan Documents and (b) the Parent pledged to the Collateral Agent a security interest in all of the property of the Parent (the collateral described in clauses (a) and (b) hereto, the "**Prepetition Collateral**").

**C.      The Debtors' Efforts to Obtain Postpetition Financing**

7.      During 2015 and 2016, the Debtors began to experience revenue, cash flow, and liquidity challenges due in large part to deteriorating market conditions within ERCOT.  The increasing strain on the Debtors' liquidity has prevented them from meeting the financial covenants under the Credit Agreement and threatened their ability to continue to service their debts.  On March 31, 2017, the Company failed to make a scheduled interest payment under the Credit Agreement of approximately $7.35 million and a scheduled principal payment of $950,000.

8.      Prior to the Petition Date, the Debtors actively pursued and examined a number of potential strategic alternatives without success.  Specifically, in January 2017, the Debtors, with the assistance of their advisors, initiated a process to evaluate and consider various potential strategic and financial alternatives with a view to maximizing value and for the purpose of deleveraging their business, including, among other alternatives, a debt or equity financing. While certain third parties indicated a willingness to refinance a substantial portion of the Prepetition Secured Obligations, no party was willing to refinance the Prepetition Secured Obligations in full.  Moreover, despite extensive efforts by the Debtors, no third party offered or proposed to fill this refinancing gap with junior secured debt, unsecured debt, or equity infusions.

9.      After full consideration of the Debtors' potential strategic and financial alternatives (with the assistance of their advisors) and discussions with certain potential investors, it became clear that there were no viable out-of-court refinancing or restructuring options for the Debtors to pursue.  Faced with a lack of viable financing options and dwindling

liquidity, and after extensive discussions with their advisors, the Debtors determined that filing for chapter 11 was in their best interest and in the best interest of their creditors.

10.    Given the lack of alternatives and the fact that the vast majority of claims against the Debtors arise from the prepetition credit facility, the Debtors focused their restructuring efforts on discussions with an ad hoc group of the Prepetition Lenders.  The Debtors, with the assistance of their advisors, commenced extensive, good-faith discussions with the ad hoc group of Prepetition Lenders regarding a potential in-court restructuring of the Debtors' obligations under the Prepetition Credit Facility, as well as the terms of a debtor in possession financing that would provide the Debtors with sufficient liquidity to continue to operate their businesses during the Chapter 11 Cases.  In the course of these negotiations, the Debtors and the ad hoc group of Prepetition Lenders exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals.  Ultimately, the Debtors reached an agreement with the DIP Lenders, who are a subset of the ad hoc group of Prepetition Lenders.

11.    Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors have been unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than those under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  New credit is unavailable to the Debtors without providing the DIP Agent for the benefit of the DIP Lenders the (i) DIP Superpriority Claims (as defined herein) and (ii) DIP Liens in the DIP Collateral, as provided herein and in the DIP Documents.

**D.**     **Need for Debtor in Possession Financing and Use of Prepetition Collateral**

12.     If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Facility and to use the Cash Collateral, the Debtors will suffer immediate and irreparable harm.  As of the Petition Date, the Debtors had less than $50,000 of cash on hand.  Without the funds available under the DIP Facility and the use of the Cash Collateral, the Debtors will not have sufficient available sources of working capital and financing to carry on the operation of their businesses.  The Debtors' ability to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.

SUMMARY OF RELIEF REQUESTED

13.     The Debtors seek authority to establish the DIP Facility that provides for postpetition secured loans in an amount not to exceed $20,000,000 (the "**DIP Loans**"), subject to the terms and conditions of the DIP Documents.

SUMMARY OF TERMS OF THE DIP FACILITY

14.     In accordance with the disclosure requirements of Bankruptcy Rule 4001(b) and (c) and Rule 4001-2(a)(i) and (ii) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court of the District of Delaware (the "**Local Rules**"), the material terms of the DIP Facility, and certain highlighted provisions, are as follows:[4]

---

[4] This summary is qualified in its entirety by the provisions of the DIP Documents.  To the extent there are any conflicts between this summary and any DIP Document, the terms of such DIP Document shall govern. Capitalized terms used but not defined herein shall have the meanings set forth in the DIP Credit Agreement or the Interim Order, as applicable.

8

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Panda Temple Power, LLC |
| **Guarantor**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Panda Temple Power Intermediate Holdings II, LLC |
| **Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Lenders party to the DIP Credit Agreement |
| **DIP Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent |
| **Purpose**<br>*Fed. R. Bankr. P. 4001(c)(1)B); Local Rule 4001-2(a)(ii)* | The DIP Facility shall be used for the following purposes: (i) working capital and other general corporate purposes, (ii) adequate protection payments, (iii) permitted payments of costs of administration of the Chapter 11 Cases, (iv) payment of interest, fees, costs and expenses related to the DIP Facility, and (v) payment of such prepetition fees, costs and expenses as consented to by the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents and approved by the Bankruptcy Court, including prepetition expenses approved by the Bankruptcy Court in connection with the Debtors' "first day" motions; <u>provided</u> that nothing in the Interim Order shall alter, limit, or impair the Carve-Out.  Interim Order ¶ H. |
| **Borrowing Limits**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | Each DIP Lender severally agrees, on the terms and subject to the conditions set forth in the DIP Credit Agreement, to make term loans to the Borrower as follows: (i) an initial Advance to the Borrower for the period commencing on the Closing Date to, but excluding the Final Order Funding Date in an aggregate principal amount equal to the lesser of (x) such DIP Lender's Commitment and (y) such DIP Lender's pro rata share of an aggregate principal amount permitted under the Interim Order, and (ii) commencing on or after the Final Order Funding Date, one additional Advance to the Borrower on the date of entry specified in the applicable Notice of Borrowing in an amount equal to such DIP Lender's pro rata share of the remaining Unused Commitment, provided that the aggregate amount of all Advances will not exceed the DIP Facility. No amounts advanced under the DIP Facility once repaid may be reborrowed.  DIP Credit Agreement § 2.01. |
| **Interest Rate**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | **Interest Rate**: A floating rate equal to the either (i) the Base Rate plus 8.0% per annum or (ii) the Adjusted LIBOR Rate, plus 9.0% per annum.<br><br>**Default Interest Rate:** Two percent (2%) above the then applicable rate.<br><br>DIP Credit Agreement § 2.08. |
| **Maturity Date**<br>*Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The earliest to occur of (a) the Stated Maturity Date, (b) the closing date of any Section 363 Sale not consented to in writing by the Required DIP Lenders, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code), and which for purposes of the DIP Credit Agreement will be no later than the Consummation Date, of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the appointment of a trustee or examiner in the Chapter 11 Cases, (e) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, and (f) the date of acceleration of the DIP Obligations in accordance with the terms set forth in the DIP Loan Documents. DIP Credit Agreement § Definitions. |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Fees**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | The Debtors shall pay all fees and other amounts set forth in the Fee Letters, including the following:<br><br>(a) *Put Option Payment.*  The Borrower shall pay to the DIP Agent, on account for, and for the benefit of, each DIP Lender, 2.0% of the initial aggregate principal amount of their respective, aggregate Commitments on the Closing Date (the "**Put Option Payment**") upon the entry of the Interim Order by the Bankruptcy Court and payable in full in cash. Such Put Option Payment shall be (x) fully earned upon execution of the Fee Letter and (y) for the Borrower's right to call the aggregate Commitments.[5]<br><br>(b) *Annual Administration Fee.*  The Borrower shall pay to the DIP Agent an Annual Administration Fee of $40,000, due and payable annually in advance, with the first year's payment due on the Closing Date, and continuing on each anniversary of the Closing Date until the DIP Lenders' Commitments are discharged, all Obligations under the DIP Credit Agreement and the other DIP Loan Documents have been paid in full and the DIP Facility has been terminated.<br><br>Copies of the Fee Letters are attached hereto as Exhibit B. |
| **DIP Budget and Related Covenants**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B);*<br>*Local Rule 4001-*<br>*2(a)(ii)* | The Debtors have provided the DIP Agent and the DIP Lenders with a cash flow forecast setting forth all line-item and cumulative cash receipts and expenditures on a weekly basis for the period beginning as of the week of the "Closing Date" of the DIP Credit Agreement through and including the 13th week after the "Closing Date" of the DIP Credit Agreement (the "**Initial Budget**"), a copy of which is attached to the Interim Order as Exhibit 1.[5]  Upon entry of the Interim Order and approval by the DIP Agent (at the direction of the Required DIP Lenders), the Initial Budget shall be deemed an "**Approved Budget**").<br><br>As soon as available and in any event not later than 5:00 p.m. New York City time on the Friday of each calendar week, the Debtors shall deliver to the DIP Agent an update to the Approved Budget then in effect, in form and substance satisfactory to the Required DIP Lenders, for the subsequent 13-week period following such Business Day (it being understood that such update to the Approved Budget then in effect shall be limited to only the addition of the subsequent new 13th week) (each such update, the "**Updated Budget**"); *provided* that no approval of the Required DIP Lenders shall be required to any proposed update to the Approved Budget to the extent the previously approved line items therein remain unchanged for the same period set forth in the Approved Budget then in effect. Upon (and subject to) the approval of any such Updated Budget by the Required DIP Lenders, such Updated Budget shall constitute the then-Approved Budget; *provided, however,* that in the event the Required DIP Lenders and Debtors are unable to reach agreement regarding an Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget.<br><br>No later than 5:00 p.m. New York City time on Friday of each calendar week, the DIP Agent and each DIP Lender shall receive a variance report (the "**Weekly Report**") setting forth in reasonable detail the actual cash flows for the immediately preceding calendar week with respect to each line item in the Approved Budget; *provided* each Weekly Report delivered during the week after a Test Date (as defined in the DIP Documents) shall also set forth such cash flows for the Test Period (as defined in the DIP Documents) most recently ended, together with the percentage, if any, by which such actual cash flows for each line item exceeded or were less than the cash flows set forth in the Approved Budget for such Test Period and a certification that no disbursements have been made inconsistent with the Approved Budget (including any permitted variances).    There shall be a weekly |

---

[5] A copy of the Initial Budget will be filed separately.

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | teleconference between the Debtors and the DIP Lenders (and their respective advisors) to discuss the Weekly Report, including a management discussion and analysis of permanent versus timing differences for any variances from the Approved Budget.<br><br>With respect to the Test Period ending on each Test Date, the Debtors shall not, without the written consent of the Required DIP Lenders, make disbursements in respect of (x) Fixed Costs (as defined in the DIP Documents) and (y) the line-item "Estate Professionals" (the "**Estate Professional Costs**"), in each case, during a Test Period, in an aggregate amount which would exceed by more than twenty percent (20.0%) the aggregate amount of Fixed Costs and Estate Professional Costs, as applicable, in the Approved Budget for such Test Period, plus the positive difference, if any, of the budgeted amount for such line items in the Approved Budget for the Test Periods prior to such then applicable Test Period (the "**Prior Budget Periods**") minus the actual aggregate expenditures of the Debtors for such line item during the Prior Budget Periods.<br><br>As of each Test Date, the Debtors shall not, without the written consent of the Required DIP Lenders, permit Minimum Liquidity (as defined in the DIP Documents) to be less than (x) prior to the Final Order Funding Date (as defined in the DIP Documents), \$4,000,000 and (y) after the Final Order Funding Date, \$8,000,000.<br><br>DIP Credit Agreement § 2.16; Interim Order ¶ 6. |
| **Limitation on Use of DIP Facility Proceeds**<br>*Bankruptcy Rule 4001(b)(l)(B)(ii); Local Rule 4001-2(a)(ii)* | Except for the Maximum Investigation Budget (as defined below) which can be utilized by the Committee solely in accordance with Paragraph 17 of the Interim DIP Order, no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with any of the following: (i) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties or Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in each case in their respective capacities as such and with respect to any transaction, occurrence, omission, action or other matter related to any Debtor (including formal discovery proceedings in anticipation thereof) (each, a "**Loan Party Claim**"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations or Prepetition Liens, (c) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties, (d) investigating or asserting any so-called "lender liability" claims and causes of action against the Prepetition Secured Parties or the DIP Parties and (e) investigating or asserting any action seeking to invalidate, set aside, avoid or (other than as contemplated by the Interim Order, and Bankruptcy Code section 510(a)) subordinate, in whole or in part, the Prepetition Secured Obligations or the DIP Loans; (ii) the assertion of any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the liens securing the Prepetition Secured Obligations in accordance with the Interim Order (including attempting to stay the exercise of any right or remedy described in clause (e), clause (f) or clause (g) of paragraph 24 of the Interim Order); (iii) seeking to modify any of the rights, |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | remedies, priorities, privileges, protections and benefits granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under the Interim Order or under the DIP Documents or the Prepetition Loan Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) the payment of any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by the DIP Agent and (y) in accordance with the DIP Credit Agreement or (z) are approved by order of the Bankruptcy Court; or (v) any purpose that is prohibited under the Bankruptcy Code; provided, however, that no more than $25,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral or the Cash Collateral may be used by any Committee to investigate any Loan Party Claim (the "**Maximum Investigation Budget**").  Interim Order ¶ 15. |
| **Conditions Precedent to Lending** *Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | <u>**Conditions to the Closing Date.**</u>  The DIP Credit Agreement shall become effective on the first date on which the following conditions precedent have been satisfied: <br><br>(a) The DIP Agent's receipt of the following, each in form and substance satisfactory to the DIP Agent: <br><br>(i) executed counterparts of the DIP Credit Agreement, duly executed and delivered by the Borrower, each Agent, each of the Lender Parties and each other party to the DIP Credit Agreement; <br><br>(ii) the Notes, if any, payable to the Lenders to the extent requested by the Lenders; <br><br>(iii) a security agreement in substantially the form of <u>Exhibit D</u> to the DIP Credit Agreement (the "**Security Agreement**"), duly executed by the Borrower and the Collateral Agent together with: <br><br>(A) proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the DIP Agent may deem necessary in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Security Agreement, covering the Collateral described in the Security Agreement, <br><br>(B) completed requests for information, dated on or before the Closing Date, listing all effective financing statements filed in the jurisdictions referred to in <u>clause (A)</u> above that name the Borrower as debtor, together with copies of such other financing statements, <br><br>(C) evidence of the completion of all other recordings and filings of or with respect to the Security Agreement that the DIP Agent may deem necessary in order to perfect and protect the security interest created thereunder and payment of all filing and recording fees related thereto from the Advance proceeds, and <br><br>(D) evidence that all other action that the DIP Agent may deem necessary in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Security Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and/or release letters and UCC-3 termination statements); <br><br>(iv) such real property documents reasonably requested by the Required Lenders (including a memorandum of DIP Order to be filed in the real property records). <br><br>(v) a pledge agreement in substantially the form of <u>Exhibit G</u> to the DIP Credit Agreement (as amended, the "**Pledge Agreement**"), duly executed by the Parent and the Collateral Agent, together with: <br><br>(A) the equity interest certificates representing the Pledged Collateral referred to in the Pledge Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Collateral referred to in the Pledge Agreement, |

12

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | indorsed in blank, |

(B) proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the DIP Agent may deem necessary or desirable in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Pledge Agreement, covering the Collateral described in the Pledge Agreement,

(C) completed requests for information, dated on or before the Closing Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name the Parent as debtor, together with copies of such other financing statements,

(D) evidence of the completion of all other recordings and filings of or with respect to the Pledge Agreement that the DIP Agent may deem necessary or desirable in order to perfect and protect the security interest created thereunder and payment of all filing and recording fees related thereto out of the Advance proceeds, and

(E) evidence that all other action that the DIP Agent may deem necessary or desirable in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Pledge Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and/or release letters and UCC-3 termination statements);

(vi) certified copies of resolutions, or consents or approvals of the board of directors, members or managers, officers, partners or general partner of each Loan Party, approving the Transaction, the Initial Commodity Agreement and each Transaction Document  to which it is or is to be a party and of all documents evidencing other necessary corporate, limited liability company or partnership action and governmental and other third party approvals and consents, if any, with respect to the Transaction, the Initial Commodity Agreement and each Transaction Document to which it is or is to be a party;

(vii) a copy of a certificate of the Secretary of State (or analogous governmental entity) of the jurisdiction of incorporation, formation or existence of each Loan Party, dated reasonably near the Closing Date, certifying (A) as to a true and correct copy of the Constituent Documents of such Person and each amendment thereto on file in such Secretary's (or analogous governmental entity's) office and (B) that (1) such amendments are the only amendments to such Person's Constituent Documents on file in such Secretary's office, (2) such Person has paid all franchise taxes to the date of such certificate and (3) such Person is duly incorporated or formed, as applicable, and in good standing or presently subsisting under the laws of the State of the jurisdiction of its incorporation or formation;

(viii) a certificate of each Loan Party signed on behalf of such Person by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the Constituent Documents of such Person since the date of the Secretary of State's (or analogous governmental entity's) certificate referred to in Section 3.01(a)(x) of the DIP Credit Agreement to the extent applicable, (B) a true and correct copy of the Constituent Documents of such Person as in effect on the date on which the resolutions referred to in Section 3.01(a)(ix) of the DIP Credit Agreement were adopted and on the Closing Date, (C) the due incorporation or organization and good standing or valid existence of such Person as a corporation, limited liability company or partnership organized under the laws of the jurisdiction of its organization and the absence of any proceeding for the dissolution or liquidation of such Person, (D) the truth of the representations and warranties made by such Person in the DIP Documents as though made on and as of the Closing Date and

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | (E) the Initial Commodity Agreement being in full force and effect; |
| | (ix) a certificate of the Secretary or an Assistant Secretary of each Loan Party certifying the names and true signatures of the officers of such Person authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered under the DIP Credit Agreement and thereunder; |
| | (x) copies of (A) each of the Material Project Contracts and each related Support Instrument in effect as of the Closing Date, duly executed by the parties thereto, together with, to the extent obtained by the Borrower after use of commercially reasonable efforts to obtain a Consent and Agreement with respect to each Core Material Project Contract, a Consent and Agreement duly executed by the DIP Agent and each other Person party to such Core Material Project Contract and (B) a certificate from a Responsible Officer of the Borrower to the effect that (1) the copies of the Material Project Contracts and such Support Instruments delivered pursuant to Section 3.01(a)(xiii) of the DIP Credit Agreement are true, correct and complete copies of such Material Project Contract or such Support Instrument, as the case may be and (2) no term or condition of any of the Material Project Contracts or such Support Instrument delivered pursuant to Section 3.01(a)(xiii) of the DIP Credit Agreement has been amended from the form thereof delivered pursuant to Section 3.01(a)(xiii) of the DIP Credit Agreement; |
| | (xi) an executed copy of the Restructuring Support Agreement (which shall be in full force and effect); |
| | (xii) a certified hard copy of, and a copy delivered in an electronic/soft medium in a format acceptable to the DIP Agent, containing, pro forma balance sheets, income statements and cash flow statements with respect to the Borrower in form and substance satisfactory to the Lender Parties for the twelve month period ending December 31, 2016 (the "**Borrower Financial Statements**"); |
| | (xiii) copies of all certificates representing the policies, endorsements and other documents required under Section 5.04 of the DIP Credit Agreement to be in effect as of the Closing Date, including, without limitation, evidence of insurance naming the DIP Agent as additional insured and naming the DIP Agent as sole loss payee to the extent required by Section 5.04, accompanied by (A) a certificate of the Borrower signed by a Responsible Officer certifying that the copies of each of the certificates and other documents delivered pursuant to Section 3.01(a)(xvii) of the DIP Credit Agreement are true, correct and complete copies thereof, (B) letters from the Borrower's insurance brokers or insurers, dated not earlier than 15 days prior to the Closing Date, stating with respect to each such insurance policy that (1) such policy is in full force and effect, (2) all premiums theretofore due thereon have been paid or are not in arrears and (3) the underwriters of such insurance have agreed that the policies, when issued, will contain, at a minimum, the provisions required under Section 5.04 of the DIP Credit Agreement and (C) a certificate from the Independent Insurance Consultant in form and substance reasonably satisfactory to the DIP Agent; and |
| | (xiv) a legal opinion of Latham & Watkins LLP, counsel for the Loan Parties, in form and substance satisfactory to the DIP Agent; |
| | (b) the Loan Parties shall have established a cash (b) management system satisfactory to the Loan Parties and the Required DIP Lenders; provided that the cash management system approved by the Cash Management Order shall be deemed satisfactory to the Required DIP Lenders; |
| | (c) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Loan Parties and the Required DIP Lenders; |

14

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | (d) all motions and other documents to be filed with and submitted to the Bankruptcy Court related to the Advances and the approval thereof shall be in form and substance reasonably satisfactory to the Loan Parties and the Required DIP Lenders;<br><br>(e) The Bankruptcy Court shall have entered the Interim Order within five (5) Business Days following the Petition Date, in form and substance satisfactory to the Loan Parties and the Required DIP Lenders;<br><br>(f) the DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein and in the Interim Order;<br><br>(g) other than the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding affecting any Loan Party or the Project pending or, to the Borrower's knowledge as certified by the Borrower, threatened before any Governmental Authority that (i) could reasonably be expected to have, either individually, or in the aggregate, a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Transaction Document, the Initial Commodity Agreement or the consummation of the Transaction;<br><br>(h) except as disclosed in writing to, and agreed by, the DIP Agent, all Applicable Governmental Authorizations and third party consents and approvals necessary in connection with the Transaction and the Project shall have been obtained and shall be in full force and effect and not subject to current legal proceedings or to any unsatisfied conditions that could reasonably be expected to allow material modification or revocation, and no appeals shall be pending with regard to any of the foregoing and all applicable appeal periods with respect thereto shall have expired; and no Requirements of Law shall be applicable that restrains, prevents or imposes materially adverse conditions upon the Transaction or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any Properties now owned or after acquired by any of them;<br><br>(i) the Borrower shall have concurrently paid (or have arranged for the payment thereof in a manner satisfactory to the DIP Agent) all agreed fees of the DIP Agent, the Lender Parties and all reasonable and documented expenses of the DIP Agent (including the fees and expenses of Stroock & Stroock & Lavan LLP, counsel to the Lender Parties and Houlihan Lokey, financial advisor to the Lender Parties ) and the Lender Parties to the extent payable pursuant to the Fee Letters;<br><br>(j) each of the DIP Agent and each Lender Party which requested that the Borrower provide all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, the Patriot Act at least 10 Business Days prior to the Closing Date shall have received, at least 5 Business Days prior to the Closing Date, such information;<br><br>(k) no Default shall have occurred and be occurring;<br><br>(l) the DIP Agent shall have received a "life of loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property, in form reasonably acceptable to the DIP Agent (together with notice about special flood hazard area status and flood disaster assistance, duly executed by the Borrower and any applicable Loan Party and evidence of flood insurance, in the event any improved parcel of Mortgaged Property is located in a special flood hazard area); and<br><br>(m) the DIP Agent and the DIP Lenders shall have received the Initial Budget (attached as <u>Exhibit E</u> to the DIP Credit Agreement), which shall be in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders. DIP Credit Agreement § 3.01. |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | **Conditions to all Advances.**  The obligation of each Lender to make any Advance is subject to the following conditions precedent:<br><br>(a) the representations and warranties of each Loan Party contained in Article IV of the DIP Credit Agreement or in any other Loan Document, shall be true and correct on and as of the date of such Advance except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) for purposes of Section 3.02 of the DIP Credit Agreement, the representations and warranties contained Article IV pertaining to financial statements shall be deemed to refer to the most recent statements;<br><br>(b) no default or Event of Default shall have occurred and be continuing, or would result from such proposed Advance or from the application of the proceeds thereof;<br><br>(c) with respect to any Advances made after the Closing Date, the Final Order shall have been entered approving the Facility, in form and substance satisfactory to the DIP Agent and the Required DIP Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agent at the discretion of the Required DIP Lenders;<br><br>(d) the making of such Advance shall not violate any laws and shall not be enjoined, temporarily, preliminarily or permanently;<br><br>(e) there shall not have occurred since the Petition Date, any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect; and<br><br>(f) the making of such Advance shall comply with the Approved Budget, or shall otherwise have been approved in writing by the DIP Agent at the direction of the Required DIP Lenders.  DIP Credit Agreement § 3.02. |
| **Priority of Claims and Liens**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii)* | Subject to and subordinate to the Carve-Out, effective upon the date of the Interim Order, as security for the DIP Obligations, the DIP Agent, for the benefit of the DIP Lenders, shall be granted the following security interests and liens (the "**DIP Liens**"), which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable:<br><br>(a) pursuant to section 364(c)(2) of the Bankruptcy Code, continuing, valid, enforceable, non-avoidable, automatically and fully perfected first priority liens on and security interests in all of the DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date;<br><br>(b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (a) and (c)) that are subject to Permitted Liens; and<br><br>(c) pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and Adequate Protection Liens granted under the Interim DIP Order, subject to liens permitted under the DIP Credit Agreement.<br><br>Except as expressly set forth in the Interim DIP Order, the DIP Liens and the DIP Superpriority Claim (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim granted in any of the Chapter 11 Cases or any successor cases and shall be |

16

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code. Interim Order ¶ 11(a). |
| **The Debtors' Stipulations** *Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B)* | As a result of, among other things, the commencement of the Chapter 11 Cases, the Debtors agree and stipulate that they are in default of their debts and obligations under the Prepetition Loan Documents. Interim Order ¶ C(v). |
| | <u>Prepetition Secured Obligations</u> |
| | The Debtors' agree and stipulate that (a) the Prepetition Secured Obligations constitute legal, valid, binding and enforceable obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction or (other than as contemplated by the Interim Order and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors; (e) the Prepetition Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the Interim Order and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens otherwise expressly permitted by the Prepetition Loan Documents and certain valid perfected unavoidable security interests or liens in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code that were senior to the respective Prepetition Liens (the "**<u>Permitted Liens</u>**"); (f) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, (other than as contemplated by the Interim Order and Bankruptcy Code section 510(a)) subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.  Interim Order ¶ C(iii). |
| | <u>Cash</u> |
| | The Debtors' agree and stipulate that all of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agents and the other Prepetition Secured Parties, as applicable.  Interim Order ¶ C(iv). |
| | <u>Releases</u> |
| | The Debtors' agree and stipulate that, subject to the entry of the Final Order (except with respect to section 364(e) of the Bankruptcy Code, as set forth in paragraphs F and 31 of |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | the Interim Order), and as set forth in paragraph 24 of the Interim Order, the Debtors forever, unconditionally and irrevocably release, discharge and acquit the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "**Releasees**") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the DIP Facility or the DIP Documents, the Prepetition Secured Obligations or the Prepetition Loan Documents, as applicable, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the DIP Liens (as defined herein), the DIP Obligations, the Prepetition Liens and the Prepetition Secured Obligations, as applicable.  Subject to the entry of the Final Order, the Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering the Interim Order.  Interim Order ¶ C(vi). |
| **Adequate Protection** *Fed. R. Bankr. P. 4001(c)(1)(B (ii)* | The proposed adequate protection provided to the Prepetition Secured Parties is comprised of the following:

(a) subject to the limitations set forth in the Interim Order, payment upon demand of all fees, costs and expenses and other amounts payable (excluding payments on account of principal and interest, whether accrued or accruing before or after the Petition Date) under the terms of the Prepetition Loan Documents and all other reasonable out-of-pocket costs and expenses of the Prepetition Secured Parties in accordance with the terms of the Prepetition Loan Documents;

(b) subject to the limitations set forth in the Interim Order, solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable and automatically perfected postpetition liens and security interests in the DIP Collateral (the "**Adequate Protection Liens**"), which liens shall be (x) junior only to the DIP Liens, Permitted Liens and the Carve-Out, and (y) senior in priority to all other liens, including the Prepetition Liens;

(c) subject to the limitations set forth in the Interim Order, solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, superpriority administrative expense claims (the "**Adequate Protection Claims**"), which claim shall be (x) junior to the DIP Superpriority Claims and the Carve-Out, and (y) senior to and have priority over any administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any successor cases, at any time existing or arising, of any kind or nature whatsoever; and

(d) subject to the limitations set forth in the Interim Order, reasonable access to the Debtors' premises during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses and their books and records in accordance with the Interim Order and the Prepetition Loan Documents and the Debtors shall cooperate with, consult with, and provide to such persons all such information as may be reasonably |

18

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | requested with respect to the businesses, results of operations, and financial condition of any of the Debtors. In addition, the Debtors shall authorize each of their respective representatives, advisors (including independent certified public accountants, financial advisors and investment bankers), professionals, consultants, agents and/or employees, to cooperate and consult with the Prepetition Secured Parties as reasonably requested from time to time. Interim Order ¶ 12.<br><br>Notwithstanding anything to the contrary contained in the Interim Order or in any DIP Documents, the DIP Liens in the DIP Collateral shall be senior to the Prepetition Liens and the Adequate Protection Liens, in each case, in such DIP Collateral. Interim Order ¶ 12. |
| **Events of Default**<br>*Fed R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | The DIP Credit Agreement contains customary events of default for financings of this type. DIP Credit Agreement § 9.01. The following is a summary of certain of the more notable events of default:<br><br>(a) any Core Material Project Contract shall terminate or otherwise cease to be valid and binding on any party thereto (except upon expiration in accordance with its terms or full performance by such party of its obligations thereunder) and such termination or cessation has resulted in or could reasonably be expected to result in a Material Adverse Effect. DIP Credit Agreement § 9.01(l).<br><br>(b) the Initial Commodity Agreement shall terminate or otherwise cease to be valid and binding on any party thereto (except upon expiration in accordance with its terms or full performance by such party of its obligations thereunder). DIP Credit Agreement § 9.01(m).<br><br>(c) the Borrower shall voluntarily abandon the operation and maintenance of the Project. DIP Credit Agreement § 9.01(n).<br><br>(d) any portion of the Project is damaged, seized or appropriated without fair value being paid therefor (by insurance or otherwise) such as to allow replacement of such Property and/or prepayment of the Secured Obligations and to allow the Borrower to continue satisfying its Obligations under the DIP Credit Agreement and the other Core Transaction Documents, in each case after giving effect to any cash contributions to the common equity of the Borrower (other than pursuant any Equity Cure Contributions) made to the Borrower after the Closing Date and applied to such replacement and/or prepayment. DIP Credit Agreement § 9.01(o).<br><br>(e) there shall have occurred any of the following in the Chapter 11 Cases:<br><br>(i) the bringing of a motion by any Loan Party in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under the DIP Credit Agreement in full in cash; (ii) to grant any Lien other than Liens expressly permitted under the DIP Credit Agreement upon or affecting any Collateral; (iii) except as provided in the DIP Credit Agreement, the Interim Order or the Final Order, as the case may be, to use cash collateral of the DIP Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Agent and the Required DIP Lenders; or (iv) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Loan Party) approves or provides authority to take any other action or actions adverse to the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Credit Agreement or their interest in the Collateral. DIP Credit Agreement § 9.01(r)(i).<br><br>(ii) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which does not provide for either (x) the repayment of all Obligations under the DIP Credit Agreement in full in cash on the "Closing Date" of such plan or (y) such other treatment of |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | the Obligations in a manner acceptable to the Required DIP Lenders, or the termination of any Loan Party's exclusive right to file and solicit acceptances of a plan of reorganization. DIP Credit Agreement § 9.01(r)(ii). |
| | (iii) the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not (i)(a) contain a provision for repayment in full in cash of all of the Obligations under the DIP Credit Agreement on or before the Closing Date of such plan or plans and (b) provide for the continuation of the Liens and security interests granted to the DIP Agent for the benefit of the DIP Lenders until the Obligations have been paid in full or (ii) provide for such other treatment of the Obligations in a manner acceptable to the Required DIP Lenders.  DIP Credit Agreement § 9.01(r)(iii). |
| | (iv) the Final Order is not entered within thirty (30) days (or such other period as the Required DIP Lenders may agree to in writing) following the date of the Interim Hearing. DIP Credit Agreement § 9.01(r)(v). |
| | (v) the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required DIP Lenders' prior written consent, other than (i) as provided in any "first day order" in form and substance reasonably acceptable to the Required DIP Lenders, or (ii) as set forth in the Approved Budget. DIP Credit Agreement § 9.01(r)(vi). |
| | (vi) the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Loan Party, for an order seeking the appointment of, in either case without the consent of the Required DIP Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the DIP Agent or the DIP Lenders or against the Prepetition Agent or Prepetition Lenders under the Prepetition Loan Documents, or the DIP Agent or DIP Lenders under the DIP Loan Documents; or the sale without the DIP Agent's and the Required DIP Lenders' consent, of all or substantially all of any Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations. DIP Credit Agreement § 9.01(r)(vii). |
| | (vii) the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of the Borrower, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of the Borrower. DIP Credit Agreement § 9.01(r)(viii). |
| | (viii) the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise. DIP Credit Agreement § 9.01(r)(ix). |
| | (ix) the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Collateral Agent and the Prepetition Agent. DIP Credit Agreement § 9.01(r)(x). |
| | (x) the challenge by any Loan Party to the validity, extent, perfection or priority of any liens |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | granted under the Prepetition Loan Documents or the DIP Loan Documents. DIP Credit Agreement § 9.01(r)(xiii).<br><br>(xi) the remittance, use or application of cash collateral of the Loan Parties other than in accordance with the Cash Management Order and the Interim Order or Final Order. DIP Credit Agreement § 9.01(r)(xiv).<br><br>(xii) the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the DIP Agent, on behalf of itself and the DIP Lenders without the consent in writing of the Required DIP Lenders. DIP Credit Agreement § 9.01(r)(xv).<br><br>(xiii) the filing of a motion by any Loan Party requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the DIP Lenders' claims or with the claims of the Prepetition Lenders under the Prepetition Loan Documents or the DIP Lenders under the DIP Loan Documents, except (i) in connection with Permitted Prior Liens, (ii) in respect of the Carve-Out, (iii) under the Adequate Protection Provisions, or (iv) to the extent the claim relates to new financing that provides for the repayment of all Obligations under this Agreement irrevocably in full in cash on the closing of such new financing. DIP Credit Agreement § 9.01(r)(xvi).<br><br>(xiv) the entry of an order precluding the DIP Agent or the Prepetition Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties. DIP Credit Agreement § 9.01(r)(xvii).<br><br>(xv) any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt. DIP Credit Agreement § 9.01(r)(xviii).<br><br>(xvi) the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order or any provision thereof without the consent of the Required DIP Lenders. DIP Credit Agreement § 9.01(r)(xix).<br><br>(xvii) termination of the Restructuring Support Agreement. DIP Credit Agreement § 9.01(r)(xxiii).<br><br>(xviii) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Interim Order, the Final Order, the Liens granted under the Collateral Documents and the Collateral. DIP Credit Agreement § 9.01(r)(xxiv). |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Indemnification**<br>*Fed. R. Bankr. P.*<br>*4001(c)(ix)* | The Debtors agree to indemnify and hold harmless the DIP Parties and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "**Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document contemplated by thereby or by the Interim Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Documents) or any action taken or omitted by the DIP Agent or the DIP Lenders under any of the DIP Documents or any document contemplated thereby or by the Interim Order; provided that the Debtors shall not have any obligation to indemnify and hold harmless any Indemnified Party with respect to any matter solely resulting from (a) the fraud, gross negligence or willful misconduct of such Indemnified Party or (b) violations by such Indemnified Party of the Interim Order, or from breaches by such Indemnified Party of the DIP Documents, in each case as determined by a court of competent jurisdiction in a final non-appealable judgment or order.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated by the Interim Order, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's (a) fraud, gross negligence or willful misconduct or (b) violations of the Interim Order or the DIP Documents. All indemnities made or owed by any Debtor to the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under the Interim Order and the DIP Documents.  Interim Order ¶ 8. |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Carveout**<br>*Local Rule 4001-2(a)(i)(F)* | The security interests, liens and claims granted to any of the DIP Parties or any of the Prepetition Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Adequate Protection Claims, Adequate Protection Liens, Prepetition Secured Obligations and Prepetition Liens) under, pursuant to or in connection with the DIP Facility, any DIP Documents, the Interim Order, or any Prepetition Loan Document shall be subject to the payment in full in cash of the amounts due under the Carve-Out.<br><br>Carve Out means (i) all fees required to be paid, both prior to and after delivery of a Carve-Out Trigger Notice, to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate; (ii) to the extent allowed by the Court at any time, whether by interim order or procedural order, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors, their estates, or the Committee pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "**Estate Professionals**") at any time before or on the date of the delivery by the DIP Agent at the direction of the Required DIP Lenders of a Carve-Out Trigger Notice, whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice); provided that there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice; and (iii) all unpaid fees, disbursements, costs and expenses incurred by the Estate Professionals on or after the day following the delivery by the DIP Agent at the direction of the Required DIP Lenders of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time (whether by interim order or procedural order), in an aggregate amount not to exceed $250,000 in total (for the avoidance of doubt, not on a professional-by-professional basis); provided, that, without duplication of the above reduction for retainers, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice (such amount set forth in this clause (iii), the "**Post-Carve-Out Trigger Notice Cap**", and, together with such amounts set forth in clauses (i) and (ii) above, the "**Carve-Out**").  Interim Order ¶ 14.<br><br>The term "Carve-Out Trigger Notice" means a written notice delivered by electronic mail by the DIP Agent (at the direction of the Required DIP Lenders) to counsel to the Debtors, the U.S. Trustee and counsel to any Committee, which notice (i) shall expressly state that the Carve-Out is triggered and (ii) can be delivered only by the DIP Agent upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or the Final Maturity Date (as defined in the DIP Credit Agreement), and in each case for which the termination of both funding under the DIP Credit Agreement and the consensual use of Cash Collateral has occurred.  Interim Order ¶ 14. |

23

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Lien Challenges**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | The Committee (if granted standing) shall have a maximum of sixty (60) calendar days from the date of the Committee's appointment, and any other party in interest (if granted standing) (other than the Debtors) shall have a maximum of seventy five (75) calendar days from entry of the Interim Order (collectively, the "**Investigation Termination Date**") to commence an appropriate contested matter or adversary proceeding (a "**Challenge**") asserting any Loan Party Claim; *provided however*, that if the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the earlier of (x) a determination by the Committee not to bring a Challenge, or (y) the expiration of the Investigation Termination Date, then a chapter 7 trustee appointed in the chapter 7 cases (and only a chapter 7 trustee) shall have an additional thirty (30) days after the chapter 7 trustee's appointment in which to bring a Challenge.  If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as ordered by the Court or extended by the written consent of the Prepetition Agents at the direction of the Prepetition Lenders or the DIP Agent at the direction of the Required DIP Lenders), then: (a) the agreements, acknowledgements and stipulations contained in paragraph C of the Interim Order shall be irrevocably binding on the Debtors, any Committee, all creditors of the Debtors, and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, without further action by any party or this Court, and the Debtors, any Committee, all creditors of the Debtors, and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Liens of the Prepetition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Secured Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, in the amounts set forth in paragraph C of the Interim Order, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Parties (whether in their prepetition or postpetition capacity), together with each of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, professionals, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations.  Notwithstanding anything to the contrary in the Interim DIP Order: (x) if any such Challenge is timely commenced, the stipulations contained in paragraph C of the Interim Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith and then only with respect to the stipulations that are subject to the Challenge and not to any stipulations not subject to the Challenge) except to the extent that such stipulations are successfully challenged in such Challenge; and (y) the Prepetition Secured Parties and the DIP Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge.  For the avoidance of doubt, nothing in the Interim Order vests or confers on the Committee or any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.  Interim Order ¶ 17. |

| Material Terms | Summary of Relevant Provisions |
|---|---|
| **Milestones**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The following milestones are contained in Schedule 5.23 of the DIP Credit Agreement:<br><br>(i) on or before April 17, 2017, the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and applicable First Day Motions (including, but not limited to, the DIP Facility Motion) shall have been filed with the Bankruptcy Court;<br><br>(ii) on or before April 21, 2017, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>(iii) on or before April 26, 2017, the Debtors shall file the Plan, Disclosure Statement and Disclosure Statement Motion;<br><br>(iv) on or before April 27, 2017, the Debtors shall file the RSA Assumption Motion;<br><br>(v) on or before May 12, 2017, the Bankruptcy Court shall have entered the Final DIP Order;<br><br>(vi) on or before May 31, 2017, the Bankruptcy Court shall have held the hearing to consider the Disclosure Statement Motion and entry of the Disclosure Statement Order;<br><br>(vii) on or before May 31, 2017, the Bankruptcy Court shall have entered the Disclosure Statement Order;<br><br>(viii) on or before June 2, 2017, Plan Solicitation shall have commenced;<br><br>(ix) on or before July 7, 2017, the Bankruptcy Court shall hold a hearing to approve confirmation of the Plan;<br><br>(x) on or before July 7, 2017, the Bankruptcy Court shall have entered the Confirmation Order;<br><br>(xi) on or before July 7, 2017, the Operator and the Borrower shall have entered into the Amended O&M Agreement and the Amended O&M Agreement shall be in full force and effect; and<br><br>(xii) on or before July 14, 2017, the Plan Effective Date shall have occurred. |
| **Waiver of the Automatic Stay**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | As set forth in further detail in the Interim Order, subject to the provisions of the DIP Documents and without further order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Parties (or any of their respective agents) to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Documents, all rights and remedies provided for in the DIP Documents, and to take any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court: (a) subject to the Carve-Out, immediately terminate the Debtors' rights, if any, under the Interim Order or the DIP Credit Agreement to use Cash Collateral; (b) cease making any DIP Loans to the Debtors (but without effecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations); (c) declare the Individual Commitments of each DIP Lender to make further DIP Loans to be terminated, whereupon such Individual Commitments and obligation shall be terminated; (d) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (e) subject to the Carve-Out, freeze monies or balances in the Debtors' accounts; (f) subject to the Carve-Out, immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders (or any of their respective agents), against the DIP Obligations, enforce all rights and remedies against the DIP Collateral in the possession of any of the DIP Lenders, for application towards the DIP Obligations, and otherwise proceed to protect or enforce all rights and remedies of the DIP Parties under the DIP Credit Agreement, any of the other DIP Documents or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant |

25

| Material Terms | Summary of Relevant Provisions |
|---|---|
| | or agreement contained in the DIP Credit Agreement or the other DIP Documents, as applicable, or any instrument pursuant to which the DIP Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Parties; and (g) subject to the Carve-Out, take any other actions or exercise any other rights or remedies permitted under the Interim Order or the Final Order, as applicable, the DIP Documents, or applicable law to effectuate the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right or remedy described in clauses (e), (f) or (g) of this paragraph, the DIP Agent, shall be required to provide five (5) Business Days' written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to any Committee, counsel to the DIP Parties, counsel to the Prepetition Secured Parties and the U.S. Trustee.  Unless the Court orders otherwise, at the end of the five (5) Business Day notice period, the automatic stay, as to the DIP Parties, shall automatically be terminated at the end of such notice period, without further notice or order, and, upon expiration of such notice period, the DIP Parties shall be permitted, subject to the Carve-Out, to exercise all rights and remedies set forth in the Interim Order, the DIP Credit Agreement and the other DIP Documents, as applicable, and as otherwise available at law, including, but not limited to, the right to foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice, motion or application to, order of or hearing before, this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.  Interim Order ¶ 24. |
| **506(c) waiver** *Bankruptcy Rule 4001(c)(l)(B)(x); Local Rule 4001-2(a)(i)(C)* | Without limiting the Carve-Out, subject to the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any subsequent chapter 7 cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to the Interim Order).  Interim Order ¶ 18. |
| **Equities of the Case** *Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(h)* | Upon entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to either of the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral.  Interim Order ¶ 20. |
| **Liens on Avoidance Actions** *Local Rule 4001-2(a)(i)(D)* | Upon entry of the Final Order, the DIP Agent, for the benefit of the DIP Lenders, shall be granted DIP Liens in and upon all avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof.  Interim Order ¶ 10. |

**BASIS FOR RELIEF**

**A.    Standards of Approval Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

15.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

16.    In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).    Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

17.    In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

> i.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    ii.    the credit transactions are necessary to preserve assets of the estate;

    iii.    the terms of the credit agreement are fair, reasonable, and adequate;

    iv.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    v.    the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

18.    Section 364 of the Bankruptcy Code also allows for postpetition financing secured by a priming lien.  Section 364(d)(1) provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

    (A)    the trustee is unable to obtain such credit otherwise; and

    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

19.    For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**i.    The Debtors Cannot Obtain Financing on More Favorable Terms**

20.    In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); <u>see</u> <u>also</u> <u>In re Snowshoe Co.</u>, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

21.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." <u>In re Sky Valley, Inc.</u>, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), <u>aff d sub nom.</u>, <u>Anchor Sav. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); <u>see</u> <u>also In re Stanley Hotel, Inc.</u>, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

22.     As set forth above and in the Zimlich Declaration, given their current financial condition, financing arrangements and capital structure, the Debtors were unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than those under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  New credit is unavailable to the Debtors without providing the DIP Agent, for the benefit of the DIP Lenders, the (i) DIP Superpriority Claims and (ii) DIP Liens in the DIP Collateral, as provided herein and in the DIP Documents.

**ii.      The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

23.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. <u>See</u> <u>In re Mushroom Transp. Co.</u>, 382 F.3d 325, 339 (3d Cir.

2004).   The DIP Facility, if approved, will provide working capital critical to funding the Debtors' day-to-day operations. Without access to the DIP Facility, the Debtors will be forced to cease operations, which would result in immediate and irreparable harm to their business and deplete the going concern value of such business. The Debtors' ability to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.   Because the Debtors' available and projected Cash Collateral is insufficient to fund their operations, the credit to be provided under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

      **iii.**     **Terms of the DIP Facility are Fair, Reasonable and Adequate under the Circumstances**

     24.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.  (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record  at 740:4-6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

     25.     Given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the

best interests of the Debtors, their estates and their creditors. The DIP Documents were negotiated extensively by the Debtors and the DIP Lenders, in good faith and at arm's length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.

### iv.     Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment

26.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

27.     Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

28.     For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is the exercise of the Debtors' reasonable business judgment.

        **v.      Proposed Adequate Protection is Appropriate**

29.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  See  In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

30.     The proposed adequate protection provided to the Prepetition Secured Parties is comprised of, among other things, (i) payment upon demand of all costs, expenses and other amounts payable under the terms of the Prepetition Loan Documents and all other reasonable out-of-pocket costs and expenses of the Prepetition Secured Parties; (ii) solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable

and automatically perfected Adequate Protection Liens, which liens shall be (x) junior only to the DIP Liens, Permitted Liens, and the Carve-Out and (y) senior in priority to all other liens, including the Prepetition Liens; (iii) solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, superpriority administrative expense claims, which claim shall be (x) junior to the DIP Superpriority Claims and the Carve-Out, and (y) senior to and have priority over any administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any successor cases, at any time existing or arising, of any kind or nature whatsoever; and (iv) reasonable access to the Debtors' premises during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses and their books and records.

31.    The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral is fair and reasonable.  Further, in reliance upon, among other things, such adequate protection, the Prepetition Lenders have consented to the priming of Prepetition Liens. The consent of the Prepetition Lenders permits the Debtors to avoid potentially time consuming and unpredictable priming litigation.  The Prepetition Lenders' consent to the priming of their liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining postpetition financing.  And importantly, the proposed adequate protection shall only be provided to the extent there is any diminution in value to the Prepetition Secured Parties' interest in the Prepetition Collateral.  Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

US-DOCS\84001763.6                                                04-18-2017

**B.      Approval of Use of Cash Collateral is Appropriate**

32.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

33.      The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents. The Debtors need the Cash Collateral to pay operating expenses, including essential vendors, in order to ensure a continued supply of goods and services essential to the Debtors' business.  Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

34.      The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Furthermore, the Prepetition Lenders have consented to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Documents and the Interim Order.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Documents.

**C.      Modification of the Automatic Stay**

35.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default under the DIP Credit Agreement, all rights and remedies provided in the DIP

34

Credit Agreement without further order of or application to the Court.  However, the DIP Agent must provide the Debtors and various other parties with five (5) business days' notice prior to exercising any enforcement rights or remedies in respect of their collateral.  During such period, the Debtors and other parties in interest may contest whether an Event of Default has occurred and is continuing.

36.    Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under these circumstances.  Accordingly, the Debtors request that the Court modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed Interim Order and Final Order.

**D.    Approval of Interim Relief**

37.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).

38.    As described above in some detail, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations.  Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two (2) business

days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

**E.      Request for a Final Hearing**

39.      The DIP Credit Agreement requires that a Final Order approving the Motion be entered within thirty (30) days after the Petition Date.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than thirty (30) days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

CONSENT TO JURISDICTION

40.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

NOTICE

41.      Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the administrative agent for the Debtors' prepetition secured financing; (c) counsel to the administrative agent for the Debtors' postpetition secured financing; (d) Stroock & Stroock & Lavan LLP and Young Conaway Stargatt & Taylor, co-counsel to the lenders under the Debtors' proposed postpetition secured financing and co-counsel to the ad hoc group of lenders under the Debtors' prepetition secured financing; (e) the Internal Revenue Service; (f) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (g) the United States Attorney for the District of Delaware; (h) the Attorney General for the state of Texas; (i) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (j) those parties that have requested notice pursuant to Bankruptcy Rule 2002; and (k) all parties entitled to notice pursuant

to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  The Debtors submit that, under

the circumstances, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the

Interim Order, substantially in the form attached hereto as Exhibit A, (ii) following the Final

Hearing (if such hearing is required) enter the Final Order, and (iii) grant the Debtors such other

and further relief as is just and proper.


Dated:  April 18, 2017
        Wilmington, Delaware

                                    */s/ John H. Knight*                
                                    John H. Knight (No. 3848)
                                    Paul N. Heath (No. 3704)
                                    Brendan J. Schlauch (No. 6115)
                                    Christopher M. De Lillo (No. 6355)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    One Rodney Square
                                    920 North King St.
                                    Wilmington, Delaware 19801
                                    Telephone: 302-651-7700
                                    Fax: 302-651-7701
                                    E-mail: knight@rlf.com
                                          heath@rlf.com
                                          schlauch@rlf.com
                                          delillo@rlf.com

                                  - and -

                                  Keith A. Simon
                                  Annemarie V. Reilly
                                  LATHAM & WATKINS LLP
                                  885 Third Avenue
                                  New York, New York 10022-4834
                                  Telephone:  212-906-1200
                                  Fax:  212-751-4864
                                  Email: keith.simon@lw.com
                                          annemarie.reilly@lw.com

                                *Proposed Counsel for Debtors and*
                                *Debtors in Possession*

## **EXHIBIT A**

## **Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
In re:                                   :    Chapter 11
                                         :
PANDA TEMPLE POWER, LLC, et al.,         :    Case No. 17-10839 (LSS)
                                         :
        Debtors. 1                       :    Jointly Administered
                                         :
                                         :    Re: Docket No. ___
------------------------------------------------------- x
```

**INTERIM ORDER: (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
**363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED**
**PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH**
**COLLATERAL OF PREPETITION SECURED PARTIES AND (D) GRANT ADEQUATE**
**PROTECTION TO PREPETITION SECURED PARTIES; (II) SCHEDULING A FINAL**
**HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND**
**(III) GRANTING RELATED RELIEF**

This matter is before the Bankruptcy Court on the motion dated April 18, 2017 (the

"Motion")[2] of Panda Temple Power, LLC (the "Company") and Panda Temple Power Intermediate

Holdings II, LLC (the "Parent"), as debtors and debtors in possession (together with the Company,

the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for

entry of an interim order (this "Interim Order") and a final order (the "Final Order"), under

sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

(the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m) of the

---

[1] The Debtors in these cases are Panda Temple Power, LLC and Panda Temple Power Intermediate Holdings II, LLC. The last four digits of Panda Temple Power, LLC's federal tax identification number are 8214. Panda Temple Power Intermediate Holdings II, LLC is a disregarded entity for federal income tax purposes and, as such, does not have a federal tax identification number. The Debtors' mailing address is 5001 Spring Valley Road, Suite 1150 West, Dallas, TX 75244.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein).

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1) authorization for the Debtors to (A) obtain postpetition secured debtor in possession financing in an aggregate principal amount of up to $10,000,000 on an interim basis and a total of $20,000,000 on a final basis (the "DIP Facility") pursuant to the terms and conditions of this Interim Order and that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement (substantially in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), dated as of April __, 2017 (the "Closing Date") by and among the Company, as borrower, Parent, as a guarantor, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, collectively, the "DIP Agent") and the lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent and any other party to which DIP Obligations (as defined herein) are owed, the "DIP Parties"), and (B) incur the "Secured Obligations" under the DIP Credit Agreement (such Secured Obligations, as provided for and defined in the DIP Credit Agreement, shall be referred to herein as the "DIP Obligations") (the DIP Credit Agreement, together with this Interim Order, any Final Order and any related agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

2

(2) authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses, premiums and other amounts payable under the DIP Documents as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and superpriority claims, including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (and, solely as set forth in paragraph 11(c) of this Interim Order, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined herein) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Interim Order;

(4) authorization for the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined herein) solely as provided herein, and the provision of adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined herein) of their interests in the Prepetition Collateral (as defined herein), including Cash Collateral, solely as set forth in paragraph 12 below;

(5) authorization for the Company to borrow under the DIP Facility up to an aggregate principal or face amount of $20,000,000 (up to $10,000,000 of which shall be available to the Debtors upon entry of this Interim Order and shall be drawn in a single draw by the Debtors on the Closing Date and, subject to the entry of the Final Order, one

3

additional drawing of the remaining balance of amounts committed under the DIP Facility), to be incurred in accordance with the terms and conditions of the DIP Documents to (A) finance, in accordance with the Approved Budget (as defined herein), (x) the ongoing working capital needs of the Debtors, and (y) to otherwise fund the operations and administration of the Debtors during these Chapter 11 Cases, (B) make required adequate protection payments and (C) pay fees, costs and expenses in connection with the DIP Documents and these Chapter 11 Cases to the extent set forth in the Approved Budget, including, but not limited to, professional fees and expenses;

(6) the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order;

(7) the scheduling of a final hearing (the "Final Hearing") on the Motion for a date that is before the 30th day after the Petition Date (as defined herein) to consider entry of a Final Order, *inter alia*, authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto; and

(8) modification of the automatic stay imposed under section 362 of the Bankruptcy Code, to the extent necessary, to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order.

This Court having found that notice of the Motion and Interim Hearing was provided by the Debtors as set forth in paragraph I below, and having held the Interim Hearing on April __, 2017 after considering all the pleadings, motions and other papers filed with this Court and as further stated on the record at the Interim Hearing; and this Court having overruled all unresolved objections to the interim relief requested in the Motion; and upon the record made by

4

the Debtors at the Interim Hearing, the First Day Declaration, and after due deliberation and consideration and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.      *Petition Date*.  On April 17, 2017 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      *Jurisdiction and Venue*.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors confirmed their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection with the Motion consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m).

C.      *Debtors' Stipulations*.  Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in paragraph 17 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)      Pursuant to (a) that certain Credit Agreement, dated as of March 6, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Credit Agreement"), by and among the Company, as borrower, the Lenders (as defined in the Credit Agreement, collectively, the "Prepetition Lenders"),

Wilmington Trust, National Association, as administrative agent (as successor-in-interest to Goldman Sachs Lending Partners LLC), MUFG Union Bank, N.A., as collateral agent (the "Collateral Agent" and, collectively with Wilmington Trust, National Association, the "Prepetition Agents" and, together with the Prepetition Lenders, the "Prepetition Secured Parties") and the other financial institutions party thereto from time to time, and (b) the other "Loan Documents" (as defined in the Credit Agreement and, together with the Credit Agreement, the "Prepetition Loan Documents"), the Prepetition Lenders provided a fully perfected secured loan to and for the benefit of the Company and the Parent.  As of the Petition Date, the Debtors were indebted to the Prepetition Lenders and the Prepetition Agents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued in the aggregate outstanding principal amount under the Prepetition Loan Documents of not less than $398,708,500.00, plus accrued and unpaid interest and fees with respect thereto (which, as of April 16, 2017, was not less than $8,850,688.80, which amount, for the avoidance of doubt, does not include the Prepetition Agents' and the Prepetition Lenders' accrued and unpaid attorneys' fees, costs, and expenses, or any "Premium" (as defined in the Prepetition Loan Documents) or any other premium, make-whole or penalty payments otherwise required by the terms of the Prepetition Loan Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Company's obligations pursuant to the Prepetition Loan Documents, collectively, the "Prepetition Secured Obligations");

(ii)    To secure the Prepetition Secured Obligations, (a) the Company granted to the Prepetition Agents, for their benefit and the benefit of the Prepetition Lenders, a security interest in and lien upon (the "Prepetition Liens") all "Collateral" under and as defined in the Prepetition Loan Documents and (b) the Parent pledged to the Collateral Agent all of its equity interest in the Company (the collateral described in clauses (a) and (b) hereto, the "Prepetition Collateral");

(iii)    (a) the Prepetition Secured Obligations constitute legal, valid, enforceable and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction or (other than as contemplated by this Interim Order and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors; (e) the Prepetition Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by this Interim Order and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or

6

applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens otherwise expressly permitted by the Prepetition Loan Documents and certain valid perfected unavoidable security interests or liens in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code that were senior to the respective Prepetition Liens (the "Permitted Liens"); (f) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, (other than as contemplated by this Interim Order and Bankruptcy Code section 510(a)) subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery;

(iv)    All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agents and the other Prepetition Secured Parties, as applicable;

(v)    As a result of, among other things, the commencement of the Chapter 11 Cases, the Debtors are in default of their debts and obligations under the Prepetition Loan Documents; and

(vi)    Subject to the entry of the Final Order (except with respect to section 364(e) of the Bankruptcy Code, as set forth in paragraphs F and 31 hereof), and as set forth in paragraph 24 hereof, the Debtors hereby forever, unconditionally and irrevocably release, discharge and acquit the DIP Agent and the DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the DIP Facility or the DIP Documents, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the DIP Liens (as defined herein) and the DIP Obligations.  Subject to the entry of the Final Order, the

7

Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order.

D.    *Need for Postpetition Financing and Use of Cash Collateral*.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and the use of Cash Collateral.  The Debtors' ability to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.  In addition, based on the record presented at the Interim Hearing: (i) the Debtors' critical need for financing and use of Cash Collateral is immediate and the entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and the value of their assets; (ii) in the absence of the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; (iii) the use of Cash Collateral will afford the Debtors adequate time to finalize and execute documents under the DIP Facility and (iv) the preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors.

E.    *No Credit on More Favorable Terms*.  Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit

8

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agent for the benefit of the DIP Lenders the (i) DIP Superpriority Claims (as defined herein) and (ii) DIP Liens in the DIP Collateral, as provided herein and in the DIP Documents.

F.    *Findings Regarding the DIP Facility*.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Parties and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

G.    *Sections 506(c) and 552(b)*.    As a material inducement to the DIP Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and the (b) the Prepetition Secured Parties' agreement to (i) subordinate their Prepetition Liens and Adequate Protection Liens (as defined herein) to the DIP Liens and the Carve-Out and (ii) the consensual use of Cash Collateral in accordance with and subject to the Approved Budget and the terms of this Interim Order, each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition

9

Lenders are entitled to receive, upon entry of the Final Order, (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

        H.  *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of Prepetition Secured Parties*.    The Debtors have received the necessary consents from the Prepetition Secured Parties to the (i) financing arrangements contemplated by this Interim Order and the DIP Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order.  Such consents are expressly limited to the postpetition financing being provided by the DIP Lenders and the use of Cash Collateral (in each case as contemplated by this Interim Order and the DIP Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility or to any modified version of the use of Cash Collateral.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral as provided in this Interim Order, the DIP Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and Cash Collateral shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and this Interim Order and in accordance with the Approved Budget, solely for the purposes set forth in the DIP Credit Agreement and this Interim Order, including (v) working capital and other general corporate purposes, (w) adequate protection payments, solely as provided for in this Interim Order, (x) the permitted payment of costs of administration of the Chapter 11 Cases, (y) payment of interest, fees, costs and expenses related to the DIP Facility as set forth herein and in the DIP Documents and (z) payment of such prepetition fees, costs and expenses as consented to by the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents and approved

US-DOCS\84494676.9

by the Bankruptcy Court, including prepetition expenses approved by the Bankruptcy Court in connection with the Debtors' "first day" motions; provided that nothing in the foregoing shall alter, limit, or impair the Carve-Out (as defined herein).

I.      *Adequate Protection*.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, solely as set forth in paragraph 12 below, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, arising from, or attributable to, among other things, (i) the Debtors' use, sale or lease of such collateral, including, without limitation, Cash Collateral (ii) the granting of liens under section 364 of the Bankruptcy Code, (iii) market value decline of such collateral, (iv) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and (v) the subordination of the Prepetition Liens and the Prepetition Obligations to the DIP Obligations, the DIP Liens and the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

J.      *Notice*.  The Debtors have represented that telephonic notice, facsimile notice or overnight mail notice of this Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the thirty (30) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel to the proposed DIP Agent; (iv) counsel to the Prepetition Agents; (v) all known parties, to the best of the Debtors' knowledge, information, or belief, asserting a lien against the DIP Collateral; (vi) the Internal Revenue Service and applicable state taxing authorities; (vii) the United States Securities and Exchange Commission (the "SEC"); and (viii) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the

US-DOCS\84494676.9

Bankruptcy Rules and the Local Rules.  Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

K.    *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, enhance the Debtors' prospects for their successful reorganization.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Approval of Interim Order.  The Motion is approved, on an interim basis, on the terms and conditions set forth in this Interim Order.  Any objections to the interim relief requested in the Motion that have not previously been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.    Approval of DIP Documents; Authority Thereunder.  The Debtors are hereby authorized to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be required or reasonably requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.

US-DOCS\84494676.9

3.    <u>Validity of DIP Documents</u>.    Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Debtor in accordance with its terms.    Loans advanced under the DIP Credit Agreement (the "<u>DIP Loans</u>") until the Final Hearing will be made to fund the Debtors' working capital and general corporate needs in the ordinary course of business and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court, in each case to the extent permitted under the DIP Credit Agreement and the Approved Budget.    No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.    <u>Authorization to Borrow; Use of Cash Collateral</u>.    Upon entry of this Interim Order and during the period prior to entry of any final order on the Motion, the Debtors are immediately authorized to borrow from the DIP Lenders under the DIP Facility in an aggregate principal amount equal to $__,000,000, subject to the terms and conditions set forth in the DIP Documents and this Interim Order and in accordance with the Approved Budget.    The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance, under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent acting at the direction of the Required DIP Lenders in their sole and absolute discretion.    Subject to the terms and conditions of this Interim Order, the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the earlier of (a) the

Final Maturity Date and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder; provided that nothing in the foregoing shall alter, limit, or impair the Carve-Out. Once repaid or prepaid, the DIP Loans incurred under the DIP Financing may not be reborrowed.

5.      Use of Proceeds and Cash Collateral.   Notwithstanding anything to the contrary in any of the first day orders, and after the entry of this Interim Order, the Debtors shall use advances of credit under the DIP Facility and Cash Collateral only for the purposes permitted by this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to any Permitted Variances (as defined herein)); provided that nothing in the foregoing shall alter, limit or impair the Carve-Out. The Debtors are authorized to use the proceeds of the DIP Loans and Cash Collateral, in part, to make certain adequate protection payments to the Prepetition Secured Parties, solely as provided for in paragraph 12 of this Interim Order.

6.      Approved Budget.

        a.      General.   Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required DIP Lenders), the proceeds of the DIP Facility and Cash Collateral shall be used only in compliance with the Approved Budget, and to pay Statutory Fees (as defined herein), which are not subject to any budget; provided that nothing in the foregoing shall alter, limit or impair the Carve-Out.

        b.      Initial Budget.   Attached as Exhibit 1 hereto and incorporated by reference herein is a cash flow forecast setting forth all line-item and cumulative cash receipts and expenditures on a weekly basis for the period beginning as of the week of the "Closing Date" of the DIP Credit Agreement through and including the 13th week after the "Closing Date" of the DIP Credit Agreement, broken down by week, including the anticipated weekly uses of proceeds

14

of the DIP Loans and Cash Collateral for such period, which shall include, among other things, available cash, cash flow, payment of trade payables and ordinary course expenses, total cash expenditures and capital expenditures, fees and expenses relating to the DIP Loans, and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the DIP Agent (at the direction of the Required DIP Lenders) (the "Initial Budget").  Upon entry of this Interim Order and approval by the DIP Agent (at the direction of the Required DIP Lenders), the Initial Budget shall be deemed an "Approved Budget".

c.    Updated Budget.  As soon as available and in any event not later than 5:00 p.m. New York City time on the Friday of each calendar week, the Debtors shall deliver to the DIP Agent an update to the Approved Budget then in effect, in form and substance satisfactory to the Required DIP Lenders, for the subsequent 13-week period following such Business Day (it being understood that such update to the Approved Budget then in effect shall be limited to only the addition of the subsequent new 13th week) (each such update, an "Updated Budget"); provided that no approval of the Required DIP Lenders shall be required with respect to any proposed update to the Approved Budget to the extent the previously approved line items therein remain unchanged for the same period set forth in the Approved Budget then in effect. Upon (and subject to) the approval of any such Updated Budget by the Required DIP Lenders, such Updated Budget shall constitute the then-Approved Budget; provided, however, that in the event the Required DIP Lenders and Debtors are unable to reach agreement regarding an Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget.

d.    Variance Reporting.  Not later than 5:00 p.m. New York City time on Friday of each calendar week, the Debtors shall deliver to the DIP Agent and each DIP Lender a variance  report (each, a "Weekly Report") setting forth in reasonable detail the actual cash flows

15

for the immediately preceding calendar week with respect to each line item in the Approved Budget; provided that each Weekly Report delivered during the week after a Test Date (as defined in the DIP Documents) shall also set forth such cash flows for the Test Period (as defined in the DIP Documents) most recently ended, together with the percentage, if any, by which such actual cash flows for each line item exceeded or were less than the cash flows set forth in the Approved Budget for such Test Period and a certification that no disbursements have been made inconsistent with the Approved Budget (including any permitted variances).    There shall be a weekly teleconference between the Debtors and the DIP Lenders (and their respective advisors) to discuss the Weekly Report, including a management discussion and analysis of permanent versus timing differences for any variances from the Approved Budget.

e.    Permitted Variances.  With respect to the Test Period ending on each Test Date, the Debtors shall not, without the written consent of the Required DIP Lenders, make disbursements in respect of (x) Fixed Costs (as defined in the DIP Documents) and (y) the line-item "Estate Professionals" (the "Estate Professional Costs"), in each case, during such Test Period, in an aggregate amount which would exceed by more than twenty percent (20.0%) the aggregate amount of Fixed Costs and Estate Professional Costs, as applicable, in the Approved Budget for such Test Period, plus the positive difference, if any, of the budgeted amount for such line items in the Approved Budget for the Test Periods prior to such then applicable Test Period (the "Prior Budget Periods") minus the actual aggregate expenditures of the Debtors for such line item during the Prior Budget Periods (the "Permitted Variances").

f.    Minimum Liquidity.  As of each Test Date, the Debtors shall not, without the written consent of the Required DIP Lenders, permit Minimum Liquidity (as defined in

the DIP Documents) to be less than (x) prior to the Final Order Funding Date (as defined in the DIP Documents), $4,000,000 and (y) after the Final Order Funding Date, $8,000,000.

       7.    <u>Payment of DIP Costs and Expenses</u>.  Subject to the limitations set forth below, the Debtors are hereby authorized to and shall pay upon demand all fees, costs, expenses, premiums and other amounts payable under the terms of the DIP Documents and all other reasonable out-of-pocket costs and expenses of the DIP Parties in accordance with the terms of the DIP Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of Stroock & Stroock & Lavan LLP ("<u>Stroock</u>"), as counsel to the DIP Lenders, Young Conaway Stargatt & Taylor, LLP, as Delaware counsel to the DIP Lenders, Gardere Wynne Sewell LLP, as special energy and regulatory counsel to the DIP Lenders, Houlihan Lokey Capital, Inc. ("<u>Houlihan</u>"), as financial advisor to the DIP Lenders, ICF Resources, LLC, as "curves" consultant to the DIP Lenders, and any other necessary or appropriate counsel, advisors, professionals and/or consultants in connection with advising the DIP Parties), subject to receiving a written invoice therefor.  None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, <u>however</u>, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to any official unsecured creditors' committee that may be appointed in these Chapter 11 Cases (the "<u>Committee</u>"); <u>provided</u>, <u>further</u>, <u>however</u>, that such invoices may contain redactions, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the Debtors, the U.S. Trustee or the Committee objects to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved

within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee or the Committee, as the case may be, shall file with the Court and serve on such DIP Parties an objection limited to the reasonableness of such fees and expenses (each, a "Fee Objection").  Professionals for the DIP Parties shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Court, U.S. Trustee, the Committee or any other party-in-interest.  The professional fees of the DIP Parties shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.  The Debtors shall pay in accordance with the terms and conditions of this Interim Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

8.    Indemnification.  The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Parties and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document

18

contemplated hereby or thereby or the transactions contemplated thereby or by this Interim Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Documents) or any action taken or omitted by the DIP Agent or the DIP Lenders under any of the DIP Documents or any document contemplated hereby or thereby; <u>provided</u> that the Debtors shall not have any obligation to indemnify and hold harmless any Indemnified Party under this paragraph with respect to any matter solely resulting from (a) the fraud, gross negligence or willful misconduct of such Indemnified Party or (b) violations by such Indemnified Party of this Interim Order, or from breaches by such Indemnified Party of the DIP Documents, in each case as determined by a court of competent jurisdiction in a final non-appealable judgment or order.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's (a) fraud, gross negligence or willful misconduct or (b) violations of this Interim Order or the DIP Documents.  All indemnities made or owed by any Debtor to the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

9.    <u>DIP Superpriority Claims</u>.  In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute senior administrative expense claims against each Debtor, on a joint and several basis, (the "<u>DIP Superpriority Claims</u>") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision

19

of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due under the Carve-Out; provided, further, that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, including, subject to the entry of the Final Order, avoidance actions and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

10.    DIP Liens.

(a)    As security for the DIP Obligations, immediately upon, and effective as of entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "DIP Liens") all DIP Collateral (as defined herein) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations.  The term "DIP Collateral" means all assets and properties (real and personal) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (ii) all funds in any deposit account, securities account or other account of the Debtors and all cash and other property deposited therein

20

US-DOCS\84494676.9

or credited thereto from time to time; (iii) all accounts and other receivables; (iv) all contract rights; (v) all instruments, documents and chattel paper; (vi) all securities (whether or not marketable); (vii) all goods, as-extracted collateral, equipment, inventory and fixtures; (viii) all real property interests; (ix) all interests in leaseholds, (x) all franchise rights; (xi) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xii) all general intangibles; (xiii) all capital stock, limited liability company interests, partnership interests and financial assets; (xiv) all investment property; (xv) all supporting obligations; (xvi) all letters of credit issued to the Debtors and letter of credit rights; (xvii) all Commercial Tort Claims; (xviii) all other claims and causes of action and the proceeds thereof (including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof (subject to entry of the Final Order)); (xix) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xx) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxi) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided, however, that the DIP Collateral shall not include Excluded Assets (as defined in the DIP Documents); provided, further, however, that the DIP Collateral shall include all proceeds and products of Excluded Assets.

(b)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the

consent or the payment of any fees or obligations to any entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Prepetition Agents and the Prepetition Lenders in accordance with this Interim Order.

11.    <u>Priority of DIP Liens</u>.

(a)    To secure the DIP Obligations, immediately upon, and effective as of entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date;

(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph), that are subject to Permitted Liens; and

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Adequate Protection Liens granted hereunder, subject to liens permitted under the DIP Credit Agreement.

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claim:  (i) shall not be made subject to or *pari passu* with (A) any lien, security

22

interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

12.    <u>Adequate Protection</u>.

(a)    As adequate protection of the interest of the Prepetition Secured Parties in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted:

(i)    subject to the limitations set forth below, payment upon demand of all fees, costs, expenses and other amounts payable (excluding payments on account of principal and interest, whether accrued or accruing before or after the Petition Date) under the terms of the Prepetition Loan Documents and all other reasonable out-of-pocket costs and expenses of the Prepetition Secured Parties in accordance with the terms of the Prepetition Loan Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of Stroock & Stroock & Lavan LLP, as counsel to the Prepetition Lenders, Young Conaway Stargatt & Taylor, LLP, as Delaware counsel to the Prepetition Lenders, Gardere Wynne Sewell LLP, as special energy and regulatory counsel to the Prepetition Lenders, Houlihan Lokey Capital, Inc., as financial advisor to the Prepetition Lenders, ICF Resources, LLC, as "curves" consultant to the Prepetition Lenders, and any other necessary or appropriate counsel, advisors, professionals and/or consultants in connection with advising the Prepetition Secured Parties), subject to receiving a written invoice therefor, and regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, <u>however</u>, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, counsel to the DIP Agent, and counsel to the Committee; <u>provided</u>, <u>further</u>, <u>however</u>, that such invoices may contain redactions, and for the avoidance of doubt, the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If any of the Debtors, the U.S. Trustee, the DIP Agent, or the Committee objects to the reasonableness of the fees and expenses of any Prepetition Secured Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors,

US-DOCS\84494676.9

the U.S. Trustee, the DIP Agent, or the Committee, as the case may be, shall file with the Court and serve on the Prepetition Secured Parties a Fee Objection. Professionals for the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Court, U.S. Trustee, the Committee or any other party-in-interest. The professional fees of the Prepetition Secured Parties shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code. The Debtors shall pay in accordance with the terms and conditions of this Interim Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed, in each case regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. All such fees, costs, expenses and other amounts owed or payable to the Prepetition Secured Parties shall be secured by the Prepetition Liens and Adequate Protection Liens (as defined herein), and afforded all of the priorities and protections afforded to the Prepetition Obligations under this Interim Order and the Prepetition Loan Documents;

(ii)    solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable and automatically perfected postpetition liens and security interests in the DIP Collateral (the "Adequate Protection Liens"), which liens shall be (x) junior only to the DIP Liens, Permitted Liens and the Carve-Out and (y) senior in priority to all other liens, including the Prepetition Liens. Except as expressly provided in this Interim Order or as otherwise agreed to by the parties, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Prepetition Obligations owed under the Prepetition Loan Documents are paid in full. The Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens;

(iii)    solely to the extent of the Diminution in Value of the interest of the Prepetition Secured Parties in the Prepetition Collateral from and after the Petition Date, superpriority administrative expense claims (the "Adequate Protection Claims"), which claim shall be (x) junior to the DIP Superpriority Claims and the Carve-Out, and (y) senior to and have priority over any administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any successor cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (A) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (B) any claims allowed pursuant to the obligations under the Prepetition Loan Documents.

24

The Adequate Protection Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, any and all claims (including Commercial Tort Claims) and causes of action and the proceeds thereof), including, subject to the entry of the Final Order, avoidance actions and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.  Except for the DIP Superiority Claims and the Carve-Out, the Adequate Protection Claims shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Prepetition Obligations owed under the Prepetition Loan Documents are paid in full;

(iv)    reasonable access to the Debtors' premises during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses and their books and records in accordance with this Interim Order and the Prepetition Loan Documents and the Debtors shall cooperate with, consult with, and provide to such persons all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of any of the Debtors.  In addition, the Debtors shall authorize each of their respective representatives, advisors (including independent certified public accountants, financial advisors and investment bankers), professionals, consultants, agents and/or employees, to cooperate and  consult with the Prepetition Secured Parties as reasonably requested from time to time; and

(v)    the Debtors shall comply with the Approved Budget, subject to Permitted Variances, and all Budget Variance Reporting requirements set forth herein and in the DIP Documents.

(b)    In the event that the Prepetition Obligations are irrevocably paid in full in cash and the Investigation Termination Date (as defined herein) has passed without any Challenge (as defined herein) filed against the Prepetition Secured Parties or otherwise relating to the Prepetition Liens or the Prepetition Obligations, the Debtors' obligation to provide the Prepetition Secured Parties the adequate protection pursuant to this paragraph 12 shall terminate on and as of the date of such payment or the Investigation Termination Date, whichever is later, without further notice to or action of any person.  In the event that any portion of the Prepetition Obligations is ordered by the Court to be reinstated or the proceeds of the repayment thereof are disgorged for reasons other than a successful challenge of the Prepetition Liens or the Prepetition

25

Obligations, for so long as such portion of the Prepetition Obligations remains outstanding, the adequate protection provided for in this paragraph 12 shall be reinstated with respect to such outstanding Prepetition Obligations until the Prepetition Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

(c)      Notwithstanding anything to the contrary contained in this Interim Order or in any DIP Documents, the DIP Liens in the DIP Collateral shall be senior to the Prepetition Liens and the Adequate Protection Liens, in each case, in such DIP Collateral.

(d)      Without limiting any rights of the Prepetition Secured Parties as set forth in this Interim Order, if there is a successful Challenge (as defined below) with respect to any portion of the interests of the Prepetition Secured Parties in the Prepetition Collateral pursuant to Paragraph 17 hereof, the Adequate Protection Liens and Adequate Protection Claims shall not apply solely with respect to that portion of the interests of the Prepetition Secured Parties in the Prepetition Collateral that was successfully challenged.

13.      <u>Adequate Protection Reservation; Section 507(b) Reservation</u>.  The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to seek additional forms of adequate protection at any time. Subject only to the Carve-Out described in paragraph 14 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in connection with any request for additional adequate protection by any party.

14.      <u>Carve-Out</u>.

(a)      As used in this Interim Order, the term "<u>Carve-Out</u>" shall mean the sum of the following:

26

(i)    all fees required to be paid, both prior to and after delivery of a Carve-Out Trigger Notice, to the Clerk of the Bankruptcy Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate (collectively, the "Statutory Fees");

(ii)    to the extent allowed by the Bankruptcy Court at any time, whether by interim order or procedural order, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors, their estates, or the Committee pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Estate Professionals") at any time before or on the date of the delivery by the DIP Agent at the direction of the Required DIP Lenders (as defined in the DIP Credit Agreement) of a Carve-Out Trigger Notice (as defined herein), whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice); provided, that, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice; and

(iii)    all unpaid fees, disbursements, costs and expenses incurred by the Estate Professionals on or after the day following the delivery by the DIP Agent at the direction of the Required DIP Lenders of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time (whether by interim order or procedural order), in an aggregate amount not to exceed $250,000 in total (for the avoidance of doubt, not on a professional-by-professional basis); provided, that, without duplication of the above reduction for retainers, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice (such amount set forth in this clause (iii), the "Post-Carve-Out Trigger Notice Cap", and, together with such amounts set forth in clauses (i) and (ii) above, the "Carve-Out").

(b)    As used herein, the term "Carve-Out Trigger Notice" means a written notice delivered by electronic mail by the DIP Agent (at the direction of the Required DIP Lenders) to counsel to the Debtors (Latham & Watkins LLP), the U.S. Trustee and counsel to any Committee, which notice (i) shall expressly state that the Carve-Out is triggered and (ii) can be delivered only by the DIP Agent upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or the Final Maturity Date (as defined in the DIP Credit Agreement), and in each case for which the termination of both funding under the DIP Credit Agreement and the consensual use of Cash Collateral has occurred.  Notwithstanding anything to the contrary

US-DOCS\84494676.9

contained in this Interim Order, any DIP Documents or any Prepetition Loan Documents, (a) the security interests, liens and claims granted to any of the DIP Parties or any of the Prepetition Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Adequate Protection Claims, Adequate Protection Liens, Prepetition Secured Obligations and Prepetition Liens) under, pursuant to or in connection with the DIP Facility, any DIP Document, this Interim Order, or any Prepetition Loan Document shall be subject to the payment in full in cash of the amounts due under the Carve-Out; and (b) after receipt of the Carve-Out Trigger Notice and for purposes of determining the source of payment only, the Carve-Out (other than Statutory Fees) shall be paid from the following sources in the following order:  first, from any unused retainers held by or on behalf of the Estate Professionals; second, from the Debtors' unencumbered funds (if any); third, from proceeds of the Prepetition Collateral that do not constitute DIP Collateral; and, fourth, from proceeds of DIP Collateral.

(c)     After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Estate Professionals, at the email addresses and facsimile numbers set forth in each Estate Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Estate Professional's last known email address and facsimile number) and by filing a notice thereof on the docket of the Bankruptcy Court within two (2) Business Days after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out.

(d)     Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Interim Order: (i) the Debtors shall be

28

permitted to pay administrative expenses of Estate Professionals allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, as the same may become due and payable, including on an interim basis and (ii) such payments shall not reduce, or be deemed to reduce, the Carve-Out.

(e)        Nothing in this Interim Order shall or shall be construed to limit the payment following the delivery of a Carve-Out Trigger Notice of any of the amounts included in the Carve-Out from Cash that is not Cash Collateral.  Further, notwithstanding anything to the contrary contained in this Interim Order or any DIP Document (other than with respect to the Post-Carve-Out Trigger Notice Cap), in no way shall the Approved Budget or Carve-Out operate or be construed as a cap or limitation on the amount of professional fees, costs and expenses due and payable by the Debtors to the extent allowed by the Bankruptcy Court at any time whether by interim order or procedural order.

(f)        Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Estate Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Parties, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment of any amounts incurred or requested.

15.        Limitation on Use of Cash Collateral and DIP Facility Proceeds. Notwithstanding anything herein to the contrary, except for the Maximum Investigation Budget (as defined below) which can be utilized by the Committee solely in accordance with Paragraph 17 hereof, no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with any of the following: (i) the

US-DOCS\84494676.9

investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties or Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in each case in their respective capacities as such and with respect to any transaction, occurrence, omission, action or other matter related to any Debtor (including formal discovery proceedings in anticipation thereof) (each, a "Loan Party Claim"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations or Prepetition Liens, (c) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties, (d) investigating or asserting any so-called "lender liability" claims and causes of action against the Prepetition Secured Parties or the DIP Parties and (e) investigating or asserting any action seeking to invalidate, set aside, avoid or (other than as contemplated by this Interim Order, and Bankruptcy Code section 510(a)) subordinate, in whole or in part, the Prepetition Secured Obligations or the DIP Loans; (ii) the assertion of any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the liens securing the Prepetition

30

US-DOCS\84494676.9

Secured Obligations in accordance with this Interim Order (including attempting to stay the exercise of any right or remedy described in clause (e), clause (f) or clause (g) of paragraph 24 of this Interim Order); (iii) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Loan Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) the payment of any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by the DIP Agent and (y) in accordance with the DIP Credit Agreement or (z) are approved by order of the Bankruptcy Court; or (v) any purpose that is prohibited under the Bankruptcy Code; _provided_, _however_, that no more than $25,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral or the Cash Collateral may be used by any Committee to investigate any Loan Party Claim (the "Maximum Investigation Budget").

        16.     Protection of DIP Lenders' Rights and Adequate Protection Liens.  So long as there are any DIP Obligations outstanding under the DIP Credit Agreement, the Prepetition Agents and the Prepetition Lenders shall (a) have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Prepetition Loan Documents), (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or

otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to the DIP Documents and/or this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the Prepetition Lenders shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of the Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

17.     <u>Reservation of Certain Third Party Rights</u>.   The Committee (if granted standing) shall have a maximum of sixty (60) calendar days from the date of the Committee's appointment, and any other party in interest (if granted standing) (other than the Debtors) shall have a maximum of seventy five (75) calendar days from entry of this Interim Order (collectively, the "<u>Investigation Termination Date</u>") to commence an appropriate contested matter or adversary proceeding (a "<u>Challenge</u>") asserting any Loan Party Claim; <u>provided</u>, <u>however</u>, that if the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the earlier of (x) a determination by the Committee not to bring a Challenge, or (y) the expiration of the Investigation Termination Date, then a chapter 7 trustee  appointed in the chapter 7 cases (and only a chapter 7 trustee) shall have an additional thirty (30) days after the chapter 7 trustee's appointment in which to bring a Challenge.  If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as ordered by this Court or extended by the written consent of the

Prepetition Agents at the direction of the Prepetition Lenders or the DIP Agent at the direction of the Required DIP Lenders), then: (a) the agreements, acknowledgements and stipulations contained in paragraph C of this Interim Order shall be irrevocably binding on the Debtors, any Committee, all creditors of the Debtors, and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, without further action by any party or this Court, and the Debtors, any Committee, all creditors of the Debtors, and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Liens of the Prepetition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Secured Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, in the amounts set forth in paragraph C, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Parties (whether in their prepetition or postpetition capacity), together with each of their respective affiliates, parents, subsidiaries, partner, controlling persons, agents, attorneys, professionals, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in paragraph C of this Interim Order shall nonetheless remain binding and preclusive on

33

all parties-in-interest (other than the party that has brought such Challenge in connection therewith and then only with respect to the stipulations that are subject to the Challenge and not to any stipulations not subject to the Challenge) except to the extent that such stipulations are successfully challenged in such Challenge; and (y) the Prepetition Secured Parties and the DIP Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge.  For the avoidance of doubt, nothing in this Interim Order vests or confers on the Committee or any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.

18.    <u>Bankruptcy Code Section 506(c) Waiver</u>.  Without limiting the Carve-Out, subject to the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any subsequent chapter 7 cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order).

19.    <u>No Marshaling/Application of Proceeds</u>.  Subject to the Final Order, in no event shall the DIP Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable), and all proceeds thereof shall be received and used in accordance with

34

this Interim Order.  In the event that the DIP Obligations are paid in full in cash by the Debtors pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Debtors, if any, that were not the subject of a valid, perfected lien or security interest on the Petition Date (the "<u>Unencumbered Assets</u>"), the proceeds of such Unencumbered Assets shall be deemed applied first to the DIP Obligations until the DIP Obligations are paid in full.

20.    <u>Section 552(b)</u>.  Upon entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral.

21.    <u>Disposition of Collateral; Application of Proceeds</u>.  Except as expressly permitted by the DIP Credit Agreement, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Prepetition Collateral other than in the ordinary course of business without an order of the Court or the prior written consent of the DIP Agent (subject to the consent of the Required DIP Lenders).  Notwithstanding anything otherwise provided herein, upon the sale of all or substantially all of the collateral secured by the DIP Liens, the Debtors shall, subject to the satisfaction of the Carve-Out and the Permitted Liens, use cash in an amount equal to 100% of any net cash proceeds of such sale to immediately satisfy the DIP Obligations.

22.    <u>Proceeds of Subsequent Financing</u>.   Unless otherwise ordered by the Court, if at any time prior to the repayment in full of the DIP Obligations, any of the Debtors or any trustee obtains credit or incurs debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code, whether or not in violation of the DIP Documents or this Interim Order, then all of the cash

proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent and distributed in accordance with the terms of the DIP Documents.

23.    <u>Automatic Effectiveness of Liens</u>.  The DIP Liens and Adequate Protection Liens shall not be subject to a Challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or any of the applicable Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  Subject to paragraph 16 above, if the DIP Agent or the Prepetition Agents hereafter requests that the Debtors execute and deliver to the DIP Agent or the Prepetition Agents, as applicable, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent or the Prepetition Agents, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or Adequate Protection Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent or the Prepetition Agents, as applicable, is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date; <u>provided</u>, <u>however</u>, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and the Adequate Protection Liens.  The DIP

Agent and the Prepetition Agents, as applicable, each in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

24.    <u>Automatic Stay; Rights and Remedies Upon Event of Default</u>.  Subject to the following sentences of this paragraph, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Documents, including, without limitation, to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may reasonably request, to assure the perfection and priority of the DIP Liens and any other liens granted hereunder; (b) the Debtors to take all appropriate actions necessary to (i) grant the Adequate Protection Liens, Adequate Protection Claims, or any other liens or claims set forth herein, and (ii) ensure that the Adequate Protection Liens or any other liens granted hereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations (including all the DIP Obligations) to the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders as contemplated under this Interim Order and the DIP Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Documents and this Interim Order; (e) the DIP Parties, the Prepetition Agents and the Prepetition Lenders to retain and apply payments made in accordance with the DIP Documents and this Interim Order; and (f) subject to the proviso below in this paragraph 24, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Documents, all rights and remedies provided for in the DIP Documents and take any or all actions

provided therein, in each case without further notice, motion, application to, order of, or hearing before, this Court.  Moreover, subject to the provisions of the DIP Documents and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Parties (or any of their respective agents) to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Documents, all rights and remedies provided for in the DIP Documents, and to take any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court: (a) subject to the Carve-Out, immediately terminate the Debtors' rights, if any, under this Interim Order or the DIP Credit Agreement to use Cash Collateral; (b) cease making any DIP Loans to the Debtors (but without effecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations); (c) declare the Individual Commitments of each DIP Lender to make further DIP Loans to be terminated, whereupon such Individual Commitments and obligation shall be terminated; (d) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; (e) subject to the Carve-Out, freeze monies or balances in the Debtors' accounts; (f) subject to the Carve-Out, immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders (or any of their respective agents), against the DIP Obligations, enforce all rights and remedies against the DIP Collateral in the possession of any of the DIP Lenders, for application towards the DIP Obligations, and otherwise proceed to protect or enforce all rights and remedies of the DIP Parties under the DIP Credit Agreement, any of the other DIP Documents or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the

US-DOCS\84494676.9

specific performance of any covenant or agreement contained in the DIP Credit Agreement or the other DIP Documents, as applicable, or any instrument pursuant to which the DIP Obligations, are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Parties; and (g) subject to the Carve-Out, take any other actions or exercise any other rights or remedies permitted under this Interim Order or the Final Order, as applicable, the DIP Documents, or applicable law to effectuate the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right or remedy described in clauses (e), (f) or (g) of this paragraph, the DIP Agent shall be required to provide five (5) Business Days' written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to any Committee, counsel to the DIP Parties, counsel to the Prepetition Secured Parties and the U.S. Trustee.  Unless the Court orders otherwise, at the end of the five (5) Business Day notice period, the automatic stay, as to the DIP Parties, shall automatically be terminated at the end of such notice period, without further notice or order, and, upon expiration of such notice period, the DIP Parties shall be permitted, subject to the Carve-Out, to exercise all rights and remedies set forth in this Interim Order, the DIP Credit Agreement and the other DIP Documents, as applicable, and as otherwise available at law, including, but not limited to, the right to foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice, motion or application to, order of or hearing before, this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.  The rights and remedies of the DIP Parties specified herein are cumulative and not exclusive of any rights or

US-DOCS\84494676.9

remedies that the DIP Parties may have under the DIP Documents or otherwise.  The Debtors and any Committee (solely with respect to the Committee, subject to entry of the Final Order) shall cooperate with the DIP Parties in their exercise of their rights and remedies, whether against the DIP Collateral or otherwise, shall not challenge or raise any objections to the exercise of such rights and shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Interim Order and in the DIP Documents.  For the avoidance of doubt, no party in interest shall have the right to contest the enforcement of the rights and remedies set forth in this Interim Order or the DIP Documents on any basis other than an assertion that no Event of Default has occurred and is continuing.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.  The delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order by the DIP Agent and the DIP Lenders shall not constitute a waiver of the applicable DIP Agent's or the DIP Lender's rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents and this Interim Order, as applicable.

25.    Third Party Access.  Subject to entry of the Final Order, without limiting any other rights or remedies of the DIP Agent or the DIP Lenders available at law or in equity, and subject to the terms of the DIP Documents, upon three (3) Business Days' written notice to counsel to the Debtors, counsel to any Committee, any lienholder, licensor, or other third party owner of any licensed premises or intellectual property, that an Event of Default has occurred and is continuing, the DIP Agent, (i) may, unless otherwise expressly provided in any separate agreement

40

by and between the applicable licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph 25 without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agent (on behalf of the DIP Lenders) shall pay only fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated on a per diem basis.   Nothing herein shall require the Debtors, the DIP Agent or the DIP Lenders, to assume any license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to each of the foregoing in this paragraph 25.

   26. <u>Maintenance of DIP Collateral</u>.   Unless the DIP Agent (at the direction of the Required DIP Lenders) may otherwise consent in writing, until (x) the indefeasible payment in full or otherwise acceptable satisfaction of (i) all adequate protection obligations owing to the the DIP Agent and the DIP Lenders and (ii) all DIP Obligations and (y) the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall (a)  insure the DIP Collateral as required under the DIP Facilities and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents with the consent of the DIP Parties.

US-DOCS\84494676.9

27.    <u>Binding Effect</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties and their respective successors and assigns, including without limitation, any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

28.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any chapter 11 plan in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Documents and the Adequate Protection Liens and Adequate Protection Claims shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Documents, as applicable, and to the maximum extent permitted by law, until all of the DIP Obligations and Prepetition Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a chapter 11 plan.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Documents unless agreed to by and among the Debtors and the DIP Parties.

29.    <u>Modifications of DIP Documents</u>.  Subject to the limitations set forth below, the Debtors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications or amendments (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the

42

DIP Documents without further notice, motion or application to, order of or hearing before, this Court.  Any proposed material modification or amendment to the DIP Documents shall (i) be filed on the Court's docket and (ii) provide parties-in-interest five (5) Business Days from the date of filing of such material modification or amendment to object in writing to such amendment, and if no objections are received, shall be submitted under certification of counsel; provided, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant, representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Documents, shall not require an order of this Court.  If no objections are timely received during such five (5) Business Day notice period, the Debtors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Documents, such material modification or amendment, without further notice, hearing or approval of this Court.  Any proposed material modification or amendment to the DIP Documents that is subject to a timely filed objection in accordance with this paragraph shall be subject to further order of this Court.

30.    Insurance Policies.  Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Agent, on behalf of the DIP Lenders, shall be, and shall be deemed to be, without any further action by or notice to any person, named as a loss payee.  The Debtors are hereby authorized to and shall take any actions necessary to have the DIP Agent and the DIP Lenders (as applicable) be added as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

43

31.    <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the record of these Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the DIP Parties, or adequate protection obligations owing to the applicable Prepetition Secured Party, incurred prior to the actual receipt by the DIP Agent or Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any DIP Loans or other advances previously made or any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations owing to the DIP Agent or the DIP Lenders or any adequate protection obligations owing to the applicable Prepetition Secured Party.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral, incurrence of DIP Obligations or incurrence of adequate protection obligations by the Debtors prior to the actual receipt by the DIP Agent, or the Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Parties and the applicable Prepetition Secured Party shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations.

32.    <u>Effect of Dismissal or Conversion of Chapter 11 Cases</u>.  If the Chapter 11 Cases are dismissed or converted, then such dismissal or conversion of the Chapter 11 Cases shall

not affect the rights of the DIP Parties and the Prepetition Secured Parties under their respective DIP Documents, Prepetition Loan Documents, or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed or converted.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Interim Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties), (ii) all Prepetition Liens, Adequate Protection Liens and Adequate Protection Claims granted to and conferred upon the applicable Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Secured Obligations shall have been paid and satisfied in full in cash (and that such Adequate Protection Liens and Adequate Protection Claims shall, notwithstanding such dismissal, remain binding on all interested parties); and (iii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Claims referred to herein.

33.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Parties and the Prepetition Secured Parties shall not be required to file proofs of

claim in the Chapter 11 Cases for any claim allowed herein.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

34.    <u>Credit Bidding</u>.  Upon entry of the Final Order and subject to the terms of the DIP Documents:  (i) the DIP Agent shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of the DIP Obligations during any sale of the Debtors' assets (in whole or in part), including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code; and (ii) the Debtors acknowledge that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of their respective claims, including, for the avoidance of doubt, adequate protection claims, if any, during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Secured Parties as of the Petition Date, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code.

35.    <u>Rights of Access and Information</u>.  The representatives, advisors, professionals, consultants, agents and/or employees of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be afforded reasonable access to the Debtors' premises during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses and their books and records in accordance with this Interim Order, the DIP Documents and the Prepetition Loan Documents and the Debtors shall reasonably cooperate with,

46

consult with, and provide to such persons all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of any of the Debtors. In addition, the Debtors shall authorize each of their respective representatives, advisors (including independent certified public accountants, financial advisors and investment bankers), professionals, consultants, agents and/or employees, to cooperate and consult with the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as reasonably requested from time to time.

36.    <u>Voting Rights</u>.  Except as expressly otherwise set forth herein, nothing in this Interim Order shall be construed to convey on any DIP Lender or any Prepetition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Documents or the Prepetition Loan Documents, as applicable.

37.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

38.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations hereunder, including without limitation, the DIP Superpriority Claims and the Adequate Protection Claims in accordance with the terms of the DIP Facility and the DIP Documents.

39.    <u>Limitations on Liability.</u>  Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Loan Documents, as applicable,

US-DOCS\84494676.9

none of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*., as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

40.    <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

US-DOCS\84494676.9

41.     <u>Choice of Law; Jurisdiction</u>.  The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) provide that they shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

42.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts with any provision of the Motion or any DIP Document, the provisions of this Interim Order shall control.

43.     <u>Service</u>.  Service of this Interim Order and notice of a final hearing shall be made upon the parties described in paragraph J of this Interim Order, any Committee (if and when it is appointed), and any person who, as of the date hereof, has filed a notice pursuant to Bankruptcy Rule 2002.

44.     <u>Objections</u>.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (prevailing Eastern time) on April __, 2017, with a copy served upon: (i) counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: Keith A Simon, Esq. and Annemarie Reilly, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Paul N. Heath, Esq. and Brendan J. Schlauch, Esq.); (ii) counsel to the DIP Lenders and the Prepetition Lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq. and Jonathan Canfield, Esq.) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn:

49

Matthew Lunn, Esq. and Edmon Morton, Esq.); (iii) counsel to the Prepetition Agents, _____,

_____ (Attn: _____); (iv) counsel to be selected by the Committee upon its

formation if selected by such date, and (v) the Office of the United States Trustee, 844 King Street,

Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: _____).

        45.    <u>Final Hearing</u>.  A final hearing on the Motion shall be heard before this

Court on _____, 2017 at _____ in Courtroom No. __ at the United States Bankruptcy Court, 824

Market Street, Wilmington, DE 19801.

Dated:  April  _____, 2017.
       Wilmington, Delaware        _____
                              THE HON. LAURIE SELBER SILVERSTEIN
                              UNITED STATES BANKRUPTCY JUDGE

US-DOCS\84494676.9

# **EXHIBIT A**

## **DIP CREDIT AGREEMENT**

*SSL Draft 4/17/17*

**$[20],000,000**

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION**

**CREDIT AGREEMENT**

Dated as of April [_], 2017

by and among

PANDA TEMPLE POWER, LLC
as Borrower,

PANDA TEMPLE POWER INTERMEDIATE HOLDINGS II, LLC
as Parent,

THE LENDERS NAMED HEREIN
as Lenders,

and

WILMINGTON SAVINGS FUND SOCIETY, FSB
as Administrative Agent and Collateral Agent,

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS AND ACCOUNTING TERMS ............................................. 2

   Section 1.01      Certain Defined Terms.................................................................. 2
   Section 1.02      Computation of Time Periods; Other Definitional Provisions.................... 32
   Section 1.03      Accounting Terms...................................................................... 33

ARTICLE II     AMOUNTS AND TERMS OF THE ADVANCES ..................................... 33

   Section 2.01      The Advances........................................................................... 33
   Section 2.02      Making the Advances ................................................................. 33
   Section 2.03      [Reserved.]............................................................................. 34
   Section 2.04      [Reserved.]............................................................................. 34
   Section 2.05      Repayment of Advances .............................................................. 34
   Section 2.06      Termination or Reduction of the Commitments .................................. 34
   Section 2.07      Prepayments............................................................................ 35
   Section 2.08      Interest .................................................................................. 36
   Section 2.09      Fees ...................................................................................... 36
   Section 2.10      Conversion of Advances .............................................................. 37
   Section 2.11      [Reserved]............................................................................... 37
   Section 2.12      Increased Costs, Etc ................................................................... 37
   Section 2.13      Payments and Computations ......................................................... 38
   Section 2.14      [Taxes.................................................................................... 40
   Section 2.15      Sharing of Payments, Etc ............................................................ 43
   Section 2.16      Use of Proceeds........................................................................ 44
   Section 2.17      Evidence of Debt....................................................................... 44
   Section 2.18      Minimizing Additional Costs; Replacement of Lenders ........................ 44
   Section 2.19      Defaulting Lender Adjustments ..................................................... 45

ARTICLE III    CONDITIONS TO EFFECTIVENESS AND OF LENDING ........................ 46

   Section 3.01      Conditions Precedent to the Closing Date ......................................... 46
   Section 3.02      Conditions to all Advances .......................................................... 50
   Section 3.03      Determinations Under Section 3.01 and Section 3.02 ........................... 51

ARTICLE IV     REPRESENTATIONS AND WARRANTIES........................................... 51

   Section 4.01      Representations and Warranties...................................................... 51

ARTICLE V      AFFIRMATIVE COVENANTS ......................................................... 61

   Section 5.01      Compliance with Laws, Etc .......................................................... 61
   Section 5.02      Payment of Taxes, Payment of Obligations,...................................... 61
   Section 5.03      Compliance with Environmental Laws ............................................. 61
   Section 5.04      Maintenance of Insurance ............................................................ 62
   Section 5.05      Preservation of Corporate Existence, Etc ......................................... 62
   Section 5.06      Visitation Rights, Etc ................................................................. 62
   Section 5.07      Keeping of Books ..................................................................... 62
   Section 5.08      Maintenance of Properties, Etc ..................................................... 62
   Section 5.09      Covenant to Give Security ........................................................... 62
   Section 5.10      Further Assurances..................................................................... 63
   Section 5.11      Enforcement of Contracts ............................................................ 64
   Section 5.12      [Reserved].............................................................................. 64

US-DOCS\84991600.4NY 76593820v2

Section 5.13    Accounts ......................................................................................... 64
Section 5.14    [Reserved.] .................................................................................... 64
Section 5.15    Separateness .................................................................................. 64
Section 5.16    [Reserved] ..................................................................................... 65
Section 5.17    Commodity Hedging ...................................................................... 65
Section 5.18    [Reserved.] .................................................................................... 65
Section 5.19    Sales Authority; EWG, PUCT etc. ................................................. 65
Section 5.20    Operation and Maintenance of the Project ...................................... 65
Section 5.21    [Reserved] ..................................................................................... 65
Section 5.22    Cash Management  and Cash Management Order. ............................ 65
Section 5.23    Milestones. ..................................................................................... 65
Section 5.24    Lender Meetings. ............................................................................ 66

ARTICLE VI    NEGATIVE COVENANTS ............................................................ 66

Section 6.01    Liens, Etc ...................................................................................... 66
Section 6.02    Debt. .............................................................................................. 66
Section 6.03    Nature of Business ......................................................................... 67
Section 6.04    Mergers, Etc .................................................................................. 67
Section 6.05    Sales, Etc. of Assets ...................................................................... 67
Section 6.06    Investments in Other Persons ......................................................... 68
Section 6.07    Restricted Payments ...................................................................... 68
Section 6.08    Transactions with Affiliates ........................................................... 68
Section 6.09    Amendments of Constituent Documents ......................................... 68
Section 6.10    Accounting Changes ...................................................................... 68
Section 6.11    Prepayments of Debt ...................................................................... 68
Section 6.12    Amendment of Material Project Contracts, Etc ............................... 69
Section 6.13    Partnerships, Formation of Subsidiaries, Etc .................................. 69
Section 6.14    Speculative Transactions ............................................................... 69
Section 6.15    Capital Expenditures ...................................................................... 69
Section 6.16    Additional Project Agreements ...................................................... 69
Section 6.17    Lease Transactions ........................................................................ 69
Section 6.18    ERISA Plans .................................................................................. 69
Section 6.19    Accounts ........................................................................................ 70
Section 6.20    Use of Proceeds ............................................................................. 70
Section 6.21    Chapter 11 Cases. .......................................................................... 70

ARTICLE VII    REPORTING COVENANTS .......................................................... 71

Section 7.01    Default and Material Adverse Effect Notice .................................... 71
Section 7.02    Annual Financials .......................................................................... 71
Section 7.03    Scheduled Financials ..................................................................... 71
Section 7.04    [Reserved] ..................................................................................... 72
Section 7.05    Litigation ....................................................................................... 72
Section 7.06    Creditor Reports ............................................................................ 72
Section 7.07    Agreement Notices, Etc ................................................................. 72
Section 7.08    Environmental Conditions .............................................................. 72
Section 7.09    Additional Reporting ..................................................................... 72
Section 7.10    Insurance ....................................................................................... 73
Section 7.11    Lien Waivers .................................................................................. 73
Section 7.12    Operating Reports .......................................................................... 73
Section 7.13    Notices, Etc ................................................................................... 73
Section 7.14    Other Information ........................................................................... 74

ii

ARTICLE VIII FINANCIAL COVENANTS ........................................................................ 74

Section 8.01    Total Expenditures; Total Receipts............................................. 74
Section 8.02    Minimum Liquidity....................................................................... 74

ARTICLE IX    EVENTS OF DEFAULT ................................................................................ 74

Section 9.01    Events of Default .......................................................................... 75

ARTICLE X    THE AGENTS ................................................................................................ 81

Section 10.01    Authorization and Action .......................................................... 81
Section 10.02    Agents Individually..................................................................... 82
Section 10.03    Duties of Agents; Exculpatory Provisions ............................... 83
Section 10.04    Reliance by Agents ..................................................................... 84
Section 10.05    Delegation of Duties ................................................................... 84
Section 10.06    Resignation of Agents; Removal of Administrative Agent ......... 84
Section 10.07    Non-Reliance on Agents and Other Lender Parties .................... 85
Section 10.08    No Other Duties, Etc................................................................... 86
Section 10.09    Indemnification ........................................................................... 86
Section 10.10    Withholding ................................................................................. 87
Section 10.11    Consultants.................................................................................. 87
Section 10.12    Credit Bidding............................................................................. 87

ARTICLE XI    MISCELLANEOUS ...................................................................................... 88

Section 11.01    Amendments, Etc......................................................................... 88
Section 11.02    Notices, Etc.................................................................................. 89
Section 11.03    No Waiver; Remedies .................................................................. 92
Section 11.04    Costs and Expenses; Indemnification ........................................ 93
Section 11.05    Right of Set-off ........................................................................... 95
Section 11.06    Binding Effect.............................................................................. 95
Section 11.07    Assignments and Participations .................................................. 95
Section 11.08    Execution in Counterparts ........................................................... 99
Section 11.09    [Waiver of Certain Bankruptcy Code Provisions.]........**Error! Bookmark not defined.**
Section 11.10    Confidentiality ............................................................................ 99
Section 11.11    Patriot Act Notice ....................................................................... 99
Section 11.12    Jurisdiction, Etc. ....................................................................... 100
Section 11.13    Governing Law .......................................................................... 100
Section 11.14    Waiver of Jury Trial .................................................................. 100
Section 11.15    [Reserved].................................................................................. 101
Section 11.16    Reinstatement............................................................................ 101
Section 11.17    No Immunity .............................................................................. 101
Section 11.18    Severability................................................................................ 101
Section 11.19    Complete Agreement ................................................................. 101
Section 11.20    Usury Savings Clause ................................................................ 102
Section 11.21    Waiver........................................................................................ 102
Section 11.22    Electronic Execution of Assignments ....................................... 102
Section 11.23    No Fiduciary Duty ..................................................................... 102
Section 11.24    Obligations Several; Independent Nature of Lenders' Rights ...... 103
Section 11.25    Independence of Covenants ...................................................... 103

iii

## SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT[1]

SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of April, [_], 2017 (this "*Agreement*"), by and among PANDA TEMPLE POWER, LLC, a Delaware limited liability company, as borrower and as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below) (the "*Borrower*"), the other Loan Parties signatory hereto, the Lenders (as defined below), ,Wilmington Savings Fund Society, FSB, a federal savings bank ("*WSFS*"), as collateral agent (collectively with any permitted successors and assigns, the "*Collateral Agent*") for the Secured Parties (as defined below), and WSFS, as administrative agent (together with any successor administrative agent appointed pursuant to Article X, the "*Administrative Agent*") for the Lender Parties (as defined below).

## PRELIMINARY STATEMENTS:

WHEREAS, each Loan Party filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on the Petition Date.

WHEREAS, each of the Loan Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower is the owner of the Project (as defined below) and is engaged in the operation of the Project.

WHEREAS, prior to the Petition Date, the Prepetition Senior Lenders provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of March 6, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition Senior Loan Agreement*"), by and among the Borrower, the Parent, the Prepetition Senior Lenders, the administrative agent, the collateral agent, the co-documentation agents, the financial institutions each party thereto as letter of credit issuing banks, the joint lead arrangers, the joint book running managers and the co-syndication agents party thereto.

WHEREAS, the Loan Parties have and each Loan Party has requested the Lenders to provide a credit facility (the "*Facility*") to the Borrower in an aggregate principal amount of $[20],000,000 (or such higher amount permitted by and in accordance with the terms hereunder) for the purposes described herein and on the terms and conditions set forth herein.

WHEREAS, the Lenders are willing to make the requested credit facility available on the terms and conditions set forth herein.

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrower and other Loan Parties hereunder, the Loan Parties have agreed to provide the Collateral Agent and the Lenders, in each case, subject to the Carve-Out (as defined herein), with the first-priority Liens on the Collateral (as defined herein).

WHEREAS, the Parent, as the sole member of the Borrower, has agreed to secure all of the Obligations of the Loan Parties under the Loan Documents by granting to the Collateral Agent, for the benefit of the Secured Parties, first-priority Liens on 100% of the membership interests in the Borrower.

---

[1] NTD: To discuss interplay of Security Deposit Agreement and DIP Facility

WHEREAS, as of the date hereof, (a) the Sponsor owns all of the Equity Interests in Panda Temple Power I, (b) Panda Temple Power I owns all of the Equity Interests in the Parent and (c) the Parent owns all of the Equity Interests in the Borrower.

WHEREAS, the Lender Parties have indicated their willingness to agree to lend such amounts and provide such letters of credit on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*3M*" means the Employee Retirement Income Plan Trust of the Minnesota Mining and Manufacturing Company, a trust organized under the laws of Massachusetts.

"*AA Request*" has the meaning specified in Section 5.09(a).

"*Acceptable Bank*" means any commercial bank or financial institution having a long-term unsecured senior debt or issuer rating of Baa1 or better by Moody's and BBB+ or better by S&P.

"*Account Control Agreement*" means any agreement entered into by and among the Collateral Agent, the Borrower and a third party bank or other institution (including a Securities Intermediary (as such term is defined in the Uniform Commercial Code)) in which the Borrower maintains a Deposit Account or Investment Property (as each such term is defined in the Uniform Commercial Code) and which is intended to perfect the Collateral Agent's security interest in any account.

"*Accounts*" means (a) the "Accounts" under and as defined in the Security Deposit Agreement, (b) the "O&M Checking Account" under and as defined in the Security Deposit Agreement, (c) the accounts established in accordance with the Cash Management Order and (d) the Utilities Account.

"*Activities*" has the meaning specified in Section 10.02(b).

"*Additional Project Agreement*" has the meaning specified in the defined term "*Material Project Contracts*".

"*Adequate Protection Provisions*" means the provisions in paragraphs 12 and 13 of the Interim Order or the Final Order, as applicable, providing for adequate protection to the Prepetition Senior Loan Lenders.

"*Adjusted LIBO Rate*" means, for any LIBOR Advance for any Interest Period therefor, the rate *per annum* determined by the Administrative Agent to be equal to the quotient obtained by dividing (a) LIBOR for such LIBOR Advance for such Interest Period by (b) 1 minus the Reserve Requirement for such LIBOR Advance for such Interest Period. For the avoidance of doubt, the Adjusted LIBO Rate

payable by the Borrower for all LIBOR Advances in respect of Advances shall in no event be less than 1.00% *per annum* at any time.

"*Administrative Agent*" has the meaning specified in the recital of parties to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lender Parties from time to time.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Advance*" has the meaning specified in Section 2.01(a).

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition and for purposes of the definition of "*Change of Control*", the term "*control*" (including the terms "*controlling,*" "*controlled by*" and "*under common control with*") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agency Agreement*" means that certain Agency Agreement dated July 10, 2012, by and between the Borrower and Twin Eagle.

"*Agent Parties*" has the meaning specified in Section 11.02(c).

"*Agents*" means, individually or collectively, as the context may require, the Administrative Agent, the Collateral Agent and the Depositary.

"*Agreement*" has the meaning specified in the recital of parties to this Agreement.

"*Agreement Value*" means, without duplication, for any Interest Rate Agreement or Commodity Agreement, on any date of determination, an amount equal to the amount, if any, that is due and payable by the Borrower to its counterparty to such Interest Rate Agreement or Commodity Agreement in accordance with its terms as a result of such Interest Rate Agreements or Commodity Agreement having been terminated early.

"*Anti-Corruption Laws*" has the meaning specified in Section 4.01(ll)(ii).

"*Applicable Governmental Authorization*" means, as of any date of determination, any Governmental Authorization, including, without limitation, all environmental, regulatory and other permits and approvals, that is necessary to be obtained by or on behalf of the Project or the Borrower at such time in light of the stage of operation of the Project in order to (a) enable the Borrower to operate, maintain, repair, own its interest in, or use the Project in accordance with Requirements of Law and as otherwise contemplated by the Core Transaction Documents, (b) sell electricity, capacity or ancillary services from the Project, (c) enter into any Core Transaction Document or (d) consummate and/or perform any transaction or obligation contemplated hereby or thereby.

"*Applicable Margin*" means, (i) 9.00% *per annum* in the case of LIBOR Advances and (ii) 8.00% *per annum* in the case of Base Rate Advances.

"***Appropriate Lender***" means, at any time, a Lender that has a Commitment or is owed any outstanding Advances with respect to the Facility at such time.

"***Approved Budget***" means the Initial Budget, as updated pursuant to Section 7.09(b) to the extent such update is in form and substance satisfactory to the Required Lenders.

"***Approved Fund***" means any Fund that is administered or managed by (a) a Lender Party, (b) an Affiliate of a Lender Party or (c) an entity (including an investment adviser or investment sub-adviser) or an Affiliate of an entity that administers or manages a Lender Party.

"***Asset Sale***" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including (a) any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith and (b) any sale and leaseback transaction and any sale, transfer, license or other disposition.

"***Asset Sale Proceeds***" means (a) with respect to any Asset Sale that is not permitted pursuant to Section 6.05 and (b) any Asset Sale pursuant to Section 6.05(b), the sum of (a) Net Cash Proceeds payable to the Loan Parties in connection with such Asset Sale *plus* (b) the amount of any Termination Payments, if any, due and payable (or that become due and payable) to the Loan Parties as a result of the termination of the Initial Commodity Agreement in connection with such Asset Sale.

"***Assignment and Assumption***" means an assignment and assumption entered into by a Lender Party and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.07 or by the definition of "***Eligible Assignee***"), and accepted by the Administrative Agent, in accordance with Section 11.07 and in substantially the form of Exhibit A hereto or any other form approved by the Administrative Agent.

"***Assistant Secretary***" means, as to any Person, the individual performing on behalf of such Person the duties customarily performed by an assistant secretary of a business corporation, whether or not such individual has been appointed as the "*assistant secretary*" of such Person.

"***Atmos Gas Transportation Agreement***" means the Interruptible Natural Gas Transportation Agreement, dated with an effective date of January 1, 2014, between the Borrower and Atmos Pipeline-Texas, a division of Atmos Energy Corporation, a Texas corporation.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "***Bankruptcy***", as now and hereafter in effect, or any successor statute.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"***Bankruptcy Law***" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and any similar federal, state or foreign law for the relief of debtors affecting the rights of creditors generally.

"***Base Rate***" means a fluctuating interest rate *per annum* in effect from time to time, which rate *per annum* shall at all times be equal to the highest of:

(a)    the rate of interest announced publicly by the Wall Street Journal in New York, New York, from time to time, as the prime rate;

(b)    ½ of 1% *per annum* above the Federal Funds Rate; and

(c)    the Adjusted LIBO Rate for one-month commencing on such date *plus* 1%;

provided, that, for all Base Rate Advances, Base Rate shall in no event be less than 2.00% per annum at any time.

Any changes in the Base Rate due to a change in the prime rate or the Federal Funds Rate shall be effective on the effective date of such change in the prime rate or Federal Funds Rate.

"*Base Rate Advance*" means an Advance that bears interest as provided in Section 2.08(a)(i).

"*Bechtel*" means Bechtel Power Corporation, a Nevada corporation.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States of America.

"*Borrower*" has the meaning specified in the recital of parties to this Agreement.

"*Borrower Financial Statements*" has the meaning specified in Section 3.01(a)(xv).

"*Borrowing*" means the borrowing comprising of simultaneous Advances of the same Type made by the Lenders.

"*Business Day*" means a day of the year (other than a Saturday or a Sunday) on which banks are not required or authorized by law to close in New York City and, if the applicable Business Day relates to notices, determinations, fundings and payments in connection with the Adjusted LIBO Rate, LIBOR or any LIBOR Advances, a day on which dealings in U.S. Dollar deposits are also carried on in the London interbank market.

"*Capital Adequacy Regulation*" means any rule, regulation, order, guideline, directive or request of any central bank or other Governmental Authority (whether or not having the force of law), or any other Requirements of Law, in each case regarding the capital adequacy or liquidity of any bank or of any corporation controlling a bank.

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, Real Property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a balance sheet of such Person *plus* (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures, but excluding to the extent they would otherwise be included:

(i)    expenditures made in connection with the replacement, substitution, restoration or repair of Property to the extent financed with (i) Insurance Proceeds or other Cash paid to the Borrower on account of the Casualty Event in respect of the Property being replaced, restored or repaired or (ii) Cash paid to the Borrower on account of an eminent domain, in each case in accordance with the terms of the Loan Documents;

(ii)    the purchase of any Property to the extent financed with Asset Sale Proceeds in accordance with the terms of the Loan Documents; and

(iii)    payments under Capitalized Leases to the extent such Capitalized Leases are permitted under the terms of the Loan Documents.

"***Capitalized Leases***" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"***Carve-Out***" has the meaning set forth in the Interim Order (with respect to the period prior to the entry of the Final Order), or the Final Order (from and after the date the Final Order is entered).

"***Cash***" means money, currency or a credit balance in any demand or deposit account.

"***Cash Equivalents***" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"***Cash Management Order***" means, as the context requires, that certain (i) Interim Order Under 11 U.S.C. §§ 105(a), 345, and 363, Fed. R. Bankr. P. 6003, and Del. Bankr. L. R. 2015-2 (I) Authorizing Maintenance of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, Subject to Certain Modifications; and (II) Authorizing Continuation of Deposit Practices or (ii) Final Order Under 11 U.S.C. §§ 105(a), 345, and 363, Fed. R. Bankr. P. 6003, and Del. Bankr. L. R. 2015-2 (I) Authorizing Maintenance of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, Subject to Certain Modifications; and (II) Authorizing Continuation of Deposit Practices, in each case, entered by the Bankruptcy Court, which shall be in form and substance reasonably satisfactory to the Loan Parties and the Required Lenders.

"***Casualty Event***" means the damage, destruction or condemnation (including an Event of Eminent Domain), as the case may be, of any property of any Loan Party.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"***CERCLIS***" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any applicable Requirements of Law, (b) any change in any applicable Requirements of Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) without limiting the foregoing, the making or issuance of any applicable request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "***Change in Law***", regardless of the date enacted, adopted or issued.

"***Change of Control***" means, at any time, the occurrence of any of the following:

(a)     Panda Power Generation Infrastructure Fund A, L.P. and Panda Power Generation Infrastructure Fund B (AIV), L.P. (collectively, the "***Panda Entities***"), collectively, cease to hold, directly or indirectly, more than 100% of the Class A Units in the Sponsor; or

(b)     the Panda Entities, collectively, cease to hold, directly or indirectly, more than 100% of the Class B Units in the Sponsor; or

(c)     the Sponsor ceases to hold, directly or indirectly, more than 100% of the aggregate Voting Interests and 100% of the aggregate Equity Interests in the Borrower; or

(d)     the Parent ceases to be the sole member of the Borrower or shall fail to own, directly, beneficially and of record, 100% of the Equity Interests in the Borrower.

"***Chapter 11 Cases***" means the voluntary cases under chapter 11 of the Bankruptcy Code of the Loan Parties and their affiliated debtors and debtors-in-possession in the Bankruptcy Court.

"***Chief Financial Officer***" means, as to any Person, the individual performing on behalf of such Person the duties customarily performed by a chief financial officer of a business corporation, whether or not such individual has been appointed as the "*chief financial officer*" of such Person.

"***Claims***" has the meaning specified in <u>Section 11.04(b)</u>.

"***Class A Units***" shall have the meaning given to such term in the Sponsor LLC Agreement as in effect on the Closing Date.

"***Class B Units***" shall have the meaning given to such term in the Sponsor LLC Agreement as in effect on the Closing Date.

"***Closing Date***" has the meaning specified in <u>Section 3.01</u>.

"***Closing Date Funds Flow Memorandum***" means that certain funds flow memorandum to be dated the Closing Date and delivered by the Borrower to the Administrative Agent in connection with the application of Advance proceeds on the Closing Date, which funds flow memorandum shall be in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

"***Closing Fee Letter***" means that certain closing fee letter, dated as of the date hereof, by and among the Agent (for the benefit of the Lenders) and the Loan Parties.

"***Collateral***" has the meaning specified in the Orders.

"***Collateral Agent***" has the meaning specified in the recital of parties to this Agreement.

"***Collateral Documents***" means the Security Agreement, the Orders, the Mortgages, if any, the Pledge Agreement, each Account Control Agreement (as and when entered into), each of the collateral documents, instruments and agreements delivered pursuant to Section 5.09, each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties and all Uniform Commercial Code financing statements and other filings, recordings or registrations required by this Agreement to be filed or made in respect of any such Collateral Document.

"***Commitment***" means, with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Commitment", or, if such Lender has entered into one or more Assignment and Assumptions, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 11.07(e) as such Lender's "Commitment", as such amount may be reduced or terminated at or prior to such time pursuant to Section 2.06. The aggregate amount of the Commitments on the Closing Date is $[20],000,000..

"***Committee***" means the official committee of unsecured creditors appointed in the Chapter 11 Cases, pursuant to Section 1102 of the Bankruptcy Code, if any.

"***Commodity Agreement***" means any agreement (including the Initial Commodity Agreement) entered into by the Borrower (including each confirmation entered into pursuant to any master agreement or similar agreement) providing for any swap, cap, collar, put, call, floor, future, option, spot, forward, credit sleeve, power purchase and sale agreement (including, but not limited to, option and heat rate options), fuel purchase and sale agreement, tolling agreement, capacity purchase agreement, emissions credit purchase or sale agreement, power transmission agreement, fuel transportation agreement, fuel storage agreement, netting agreement or similar agreement, in each case entered into in respect of any commodity, including any energy management agreements having any such characteristics, other than, for the avoidance of doubt, any energy management agreement that solely establishes an agency function for the party or parties thereto, and any agreement providing for credit support for any of the foregoing (but excluding the Collateral Documents), in all cases whether settled financially or physically.

"***Commodity Hedge Requirement***" has the meaning specified in Section 5.17(a).

"***Communications***" has the meaning specified in Section 11.02(b).

"***Confidential Information***" means information that any Loan Party furnishes to any Agent or any Lender Party, other than (a) any such information clearly identified at the time of its delivery as not confidential or (b) any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender Party of its obligations hereunder or that is or becomes available to such Agent or such Lender Party from a source other than the Loan Parties that is not, to the

best of such Agent's or such Lender Party's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"***Constituent Documents***" means with respect to any Person, (a) to the extent such Person is a corporation, the certificate or articles of incorporation and the by-laws of such Person, (b) to the extent such Person is a limited liability company, the certificate of formation or articles of formation or organization and operating or limited liability company agreement of such Person and (c) to the extent such Person is a partnership, joint venture, trust or other form of business, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization or formation of such Person (it being understood, that, with respect to the Borrower, such Constituent Documents shall include that certain Side Letter, dated as of the date hereof, with respect to the Amended and Restated Limited Liability Company Agreement of the Borrower, dated as of July 17, 2012, between the Borrower and the Parent and, with respect to the Parent, such Constituent Documents shall include that certain Side Letter, dated as of the date hereof, with respect to the Amended and Restated Limited Liability Company Agreement of the Parent, dated as of July 17, 2012, between the Parent and Panda Temple Power I).

"***Consummation Date***" shall mean the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court (in form and substance reasonably satisfactory to the Loan Parties and the Required Lenders).

"***Contest***" means, with respect to any matter or claim involving any Person, that such Person is contesting such matter or claim in good faith and by appropriate proceedings timely instituted; *provided* that the following conditions are satisfied: (a) such Person has posted a bond or other security reasonably acceptable to the Administrative Agent or has established reasonably adequate reserves with respect to the contested items in accordance with GAAP; (b) during the period of such contest, the enforcement of any contested item is effectively stayed; (c) neither such Person nor any of its officers, directors or employees nor any Agent or Lender Party or any of their respective officers, directors, partners, employees is, or could reasonably be expected to become, subject to any criminal liability or sanction in connection with such contested items; and (d) such contest could not reasonably (individually or in the aggregate) be expected to, have a Material Adverse Effect or involve a material risk of the sale, forfeiture or loss of any material portion of the Collateral.

"***Contractual Obligation***" means, as to any Person, any contractual provision of any security issued by such Person or of any indenture, mortgage, deed of trust, contract, agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"***Conversion***", "***Convert***" and "***Converted***" each refer to a conversion of Advances of one Type into Advances of another Type pursuant to Section 2.10.

"***Core Material Project Contract***" means (a) the Initial Commodity Agreement, (b) the Interconnection Agreement, (c) the LTP Contract, (d) the Water Purchase Agreement, (e) the Tax Abatement Agreement, (f) the Energy Management Agreement, (g) the O&M Agreement, (h) the Panda Services Agreement, and (i) the Shared Facilities Agreement.

"***Core Transaction Documents***" means, collectively, the Core Material Project Contracts, the Interest Rate Agreements and the Loan Documents.

"***Debt***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 60 days incurred in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, and all drafts drawn thereunder, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all payments that such Person would have to make in the event of an early termination on the date Debt of such Person is being determined in respect of outstanding Hedge Agreements (such payments in respect of any such agreements with a counterparty being calculated subject to and in accordance with any netting provisions in such agreement), (i) all Obligations, contingent or otherwise, of such Person for production payments from property operated by or on behalf of such Person and other similar arrangements with respect to natural resources, (j) all Guaranteed Debt and Synthetic Debt of such Person and (k) all indebtedness and other payment Obligations referred to in clauses (a) through (j) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations, *provided* that in no event shall (A) deferred compensation arrangements, (B) earn-out, non-compete or consulting obligations, (C) earn out obligations until such obligations are earned or mature in accordance with GAAP, or (D) working capital or other adjustments to purchase price or indemnification obligations under purchase agreements, in each case, constitute Debt of a Person for the purposes of Section 6.02.

"***Debt for Borrowed Money***" means, at any date of determination, without duplication, (a) all items that, in accordance with GAAP, would be classified as funded indebtedness on a balance sheet of the Borrower at such date, (b) all funded Obligations of the Borrower under acceptance, letter of credit or similar facilities at such date and (c) Synthetic Debt of the Borrower at such time.

"***Default***" means any Event of Default or any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

"***Default Interest***" has the meaning specified in Section 2.08(c).

"***Default Rate***" has the meaning specified in Section 2.08(c).

"***Defaulting Lender***" means, any Lender Party that (a) has failed to fund all or any portion of its Advances within two Business Days of the date such Advances were required to be funded hereunder unless such Lender Party notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender Party's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender Party's obligation to fund an Advance hereunder and states that such position is based on such Lender Party's determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be

specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender Party shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Administrative Agent and the Borrower, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Bankruptcy Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender Party shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender Party or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender Party with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender Party (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender Party. Any determination by the Administrative Agent that a Lender Party is a Defaulting Lender under any one or more of <u>clauses (a)</u> through <u>(d)</u> above shall be conclusive and binding absent manifest error, and such Lender Party shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each other Lender Party.

"***Domestic Lending Office***" means, with respect to any Lender Party, the office of such Lender Party specified as its "***Domestic Lending Office***" opposite its name on <u>Schedule I</u> hereto or in the Assignment and Assumption pursuant to which it became a Lender Party, as the case may be, or such other office of such Lender Party as such Lender Party may from time to time specify to the Borrower and the Administrative Agent.

"***Easement Agreements***" means those agreements listed in <u>Schedule 1.01(A)</u>.

"***Economic Development Agreement***" means the Economic Development Agreement, dated as of January 3, 2011, among Temple, TEDC and the Borrower.

"***Eligible Assignee***" means (a) a Lender Party; (b) an Affiliate of a Lender Party; (c) an Approved Fund, and (d) any other Person (other than an individual) approved by the Administrative Agent and/or the Borrower (as applicable) (unless approval of such Person is not required under <u>Section 11.07(a)</u>); *provided*, *however*, that none of any Defaulting Lender, any Loan Party nor any Affiliate of a Loan Party shall qualify as an Eligible Assignee.

"***Energy Management Agreement***" means the Twin Eagle Energy Management Agreement.

"***Energy Manager***" means Twin Eagle in its capacity as energy manager under the Energy Management Agreement.

"***Environmental Action***" means any action, suit, written demand, demand letter, written claim, notice of enforcement, notice of non-compliance or violation, written notice of liability or potential liability, known investigation, proceeding, order, consent order or consent agreement relating in any way to any applicable Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to human health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority or third party for enforcement, cleanup, removal, response, remedial or other actions or damages arising under applicable Environmental Law and (b) by any governmental or regulatory authority or third party for damages, penalties, fines, contribution,

indemnification, cost recovery, compensation or injunctive relief pursuant to any applicable Environmental Law.

"***Environmental Law***" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, common law, order, writ, judgment, injunction, decree or judicial or legally binding agency interpretation, policy or guidance relating to pollution or protection of the environment, human health (relating to exposure to Hazardous Materials), worker health and safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of or exposure to Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license or other authorization required under any applicable Environmental Law.

"***EPC Contract***" means that certain Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of March 16, 2012, by and between the Borrower and the EPC Contractor, as amended by Amendment No. 1 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 15, 2012, Amendment No. 2 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 15, 2012, Amendment No. 3 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 19, 2012, Amendment No. 4 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 21, 2012, Amendment No. 5 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 27, 2012, Amendment No. 6 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of June 28, 2012, and Amendment No. 7 to Turnkey Engineering, Procurement and Construction Agreement for Combined-Cycle Generation Facility, dated as of July 13, 2012.

"***EPC Contract Letter of Credit***" means the "Contractor Letter of Credit" as defined in the EPC Contract.

"***EPC Contractor***" means Siemens and Bechtel, acting in an unincorporated consortium.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"***ERCOT***" means, as appropriate, (a) the Electric Reliability Council of Texas, Inc. or a successor entity or (b) the power region served by the electrical grid wholly within the State of Texas for which the Electric Reliability Council of Texas, Inc., or a successor entity is the independent system operator certified by the PUCT.

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974 and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is treated as a single employer together with the Borrower under Section 414(b) or (c) of the Internal Revenue Code.

"***Estate Professional Costs***" has the meaning specified in Section 8.01.

"***ETF***" means Energy Transfer Fuel, LP, a Delaware limited partnership.

"***ETF Gas Transportation Agreement***" means the Intrastate Natural Gas Transportation Service Agreement, dated as of March 1, 2012, between the Borrower and ETF, and the related Confirmations No. 149-12070-02-101 and 149-12070-02-102, as amended by Amendment to Service Agreement Confirmation effective as of March 1, 2012, between the Borrower and ETF.

"***Event of Default***" has the meaning specified in Section 9.01.

"***Event of Eminent Domain***" means any action, series of actions, omissions or series of omissions by any Governmental Authority (a) by which such Governmental Authority appropriates, confiscates, condemns, expropriates, nationalizes, seizes or otherwise takes all or a material portion of the Property of the Borrower (including any Capital Stock of the Borrower) or (b) by which such Governmental Authority assumes custody or control of the Property (other than immaterial portions of such Property) or business operations of the Borrower or any Capital Stock of the Borrower.

"***EWG***" means an "*exempt wholesale generator*" within the meaning of Section 1262(6) of PUHCA, and FERC's implementing regulations thereof at 18 C.F.R. Part 366 and Section 31.002(7) of PURA.

"***Excluded Assets***" has the meaning given to such term in the Security Agreement.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender Party pursuant to Requirements of Law in effect on the date on which such Lender acquires its applicable interest under the relevant Loan Document , (c) Taxes attributable to such Recipient's failure to comply with Section 2.14(f) and (d) any Taxes imposed under FATCA.

"***Extraordinary Receipt***" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments.

"***Facility***" has the meaning specified in the recital of parties to this Agreement.

"***FATCA***" means Sections 1471 through 1474 of the Internal Revenue Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreement entered into with the Internal Revenue Service, the United States government or any governmental or taxing authority in any other jurisdiction in connection therewith pursuant to Section 1471(b)(1) of the Internal Revenue Code or similar provisions of applicable law and any intergovernmental agreements and legislation, official guidance or other official requirements adopted in accordance with any such agreement.

"***Federal Funds Rate***" means, for any period, a fluctuating interest rate *per annum* equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"***Fee Letters***" means the fee letter, dated as of the date hereof, between the Administrative Agent and the Borrower and the Closing Fee Letter.

"***Fee Site***" means the Site as described on Schedule 3.01(a)(iv) in which the Borrower holds a fee simple property interest.

"***FERC***" means the Federal Energy Regulatory Commission of the United States or any successor entity performing similar functions.

"***Final Order***" means a final order of the Bankruptcy Court approving the Advances, the Facility and the Loan Documents on a final basis, in form and substance satisfactory to the Loan Parties and the Required Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent at the direction of the Required Lenders.

"***Final Order Funding Date***" shall mean the date on which the conditions precedent set forth in Section 3.02 shall have been satisfied or waived in writing, which date shall be not later than 2:00 p.m., New York City time, two (2) Business Days following entry of the Final Order by the Bankruptcy Court.

"***Fiscal Year***" means a fiscal year of the Borrower ending on December 31 in any calendar year.

"***Fixed Costs***" means the aggregate amount of the "Company Related Fees" line-item, the "Capital Expenditures" line-item and each line-item that is taken into account in calculating the "Plant Operating Disbursements" line-item (other than the line-items titled "Variable O&M", "Variable LTSA" and "Forbearance Advisors") in the Approved Budget.

"***Foreign Lender***" means any Recipient that is not a United States person, as such term is defined in Section 7701(a)(30) of the Internal Revenue Code.

"***FPA***" means the Federal Power Act of 1935, 16 U.S.C. §§791a, et seq., as amended, and the rules and regulations promulgated by FERC thereunder.

"***Fund***" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"***GAAP***" has the meaning specified in Section 1.03.

"***Gas Storage Agreement***" means that certain Master Intrastate Gas Storage Agreement between the Borrower and HPL, dated as of March 1, 2012, and the related Storage Confirmation 120700301.

"***Gas Transportation Agreements***" means each of the ETF Gas Transportation Agreement, the Katy Gas Transportation Agreement, the Oasis Gas Transportation Agreement, the HPL Gas Transportation Agreement and the Atmos Gas Transportation Agreement.

"***Governmental Authority***" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether federal, state or local, and any agency, authority, municipality, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, ERCOT, PUCT, TRE, the IMM and any supra-national bodies such as the European Union or the European Central Bank).

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Guaranteed Debt***" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt, leases, dividends or other payment Obligations ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"***Hazardous Materials***" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, mold, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials, substances or condition designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant or otherwise subject to regulation under any Environmental Law.

"***Hedge Agreement***" means any agreement with respect to any swap, call, cap, collar, floor, forward, future, put, spot or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"***Highest Lawful Rate***" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which

are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"*HPL*" means Houston Pipe Line Company LP, a Delaware limited partnership.

"*HPL Gas Transportation Agreement*" means the Intrastate Natural Gas Transportation Service Agreement, dated as of March 1, 2012, between the Borrower and HPL, and the related Confirmations No. 120700101 and 120700102.

"*IMM*" means the independent market monitor for the ERCOT market.

"*Indemnified Costs*" has the meaning specified in Section 10.09(a).

"*Indemnified Party*" has the meaning specified in Section 11.04(b).

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"*Independent Engineer*" means any independent engineer reasonably acceptable to the Administrative Agent, and, so long as no Default or Event of Default has occurred and is continuing, the Borrower, retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Leidos Engineering, LLC.

"*Independent Insurance Consultant*" means any independent insurance consultant reasonably acceptable to the Administrative Agent, and, so long as no Default or Event of Default has occurred and is continuing, the Borrower, retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Moore-McNeil, LLC.

"*Independent Power Market Consultant*" means any independent power market consultant reasonably acceptable to the Administrative Agent, and, so long as no Default or Event of Default has occurred and is continuing, the Borrower, retained on behalf of or for the benefit of the Lender Parties from time to time, including, as of the date hereof, Leidos Engineering, LLC.

"*Initial Budget*" means a cash flow forecast setting forth all line-item and cumulative cash receipts and expenditures on a weekly basis for the period beginning as of the week of the Closing Date through and including the 13th week after the Closing Date, broken down by week, including the anticipated weekly uses of the proceeds of the Advances for such period, which shall include, among other things, available cash, cash flow, payment of trade payables and ordinary course expenses, total cash expenditures and Capital Expenditures, fees and expenses relating to the Facility, and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

"*Initial Commodity Agreement*" means, collectively, that certain 2002 ISDA Master Agreement, dated as of July 17, 2012, by and between the Borrower and the Initial Commodity Provider, including the Schedule, Credit Support Annex and Revenue Put Option Confirmation, each dated as of July 17, 2012.

"*Initial Commodity Provider*" means 3M.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Insurance Proceeds*" means proceeds from any insurance policy of the Loan Parties.

"*Intellectual Property*" has the meaning specified in the Security Agreement.

"*Interconnection Agreement*" means that certain ERCOT Standard Generation Interconnection Agreement, dated as of June 21, 2012, between the Borrower and the Transmission Service Provider.

"*Interest Period*" means, for each LIBOR Advance comprising part of the same Borrowing, the period commencing on the date of such LIBOR Advance or the date of the Conversion of any Base Rate Advance into such LIBOR Advance, and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one month; *provided*, that:

(a)    Interest Periods commencing on the same date for LIBOR Advances comprising part of the same Borrowing shall be of the same duration;

(b)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, *provided*, *however*, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(c)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"*Interest Rate Agreement*" means that certain 2002 ISDA Master Agreement with Goldman Sachs Bank USA, dated March 20, 2015, including the schedule thereto, dated as of March 20, 2015 and each confirmation thereunder.

"*Interest Rate Determination Date*" means, with respect to any Interest Period, the second Business Day prior to the first day of such Interest Period.

"*Interim Hearing*" has the meaning specified therefor in the Interim Order.

"*Interim Order*" means the interim order entered by the Bankruptcy Court on April [__], 2017 in the Chapter 11 Cases approving the Facility, the Advances and the Loan Documents on an interim basis, in form and substance satisfactory to the Loan Parties and the Required Lenders.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*Investment*" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a

substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in (j) or (k) of the definition of "*Debt*" in respect of such Person.

"*IRS*" means the United States Internal Revenue Service.

"*Joinder Agreement*" has the meaning specified in Section 2.21(h).

"*Katy*" means ETC Katy Pipeline, Ltd., a Texas limited partnership.

"*Katy Gas Transportation Agreement*" means the Intrastate Natural Gas Transportation Service Agreement, dated as of March 1, 2012, between the Borrower and Katy, and the related Confirmations No. 150-12070-02-101 and 150-12070-02-102, as amended by Amendment to Service Agreement Confirmation effective as of April 1, 2012, between the Borrower and Katy.

"*Lender Party*" means any Lender or Agent, as the context may require.

"*Lender Party Appointment Period*" has the meaning specified in Section 10.06(a).

"*Lenders*" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 2.21 and Section 11.07 for so long as such Initial Lender or Person, as the case may be, shall be a party to this Agreement.

"*LIBOR*" means, with respect to any LIBOR Advance for any Interest Period, the rate per annum determined by the Administrative Agent (which determination shall be conclusive absent manifest error) at approximately 11:00 a.m. (London time) on the Interest Rate Determination Date to be the London interbank offered rate administered by ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits in U.S. Dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or any replacement Reuters page which displays that rate), or, if the agreed page is replaced or service ceased to be available, the Administrative Agent may specify another page or service displaying the appropriate rate after the consultation with Borrower and the Lenders) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, "*LIBOR*" shall be the interest rate per annum determined by the Administrative Agent (which determination shall be conclusive absent manifest error), provided, further, that, for all LIBOR Advances, LIBOR shall in no event be less than 1.00% per annum at any time.

"*LIBOR Advance*" means an Advance that bears interest as provided in Section 2.08(a)(ii).

"*Lien*" means any lien, mortgage, deed of trust, deed to secure debt, leasehold mortgage, leasehold deed of trust, leasehold deed to secure debt, pledge, hypothecation, security interest or other charge or encumbrance of any kind, or any other similar type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to Real Property.

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) [reserved], (e) the Fee Letters, and (f) any other document that is executed in connection with the transactions contemplated herewith or therewith and is deemed in writing by the Borrower and the Administrative Agent to constitute a Loan Document.

"***Loan Parties***" means each of the Borrower and the Parent.

"***LTP Contract***" means the Long Term Program Contract, dated as of March 20, 2012, between the Borrower and the LTP Provider, as amended by Amendment No. 1, dated as of May 25, 2012, Amendment No. 2, dated as of June 25, 2012, and Amendment No. 3, dated as of June 27, 2014.

"***LTP Provider***" means Siemens.

"***Major Maintenance Expenditures***" has the meaning specified in the Security Deposit Agreement.

"***Major Subcontractors***" means "*Substantial Subcontractors*" and "*Substantial Vendor*", as each such term is defined in the EPC Contract.

"***Margin Stock***" has the meaning specified in Regulation U.

"***Material Adverse Effect***" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, assets or properties of the Borrower or the Project, (b) the rights and remedies of any Agent, the Depositary or any other Secured Party under any Loan Document, (c) the legality, validity, binding effect or enforceability of any of the Loan Documents or (d) the ability of any Loan Party to fully and timely perform its Obligations under any Loan Document to which it is or is to be a party, in each case, other than the commencement of the Chapter 11 Cases or the continuation of the Chapter 11 Cases.

"***Material Project Contract***" (a) the Core Material Project Contracts, (b) the EPC Contract, (c) the QSE Services Agreement, (d) the Gas Transportation Agreements, (e) the Gas Storage Agreement, (f) the Economic Development Agreement, (g) Standard Form Market Participant Agreements, (h) the Agency Agreement and (i) each other Contractual Obligation (other than the Loan Documents) of the Borrower entered into after the Closing Date for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect (each such Contractual Obligation described in clause (i), an "***Additional Project Agreement***").

"***Maturity Date***" means, the earliest to occur of (a) the Stated Maturity Date, (b) the closing date of any Section 363 Sale not consented to in writing by the Required Lenders, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code), and which for purposes hereof shall be no later than the Consummation Date, of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the appointment of a trustee or examiner in the Chapter 11 Cases, (e) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, and (f) the date of acceleration of the Obligations in accordance with the terms set forth in the Loan Documents.

"***Measurement Period***" means each period of four consecutive fiscal quarters of the Borrower, taken as one accounting period.

"***Minimum Liquidity***" means as of any time of determination, the sum of the amount of unrestricted and unreserved cash and Cash Equivalents of the Loan Parties that is not subject to a Lien at such time (other than the Liens securing the Facility or the Prepetition Senior Loan Debt).

"***Moody's***" means Moody's Investors Services, Inc.

"***Mortgage Policy***" means (i) the title insurance policy in favor of the Collateral Agent, for the benefit of the Secured Parties, delivered by the Borrower pursuant to Section 3.01(a)(iv)(B) and (ii) any replacement, supplemental, amended or modified title insurance policy for the benefit of the Secured Parties delivered by the Borrower from time to time in accordance with the provisions of this Agreement.

"***Mortgaged Properties***" means those properties listed on Schedule 3.01(a)(iv).

"***Mortgages***" has the meaning specified in Section 3.01(a)(iv).

"***Net Cash Proceeds***" means (a) with respect to any Casualty Event or Asset Sale by Parent or any of its Subsidiaries of assets (including pursuant to casualty losses or condemnation), the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration and including condemnation awards and payments in lieu thereof) or through the payment of deferred consideration) by or on behalf of Parent or its Subsidiaries, in connection therewith, and (b) with respect to the issuance or incurrence of any Indebtedness by any Loan Party, or the issuance by any Loan Party of any Equity Interests, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of any Loan Party in connection with such issuance or incurrence.

"***Non-Consenting Lender***" has the meaning specified in Section 2.18(c).

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

"***Non-Public Information***" means material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to the Borrower, its Equity Interests, its Debt or its Affiliates.

"***Non-Public Lenders***" means Lenders that wish to receive Non-Public Information with respect to the Borrower, its Equity Interests, its Debt or its Affiliates.

"***Note***" means a promissory note of the Borrower payable to any Lender, in substantially the form of Exhibit B-1 hereto, evidencing the indebtedness of the Borrower to such Lender resulting from the Advance made by such Lender.

"***Notice of Borrowing***" has the meaning specified in Section 2.02(a).

"***NPL***" means the National Priorities List under CERCLA.

"***O&M Agreement***" means the Operation and Maintenance Agreement, dated as of April 17, 2012, between the Borrower and the Operator, as amended pursuant to Amendment No. 1, dated as of May 23, 2012, Amendment No. 2, dated as of June 1, 2012, Amendment No. 3, dated as of June 8, 2012, and Amendment No. 4, dated as of June 21, 2012.

"***O&M Costs***" has the meaning specified in the Security Deposit Agreement.

"***Oasis***" means Oasis Pipeline, LP, a Texas limited partnership.

"***Oasis Gas Transportation Agreement***" means the Intrastate Natural Gas Transportation Service Agreement, dated as of March 1, 2012, between the Borrower and Oasis, and the related Confirmations

No. 028-12070-02-101 and 028-12070-02-102, as amended by Amendment to Service Agreement Confirmation effective as of April 1, 2012, between the Borrower and Oasis.

"*Obligation*" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding under Bankruptcy Law. Without limiting the generality of the foregoing, the Obligations of any Loan Party under the Loan Documents include (a) the obligation to pay principal, interest, prepayment premium, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under any Loan Document and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Lender Party, any Agent or the Depositary, in its sole discretion, may elect to pay or advance on behalf of such Person.

"*Operating Account*" means the deposit account held at Bank of Texas with account number [_____][2].

"*Operator*" means PPG-O&M Panda Temple Power, LLC, a Delaware limited liability company.

"*Orders*" means, collectively, the Interim Order and the Final Order and separately, the Interim Order and the Final Order, as the context requires.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Advance, Commitment or Loan Document).

"*Other Taxes*" means all present or future stamp, excise, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, other than Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.18).

"*Panda Agreements*" means each of the Panda Services Agreement, the O&M Agreement and the Shared Facilities Agreement.

"*Panda Entities*" has the meaning provided in the definition of "*Change of Control*".

"*Panda Services Agreement*" means that certain Amended and Restated Services Agreement, dated as of April 28, 2011, between the Borrower and the Services Provider, as amended pursuant to Amendment No. 1, dated as of February 1, 2012, Amendment, dated as of May 22, 2012, Amendment No. 2, dated as of June 8, 2012, Amendment No. 3, dated as of July 16, 2012, Amendment No. 4, dated as of January 1, 2013, Amendment No. 5, dated as of January 1, 2014, and Amendment No. 6, dated as of the date hereof.

---

[2] NTD: Company please provide.

"***Panda Temple Energy Center***" means an approximately 758 megawatt combined cycle natural gas-fired electric generating unit constructed in connection with the Project and located on the Site.

"***Panda Temple II Energy Center***" means an approximately 758 megawatt combined cycle natural gas-fired electric generating unit located adjacent to the Site.

"***Panda Temple Power I***" means Panda Temple Power Intermediate Holdings I, LLC, a Delaware limited liability company.

"***Parent***" means Panda Temple Power Intermediate Holdings II, LLC, a Delaware limited liability company.

"***Participant Register***" has the meaning provided in Section 11.07(g).

"***Patriot Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"***Permitted Commodity Agreement***" means the Initial Commodity Agreement.

"***Permitted Debt***" means any Debt permitted to be incurred under Section 6.02.

"***Permitted Investments***" means (a) (i) any marketable securities (A) issued or directly and unconditionally guaranteed or insured as to interest and principal by the United States of America or (B) issued by any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America, in each case maturing within one year after the date of issuance and (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public agency or instrumentality thereof, in each case maturing within one year after the date of issuance and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P and at least P-1 from Moody's, (b) commercial paper maturing no more than three months from the date of acquisition thereof and having, at the time of the acquisition thereof, a rating of at least A 1 from S&P and at least P 1 from Moody's, (c) any certificate of deposit or bankers acceptance maturing not more than three months after its date of acquisition and issued or accepted by any commercial bank organized under the laws of the United States of America (or any state thereof or the District of Columbia) that (i) is at least "***adequately capitalized***" (as defined in the regulations of its primary Federal banking regulator) and has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000 or (ii) is the Administrative Agent, (d) interest-bearing deposit accounts, including time deposits and certificates of deposit, of any Lender or any domestic or foreign commercial bank whose outstanding long-term debt is rated at least A 1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's having capital and sur*plus* in excess of $500,000,000 having a maturity not exceeding 90 days from the date of acquisition, (e) shares of any money market mutual fund whose investment criteria are substantially similar to those in respect of the other investments described in the foregoing clauses (a) through (d), (f) fully secured repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications established in clause (d) above, (g) instruments issued by an investment company rated at least A or the equivalent thereof by S&P or at least A2 or the equivalent thereof by Moody's having a portfolio consisting of 95% or more of the securities described in clauses (a) through (f) of this definition and (h) investment contracts pursuant to which moneys are deposited (to bear interest at an agreed rate) with a bank, insurance company or other financial institution whose long-term senior unsecured debt is rated at least A or the equivalent thereof by S&P or at least A2 or the equivalent thereof by Moody's.

"**_Permitted Liens_**" means each of the following:

(a)      Liens for Taxes, assessments and governmental charges or levies to the extent not required to be paid under <u>Section 5.02</u>;

(b)      Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business that (i) are for amounts (x) not yet due and delinquent or (y) which are being Contested and (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the Property to which they relate or materially impair the construction, operation or maintenance of the Project;

(c)      pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations;

(d)      [Reserved];

(e)      Liens securing judgments (or the payment of money owing in respect of such judgments) not constituting a Default under <u>Section 9.01(h)</u> or securing appeal or other surety bonds related to such judgments so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which adequate reserves, bonds or other security reasonably acceptable to the Administrative Agent have been provided or are fully covered by insurance;

(f)      easements, rights of way and other encumbrances on or defects in title to Real Property held by the Borrower that do not render title to the Property encumbered thereby unmarketable and will not materially adversely affect the use of such Property in the manner contemplated by the Transaction Documents or the use of such Property for the purpose of such business, and any matters listed as exceptions to title in the Mortgage Policy or disclosed by the Survey;

(g)      purchase money Liens in effect and perfected as of the Petition Date upon or in Real Property or equipment acquired or held by the Borrower in the ordinary course of business prior to the Petition Date to secure the purchase price of such Property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such Property or equipment to be subject to such Liens, or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; _provided_, _however_, that no such Lien shall extend to or cover any Property other than the Property or equipment being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any Property not theretofore subject to the Lien being extended, renewed or replaced; and _provided further_, that the aggregate principal amount of the Debt secured by Liens permitted by this <u>clause (g)</u> shall not exceed the amount permitted under <u>Section 6.02(b)</u> at any time outstanding;

(h)      Liens arising under Capitalized Leases permitted under <u>Section 6.02(c)</u>; provided that no such Lien shall extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases;

(i)      Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(j)    Liens arising from precautionary Uniform Commercial Code financing statements regarding any interest or title of a licensor, lessor or sublessor under any capital or operating lease otherwise permitted hereunder;

(k)    pledges or deposits of Cash or Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions or similar obligations to providers of property, casualty or liability insurance in the ordinary course of business;

(l)    Liens created under the Collateral Documents;

(m)    Liens created under the Prepetition Senior Loan Documents;

(n)    Liens on any cash collateral provided to the Borrower by any third party;

(o)    [Reserved];

(p)    any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(q)    (i) Liens encumbering, to the extent pledged to an energy manager or fuel supplier, no more than 60 days of accounts receivable (and accounts of any such energy manager or fuel supplier, as the case may be, into which the proceeds of such accounts receivable are deposited) owed by ERCOT or any other Person to the Borrower for the purchase of electric energy and other related products or services, (ii) to the extent applicable, Liens in favor of ERCOT pursuant to ERCOT Nodal Protocols on (A) any segregated QSE account for the Project (as described in the QSE Services Agreement) or any similar receipts account in respect of ERCOT held by the QSE for the account of the Borrower and (B) all amounts held therein, and (iii) margin, clearing, cash collateral or similar accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, exchanges related to the trading of energy (including the Intercontinental Exchange), customers, trading counterparties, or any other parties or issuers of surety bonds and any proceeds thereof in an aggregate amount not to exceed $5,000,000 at any time;

(r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)    encumbrances on real property in the nature of any zoning restrictions, building and land use laws or ordinances imposed by any Governmental Authority on any Real Property of the Borrower, if the same does not have a materially adverse effect on the construction or operation or use of the Project in the ordinary conduct of the business of the Borrower;

(t)    non-exclusive outbound licenses of patents, copyrights, trademarks and other Intellectual Property rights granted by the Borrower in the ordinary course of business and not interfering in any respect with the ordinary conduct of or materially detracting from the value of the business of the Borrower;

(u)    any Liens with respect to the Properties of the Borrower that arise under Contractual Obligations of the Borrower as in effect on the Closing Date, but only to the extent the same have been set forth on Schedule 1.01(b); and

(v)     Liens consisting of an agreement to sell, assign, transfer, convey or otherwise dispose of any property in a sale, assignment, transfer, conveyance or other disposition permitted hereunder solely to the extent that such investment or sale, assignment, transfer, conveyance or other disposition would have been permitted on the date of the creation of such Lien.

"***Permitted Prior Lien***" has the meaning set forth in the Orders.

"***Permitted Variances***" has the meaning set forth in Section 8.01

"***Person***" means an individual, partnership, limited partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Authority.

"***Petition Date***" means April [_], 2017.

"***PGC***" means a "***power generation company***" as that term is defined in PURA.

"***Planned Shared Facilities***" means (i) the shared facilities  constructed on the Shared Premises, as more particularly described on Exhibit D to the Shared Facilities Agreement and (ii) the Shared Permits.

"***Platform***" has the meaning specified in Section 11.02(b).

"***Pledge Agreement***" has the meaning specified in Section 3.01(a)(vi).

"***Pledged Collateral***" has the meaning specified in the Pledge Agreement.

"***Preferred Interests***" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

 "***Prepayment Event***" means the occurrence of any Asset Sale, Casualty Event, any Extraordinary Receipt, any Termination Event with respect to the Initial Commodity Agreement and the incurrence or issuance of any Debt or Equity (excluding Permitted Debt).

"***Prepetition Senior Loan Agreement***" has the meaning specified in the recital of parties to this Agreement.

"***Prepetition Senior Loan Agent***" shall mean Wilmington Trust, National Association and its successors and assigns, including any successor or replacement agent under the Prepetition Senior Loan Agreement.

"***Prepetition Senior Loan Debt***" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by the Loan Parties to the Prepetition Senior Loan Agent and Prepetition Senior Loan Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Prepetition Senior Loan Documents (including all "Secured Obligations" as defined thereunder).

"***Prepetition Senior Loan Documents***" shall mean, collectively, the following (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced): (a)

the Prepetition Senior Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Loan Parties with, to or in favor of Prepetition Senior Loan Agent or any Prepetition Senior Loan Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Senior Loan Document".

"*Prepetition Senior Loan Lenders*" shall mean the lenders under the Prepetition Senior Loan Agreement and their respective successors and assigns.

"*Project*" means the ownership, development, operation and maintenance of, collectively, the Panda Temple Energy Center and all attendant buildings, structures and improvements, all alterations thereto and replacements thereof, all fixtures, attachments, appliances, equipment, machinery and other articles attached thereto or used in connection therewith and all parts which may from time to time be incorporated or installed in or attached thereto, including all related Material Project Contracts, all Easement Agreements, all leases of Real Property or personal Property related thereto, all other Real Property and tangible and intangible personal Property owned, leased or otherwise under the control of the Borrower (or used in connection with the operation of the Panda Temple Energy Center), the Governmental Authorizations required in connection with (or otherwise related to) the Panda Temple Energy Center and any electrical or gas interconnections, which may include, at the option of the Borrower, water intake structure or pipelines owned or leased by the Borrower.

"*Project Agreement*" means each Material Project Contract, all Easement Agreements, each Permitted Commodity Agreement, each Interest Rate Agreement and each other Contractual Obligation related to the operation, maintenance, management, administration, ownership or use (but not the financing) of the Project, the provision of fuel, water and other inputs therefore, the sale of electricity or other products therefrom, the disposal of wastewater or other outputs therefrom, or the provision of services therefore, entered into by the Borrower and any other Person, or assigned to the Borrower.

"*Property*" means any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether tangible or intangible.

"*Prudent Industry Practices*" means those practices, methods, equipment, techniques, specifications and standards of safety and performance that are commonly used from time to time by gas-fired electric generation stations in ERCOT as good, safe and prudent engineering and operating practices, which, in the exercise of reasonable judgment in light of facts known at the time the decision was made, could have been expected to accomplish a desired result at a reasonable cost in connection with the operation, maintenance, repair and use of electric generating and other equipment, facilities and improvements of such electrical generation stations, with commensurate standards of safety, performance, dependability, efficiency and economy having due regard for Requirements of Law, Governmental Authorizations and applicable Contractual Obligations, and considering the type and size of such Project. "*Prudent Industry Practices*" is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to a spectrum of possible practices, methods or acts having due regard for, among other things, Requirements of Law, Governmental Authorizations and applicable Contractual Obligations.

"*Public Lender*" has the meaning specified in Section 11.02(e).

"*PUCT*" means the Public Utility Commission of Texas.

"*PUHCA*" means the Public Utility Holding Company Act of 2005, as set forth in EPAct 2005, Pub. L. No. 109-58, 1261-1277 (2005), and the rules and regulations promulgated by FERC thereunder.

"**PURA**" means the Texas Public Utility Regulatory Act, set forth in the Tex. Util. Code Ann. § 11.001, et seq., and the rules and regulations promulgated thereunder.

"**QSE**" means the "Qualified Scheduling Entity" identified as such in the QSE Services Agreement.

"**QSE Services Agreement**" means that certain Qualified Scheduling Entity Agreement, dated July 17, 2012, by and between the Energy Manager and the Borrower, together with each schedule, exhibit and annex thereto.

"**Real Property**" means all right, title and interest of any Person in and to any and all parcels of real Property owned or leased by such Person, or in which such Person possesses an easement interest or other occupancy right, together with all improvements and appurtenant fixtures and equipment located thereon, in each case to the extent such improvements, fixtures and equipment constitute real property pursuant to Requirements of Law. Unless otherwise specified, all references herein to "Real Property" shall refer to Real Property of the Borrower.

"**Recipient**" means (a) the Administrative Agent and (b) any Lender, as applicable.

"**Redeemable**" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

 "**Register**" has the meaning specified in Section 11.07(e).

"**Regulation D**" means Regulation D of the Board, as in effect from time to time.

"**Regulation U**" means Regulation U of the Board, as in effect from time to time.

"**Regulation X**" means Regulation X of the Board, as in effect from time to time.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and such Person's and such Person's Affiliates' respective partners, directors, officers, employees, agents and advisors.

"**Remedies Notice Period**" has the meaning ascribed to such term in the Orders, as applicable.

"**Reorganization Plan**" means a plan of reorganization filed by the Loan Parties in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Required Lenders.

"**Required Lenders**" [means, at any time, Lenders owed or holding at least a majority in interest of the sum of (a) the aggregate principal amount of the Advances outstanding at such time and (b) Unused Commitments. The Advances and Unused Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.]

"**Reserve Requirement**" means, at any time, the maximum rate at which reserves (including any marginal, special, supplemental, or emergency reserves) are required to be maintained under regulations issued from time-to-time by the Board (or any successor) by member banks of the Federal Reserve System against "**Eurocurrency liabilities**" (as such term is used in Regulation D). Without limiting the effect of the foregoing, the Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (a) any category of liabilities which includes deposits by reference

to which the Adjusted LIBO Rate is to be determined, and (b) any category of extensions of credit or other assets which include LIBOR Advances. The Adjusted LIBO Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Requirement.

"*Responsible Officer*" means, as to any Person, its president, chief executive officer, any vice president, treasurer or secretary, any managing general partner or manager (or any of the preceding with regard to such Person's managing general partner or manager) or authorized representative.

"*Restricted Payments*" has the meaning given to such term in Section 6.07.

"*Restricting Information*" has the meaning specified in Section 11.02(f).

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated on or about the date hereof, by and among an ad hoc committee of certain Prepetition Senior Loan Lenders, the Prepetition Senior Loan Agent and the Borrower, the Parent and their respective Affiliates party thereto.

"*Revenue Account*" has the meaning specified in Security Deposit Agreement.

"*Revenues*" has the meaning specified in the Security Deposit Agreement.

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc.

"*Sanctions*" has the meaning specified in Section 4.01(ll)(i).

"*Sanctions Laws*" has the meaning specified in Section 4.01(ll)(i).

"*Scheduled Payment Date*" means the last day of each month or, if any such day is not a Business Day, the Business Day occurring immediately prior thereto.

"*Secretary*" means, as to any Person, the individual performing on behalf of such Person the duties customarily performed by a secretary of a business corporation, whether or not such individual has been appointed as the "*secretary*" of such Person.

"*Section 363 Sale*" means a sale of substantially all of the Loan Parties' assets pursuant to Bankruptcy Code section 363 and an order of the Bankruptcy Court approving such sale.

"*Secured Obligations*" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Advance (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities, and (b) any other liabilities and obligations owed by the Loan Parties to the Lender Parties under the Loan Documents.

"*Secured Parties*" means the Agent and the Lenders.

"*Security Agreement*" has the meaning specified in Section 3.01(a)(iii).

"*Security Deposit Agreement*" means that certain Security Deposit Agreement, dated as of March 6, 2015, by and among the Borrower, Goldman Sachs Lending Partners LLC as administrative agent

under the Prepetition Senior Loan Agreement and MUFG Union Bank, N.A., as collateral agent and depositary under the Prepetition Senior Loan Agreement.

"**Services Provider**" means PPG Fund I, LLC, a Delaware limited liability company.

"**Shared Facilities**" means those facilities from time to time set forth on Exhibit D of the Shared Facilities Agreement.

"**Shared Facilities Agreement**" means that certain Shared Facilities Agreement, dated as of April 3, 2013, among the Borrower, Temple II, and the Operator, as amended by Amendment No. 1, dated as of March 6, 2015.

"**Shared Facilities Easement Agreements**" means the easement agreements described on Exhibit B-1 of the Shared Facilities Agreement.

"**Shared Facilities Easements**" means the easements and other Real Property rights granted on the date hereof by Panda Temple Power II, LLC, a Delaware limited liability company, to the Borrower pursuant to any Shared Facilities Easement Agreement.

"**Shared Permits**" means, collectively, the permits that are described on Exhibit C of the Shared Facilities Agreement.

"**Shared Premises**" has the meaning specified in the Shared Facilities Agreement.

"**Siemens**" means Siemens Energy, Inc., a Delaware corporation.

"**Site**" means the Fee Site on which the Project is located, as described more fully in the Mortgage Policy, and any other easements, licenses, and other real property rights and interests required for the construction and operation of the Project, including any land required for the construction and operation of the Project referred to in the Easement Agreements.

"**SPC**" has the meaning specified in Section 11.07(l).

"**Sponsor**" means Panda Temple Power Holdings, LLC, a Delaware limited liability company.

"**Sponsor LLC Agreement**" means that certain Amended and Restated Limited Liability Company Agreement of Sponsor, dated as of July 17, 2012, entered into by and among its members.

"**Standard Form Market Participant Agreements**" means, collectively, (a) the Standard Form Market Participant Agreement, with an effective date of January 1, 2013, by and between the Borrower and ERCOT and (b) the Standard Form Market Participant Agreement, with an effective date of April 1, 2015, by and between the Borrower and ERCOT.

"**Stated Maturity**" means April [___], 2018.

"**Subsidiary**" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or

estate, in each case, is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"***Superpriority Claims***" means all of the claims of the Administrative Agent and the Lenders on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the payment in full in cash of any amounts due under the Carve-Out.

"***Support Instrument***" means, with respect to any Material Project Contract, any guarantee, letter of credit, surety, payment or performance bond or other agreement or instrument relating to the performance by any Person of its obligations under such Material Project Contract.

"***Survey***" has the meaning specified in <u>Section 3.01(a)(iv)(C)</u>.

"***Synthetic Debt***" means, with respect to any Person, without duplication of any clause within the definition of "*Debt*," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "*synthetic lease*"), (b) Obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) Obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "*Debt*" or in <u>clause (a)</u> or <u>(b)</u> above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"***Tax Abatement Agreement***" means the Tax Abatement Agreement (2011), dated June 8, 2011, between the Borrower, Temple and each other party from time to time thereto.

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or similar liabilities applicable thereto.

"***TEDC***" means the Temple Economic Development Corporation, a political subdivision of the State of Texas.

"***Temple***" means the City of Temple, a political division of the State of Texas.

"***Temple II***" means Panda Temple Power II, LLC, as Delaware limited liability company.

"***Termination Event***" means any unwinding, termination, sale or other disposition in any manner of any Interest Rate Agreement or Commodity Agreement other than a scheduled expiration or termination of such Interest Rate Agreement or Commodity Agreement occurring after full performance of the Persons party thereto.

"***Test Date***" means for all purposes hereunder, each Friday occurring after the first full week after the Closing Date.

"***Test Period***" means, with respect to each Test Date, the consecutive trailing four-week period ending on such Test Date.

"***Title Event***" has the meaning specified in the Security Deposit Agreement.

"***Title Event Proceeds***" has the meaning specified in the Security Deposit Agreement.

"***Title Insurer***" has the meaning specified in <u>Section 3.01(a)(iv)(B)</u>.

"***Transaction***" means collectively, (a) the ownership and operation of the Project as contemplated by the Transaction Documents, (b) the execution, delivery and performance by the Loan Parties of the Loan Documents, (c) [reserved], (d) [reserved], (e) the granting of the Liens pursuant to the Collateral Documents and (f) any other transactions entered into by the Borrower in connection with the foregoing, to the extent permitted under the Loan Documents.

"***Transaction Documents***" means, collectively, the Material Project Contracts, the Interest Rate Agreements and the Loan Documents.

"***Transmission Service Provider***" means Oncor Electric Delivery Company LLC, a Delaware limited liability company.

"***TRE***" means the Texas Reliability Entity, Inc.

"***Twin Eagle***" means Twin Eagle Resource Management, LLC, a Delaware limited liability company.

"***Twin Eagle Energy Management Agreement***" means that certain Energy Management Agreement, dated July 17, 2012, by and between the Borrower and Twin Eagle, together with that certain 1992 ISDA Master Agreement, dated as of July 17, 2012, by and between the Borrower and Twin Eagle, including the Schedule and any confirmation letters related thereto and any related schedule, exhibit or annex thereto.

"***Type***" refers to the distinction between Advances bearing interest at the Base Rate and Advances bearing interest at LIBOR.

"***Undivided Interest***" has the meaning specified in the Shared Facilities Agreement.

"***Uniform Commercial Code***" means the Uniform Commercial Code as adopted in any applicable jurisdiction.

"***United States***" and "***United States person***" has the meaning specified in <u>Section 2.14(f)</u>.

"***Unused Commitments***" means with respect to any Lender at any time (a) such Lender's Commitment at such time minus (b) the aggregate principal amount of all Advances made by such Lender as of such time.

"***U.S. Dollars***" or "***$***" means lawful money of the United States of America.

"***U.S. Tax Compliance Certificate***" has the meaning specified in <u>Section 2.14(f)(ii)(B)(3)</u>.

"***Utilities Account***" shall mean a deposit account held at a deposit bank in the name of the Loan Parties, which shall be used to provide adequate assurances of future performance sufficient to satisfy the requirements under Section 366 of the Bankruptcy Code to any utility company providing services to the Loan Parties, as authorized by an order of the Bankruptcy Court.

"***Voting Interests***" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"***Water Purchase Agreement***" means that certain Effluent and Water Purchase Agreement, dated as of November 23, 2009, by and between Temple and the Borrower, and the related Letter in lieu of Exhibit A, dated as of June 27, 2012, from Temple to Panda Power Funds.

"***Weekly Report***" has the meaning set forth in Section 7.09(a).

"***Withholding Agent***" means the Loan Parties and the Administrative Agent.

"***WSFS***" has the meaning specified in the preamble to this Agreement.

Section 1.02    Computation of Time Periods; Other Definitional Provisions.    Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Loan Documents:

(a)    in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each shall mean "*to but excluding*";

(b)    references to any agreement or contract shall mean and be a reference to such agreement or contract, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and to the extent permitted under this Agreement (including, without limitation, Section 6.12);

(c)    each reference to a Requirement of Law shall be deemed to refer to such Requirement of Law as the same may be amended, supplemented or otherwise modified from time to time;

(d)    each reference to a Person in any capacity includes a reference to its permitted successors and assigns in such capacity and, in the case of any Governmental Authority, any Person succeeding to any of its functions and capacities;

(e)    references to days shall refer to calendar days unless Business Days are specified, and references to weeks, months or years shall be to calendar weeks, months or years, respectively;

(f)    all references to a "Section," a "Schedule" or an "Exhibit" are to the relevant section of this Agreement or the applicable Loan Document (as the case may be) or to the relevant schedule or exhibit attached hereto or thereto (as applicable);

(g)    the table of contents and section headings and other captions are for the purpose of reference only and do not affect the interpretation of this Agreement or the applicable Loan Document (as the case may be);

(h)    defined terms in the singular shall include the plural and vice versa, and the masculine, feminine or neuter gender shall include all genders;

(i)        the words "hereof," "herein" and "hereunder," and words of similar import, when used herein, shall refer to this Agreement or the applicable Loan Document (as the case may be) as a whole and not to any particular provision hereof or thereto (as applicable);

(j)        the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation";

(k)        where the terms of this Agreement or the applicable Loan Document (as the case may be) require that the approval, opinion, consent or other input of the Collateral Agent be obtained, such requirement shall be deemed satisfied only where the required approval, opinion, consent or other input is given by or on behalf of the Collateral Agent in writing; and

(l)        any reference to a document shall be deemed to include all exhibits, annexes, appendices and schedules thereto.

Section 1.03    <u>Accounting Terms</u>.  All accounting terms not specifically defined herein shall be construed in accordance with United States generally accepted accounting principles consistent with those applied in the preparation of the financial statements referred to in <u>Section 4.01(i)</u> ("***GAAP***").

ARTICLE II

AMOUNTS AND TERMS OF THE ADVANCES

Section 2.01    <u>The Advances</u>.

(a)        Each Lender severally agrees, on the terms and conditions set forth herein, to make term loans (collectively the "***Advances***") to the Borrower as follows: (i) an initial Advance to the Borrower for the period commencing on the Closing Date to, but excluding the Final Order Funding Date in an aggregate principal amount equal to the lesser of (x) such Lender's Commitment and (y) such Lender's pro rata share of an aggregate principal amount permitted under the Interim Order, and (ii) commencing on or after the Final Order Funding Date, one additional Advance to the Borrower on the date of entry specified in the applicable Notice of Borrowing  in an amount equal to such Lender's pro rata share  of the remaining Unused Commitment, provided that the aggregate amount of all Advances shall not exceed the Facility. No amounts advanced under the Facility once repaid may be reborrowed.

Section 2.02    <u>Making the Advances</u>.

(a)        Each Borrowing shall be made on notice, given not later than 11:00 A.M. (New York City time) by the Borrower to the Administrative Agent (which shall give to each Appropriate Lender prompt notice thereof by facsimile or other electronic communication) on the third Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of LIBOR Advances, or the first Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Advances. Each such notice of a Borrowing (a "***Notice of Borrowing***") shall be by telephone, confirmed immediately in writing, or by facsimile or other electronic communication, in substantially the form of <u>Exhibit C</u> hereto, specifying therein the requested (i) date of such Borrowing, (ii) Facility under which such Borrowing is to be made, (iii) Type of Advances comprising such Borrowing, (iv) aggregate amount of such Borrowing, (v) in the case of a Borrowing consisting of LIBOR Advances, the initial Interest Period in respect thereof and (vi) in the case of any Borrowing to be made after the Closing Date, the Account to which the proceeds of such Borrowing are to be disbursed (if applicable). Each Appropriate Lender shall, before 11:00 A.M. (New York City time) on the date of such Borrowing, make available for its account to the Administrative Agent at the Administrative Agent's Account, in

same day funds, such Lender's ratable portion of such Borrowing in accordance with the respective Commitments under the applicable Facility of such Lender and the other Appropriate Lenders. With respect to the Borrowing made on the Closing Date, the Administrative Agent will make such funds available to the Borrower in accordance with the Closing Date Funds Flow Memorandum. With respect to any Borrowing made after the Closing Date, after the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower in the Operating Account.

(b)     Anything in clause (a) above to the contrary notwithstanding, (i) the Borrower may not select LIBOR Advances (A) for any Borrowing if the aggregate amount of such Borrowing is less than $2,500,000 or (B) if the obligation of the Appropriate Lenders to make LIBOR Advances shall then be suspended pursuant to Section 2.10 or Section 2.12 and (ii) the Advances may not be outstanding as part of more than two separate Borrowings.

(c)     Each Notice of Borrowing shall be irrevocable and binding on the Borrower. In the case of any Borrowing that the related Notice of Borrowing specifies is to be comprised of LIBOR Advances, the Borrower shall indemnify each Appropriate Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on and as of the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(d)     [Reserved.]

(e)     The failure of any Lender to make the Advance to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Borrowing.

Section 2.03     [Reserved.]

Section 2.04     [Reserved.]

Section 2.05     Repayment of Advances.

(a)     Advances.     All Advances shall be immediately due and payable and all Commitments hereunder shall terminate and cease to be in effect. on the earliest Maturity Date to occur.

(b)     Reserved.

(c)     Reserved.

(d)     Reserved.

(e)     Certain Repayments or Prepayments.  For the avoidance of doubt, any repayment or prepayment of any Advances made as permitted or required pursuant to Section 2.07(a) and Section 2.07(b)(ii)(E) shall be made together with the Premium.

Section 2.06     Termination or Reduction of the Commitments.

(a)    <u>Optional</u>.

(i)    The Loan Parties may not voluntarily terminate or reduce any Commitments.

(b)    <u>Mandatory</u>.

(i)    Reserved.

(ii)    Reserved.

(iii)    The Commitment of each Lender who receives a prepayment of all of its Advances pursuant to <u>Section 2.19</u> shall terminate upon receipt of such payment.

Section 2.07    <u>Prepayments</u>.

(a)    <u>Optional</u>.  Simultaneously with the payment in full of all Senior Prepetition Loan Debt outstanding pursuant to Section 2.07(a) of the Prepetition Senior Loan Documents, the Loan Parties may, upon at least three Business' Days' notice to the Administrative Agent stating the proposed date of the repayment, and if such notice is given the Loan Parties shall, prepay the outstanding aggregate principal amount of the Advances in whole (but not in part), together with (i) accrued interest to the date of such prepayment on the aggregate principal and (ii) any other outstanding Obligations.

(b)    <u>Mandatory</u>.

(i)    Once an Advance is made, the Commitment corresponding thereto automatically gets permanently reduced by such Advance.

(ii)    Upon the occurrence of a Prepayment Event, the Borrower shall prepay an aggregate principal amount of the Advances in an aggregate amount equal to (A) in the case of any Asset Sale, the Asset Sale Proceeds attributable thereto, (B) in the case of any Casualty Event, the Net Cash Proceeds attributable thereto or therefrom, (C) in the case of any Title Event, the proceeds attributable thereto, (D) in the case of any Termination Event with respect to the Initial Commodity Agreement, the termination payment paid to the Borrower or any of its Affiliates in respect thereof, (E) in the case of an Extraordinary Receipt, the proceeds attributable thereto or therefrom and (F) in the case of the incurrence of any Debt or Equity, the Net Cash Proceeds attributable thereto or therefrom. Each such prepayment shall be applied in accordance with <u>Section 2.07(b)(vii)</u>.

(iii)    [Reserved.]

(iv)    [Reserved.]

(v)    [Reserved.]

(vi)    [Reserved.]

(vii)    All prepayments under this <u>Section 2.07(b)</u> shall be made together with accrued interest to the date of such prepayment on the principal amount prepaid, together with any amounts owing pursuant to <u>Section 11.04(e)</u> and, to the extent applied to prepay the

outstanding Advances shall be applied such  that such prepayments in respect of Advances shall be applied on a pro rata basis amongst all Advances.

Section 2.08     Interest.

(a)     Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Advance owing to each Lender under each Facility at the following rates *per annum*:

(i)     Base Rate Advances.  During such periods as such Advance is a Base Rate Advance, a rate *per annum* equal at all times to the sum of (A) the Base Rate in effect from time to time *plus* (B) the Applicable Margin in effect from time to time for Base Rate Advances under such Facility.

(ii)     LIBOR Advances. During such periods as such Advance is a LIBOR Advance, a rate *per annum* equal at all times during each Interest Period for such Advance to the sum of (A) the Adjusted LIBO Rate for such Interest Period for such Advance *plus* (B) the Applicable Margin in effect from time to time for LIBOR Advances under such Facility.

(b)     Interest Payment Dates.  Accrued interest on each Advance shall be payable by the Borrower in arrears (i) on each Scheduled Payment Date for such Advance and (ii) on the Maturity Date,; provided that (v) interest accrued pursuant to Section 2.08(c) shall be payable on demand, (y) in the event of any repayment or prepayment of any Advance, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (z) in the event of any Conversion of any LIBOR Advance prior to the end of the Interest Period therefor, accrued interest on such Advance shall be payable on the effective date of such Conversion.

(c)     Default Interest.  Notwithstanding the foregoing, if any principal of or interest on any Advance or any fees or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Borrower shall pay interest (“***Default Interest***”) on such overdue amount, after as well as before judgment, at a rate *per annum* equal to (i) in the case of overdue principal of any Advance, 2% *plus* the rate otherwise applicable to such Advance as provided this Section 2.08 or (ii) in the case of any other amount, 2% *plus* the rate applicable to Base Rate Advances under the Facility as provided in Section 2.08(a)(i) (“***Default Rate***”).

(d)     Notice of Interest Period and Interest Rate.  Promptly after receipt of a Notice of Borrowing pursuant to Section 2.02(a), a notice of Conversion pursuant to Section 2.10 or a notice of selection of an Interest Period pursuant to the terms of the definition of “Interest Period,” the Administrative Agent shall give notice to the Borrower and each Appropriate Lender of the applicable Interest Period and the applicable interest rate determined by the Administrative Agent for purposes of Section 2.08(a)(ii) above.

Section 2.09     Fees.

(a)     The Loan Parties shall pay all fees and other amounts set forth in the Fee Letters.

(b)     [Reserved.]

(c)     Agents’ Fees. The Borrower shall pay to each Agent for its own account such fees as may from time to time be agreed between the Borrower and such Agent (including pursuant to the Fee Letters).  Such fees and amounts shall be fully earned when paid and shall not be refundable under any circumstance.

Section 2.10    Conversion of Advances.

(a)    Optional.  The Borrower may on any Business Day, upon notice given to the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Section 2.08, Convert all or any portion of the Advances of one Type comprising the same Borrowing into Advances of the other Type; *provided*, *however*, that any Conversion of LIBOR Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such LIBOR Advances, any Conversion of Base Rate Advances into LIBOR Advances shall be in an amount not less than the minimum amount specified in Section 2.02(b), no Conversion of any Advances shall result in more separate Borrowings than permitted under Section 2.02(b) and each Conversion of Advances comprising part of the same Borrowing under the Facility shall be made ratably among the Appropriate Lenders in accordance with their Commitments (or if no Commitments shall be outstanding for such Facility, in accordance with their outstanding Advances) under such Facility. Each such notice of Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Advances to be Converted and (iii) if such Conversion is into LIBOR Advances, the duration of the initial Interest Period for such Advances. Each notice of Conversion shall be irrevocable and binding on the Borrower.

(b)    Mandatory.

(i)    On the date on which the aggregate unpaid principal amount of LIBOR Advances comprising any Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $1,000,000, such Advances shall automatically Convert into Base Rate Advances.

(ii)    If the Borrower shall fail to select the duration of any Interest Period for any LIBOR Advances in accordance with the provisions contained in the definition of "*Interest Period*" in Section 1.01, the Administrative Agent will forthwith so notify the Borrower and the Appropriate Lenders, whereupon each such LIBOR Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance.

(iii)    Notwithstanding any other provision of this Agreement, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower then, so long as such Event of Default is continuing, (A) no outstanding Advance may be converted to or continued as a LIBOR Advance and (B) unless repaid, each LIBOR Advance shall be converted to a Base Rate Advance at the end of the Interest Period applicable thereto.

(iv)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the maturity date of the Facility (whether by acceleration or otherwise).

Section 2.11    [Reserved].

Section 2.12    Increased Costs, Etc.

(a)    If, due to a Change in Law, there shall be any increase in the cost to any Lender Party of agreeing to make or of making, funding or maintaining LIBOR Advances (including, for purposes of this Section 2.12, any change subjecting any Recipient to any Taxes (other than (i) Indemnified Taxes and (ii) Excluded Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto), then the Borrower

shall from time to time, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party additional amounts sufficient to compensate such Lender Party for such increased cost. A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender Party, shall be conclusive and binding for all purposes, absent manifest error.

(b)    If any Lender Party determines that (i) the introduction of any Capital Adequacy Regulation or any change in any Capital Adequacy Regulation, (ii) any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof or (iii) compliance by such Lender Party or any corporation controlling such Lender Party with such Capital Adequacy Regulation or Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender Party or any corporation controlling such Lender Party and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender Party's commitment to lend hereunder, then, upon demand by such Lender Party or such corporation (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender Party, from time to time as specified by such Lender Party, additional amounts sufficient to compensate such Lender Party in light of such circumstances, to the extent that such Lender Party reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender Party's commitment to lend hereunder.

(c)    If, with respect to any LIBOR Advances under the Facility, Lender Parties owed at least a majority of the then aggregate unpaid principal amount thereof notify the Administrative Agent that the Adjusted LIBO Rate for any Interest Period for such Advances will not adequately reflect the cost to such Lender Parties of making, funding or maintaining their LIBOR Advances for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Appropriate Lenders, whereupon (i) each such LIBOR Advance under such Facility will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (ii) the obligation of the Appropriate Lenders and such Lender Parties to make, or to Convert Advances into, LIBOR Advances shall be suspended.

(d)    Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful, or any central bank or other governmental authority shall assert that it is unlawful, for any Lender Party or its LIBOR Lending Office to perform its obligations hereunder to make LIBOR Advances or to continue to fund or maintain LIBOR Advances then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) each LIBOR Advance under each Facility under which such Lender Party has a Commitment or has Advances outstanding will automatically, upon such demand, Convert into a Base Rate Advance, and (ii) the obligation of the Appropriate Lenders and such Lender Parties to make, or to Convert Advances into, LIBOR Advances shall be suspended.

Section 2.13    <u>Payments and Computations</u>.

(a)    Subject to <u>Section 2.04</u>, the Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 11:00 A.M. (New York City time) on the day when due in U.S. Dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender Party, to such Lender Parties for

its account ratably in accordance with the amounts of such respective Obligations then payable to such Lender Parties and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender Party, to such Lender Party for its account, in each case to be applied in accordance with the terms of this Agreement and the other Loan Documents. Upon its acceptance of an Assignment and Assumption and recording of the information contained therein in the Register pursuant to Section 11.07(e), from and after the effective date of such Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)    The Borrower hereby authorizes each Lender Party and each of its Affiliates, if and to the extent payment owed to such Lender Party is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with such Lender Party or such Affiliate any amount so due.

(c)    All computations of interest based on the Base Rate when Base Rate is determined by the prime rate shall be made by the Administrative Agent on the basis of a year of 360 days, as the case may be, and all computations of interest based on LIBOR or the Federal Funds Rate and of fees for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable. Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment or letter of credit fee or commission, as the case may be; *provided, however*, that, if such extension would cause payment of interest on or principal of LIBOR Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender Party hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender Party on such due date an amount equal to the amount then due such Lender Party. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender Party shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender Party together with interest thereon, for each day from the date such amount is distributed to such Lender Party until the date such Lender Party repays such amount to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry practices on interbank compensation.

(f)    If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Advances or the Facility to which, or the manner in which, such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lender Parties in accordance with such Lender Party's pro rata share of the sum of the aggregate principal amount of all Advances outstanding at such time in repayment or prepayment of such

of the outstanding Advances or other Obligations then owing to such Lender Party, and for application to such principal repayment installments thereof, as the Administrative Agent shall direct.

Section 2.14    <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Requirements of Law. If any applicable Requirements of Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholding applicable to additional sums payable under this <u>Section 2.14</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes.

(c)    Without duplication of any amounts paid pursuant to <u>Section 2.14(a)</u>, the Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.14</u>) that are payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.07(g)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Section 2.14(d)</u>.

(e)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this <u>Section 2.14</u>, such Loan Party shall furnish to the Administrative Agent, at its address referred to in <u>Section 11.02</u>, the original or a certified copy of a receipt issued by

such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     For purposes of subsection (f) of this <u>Section 2.14</u>, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code and the term "*Lender*" includes the Administrative Agent.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>clauses</u> (ii) (A), (ii) (B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a United States person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two duly executed originals of IRS Form W-9 (or successor form) certifying that such Lender is exempt from U.S. federal backup withholding;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two duly executed originals of whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     IRS Form W-8ECI or W-8EXP (or successor form);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a duly executed certificate substantially in the form of Exhibit R-1, R-2, R-3 or R-4 (a "**U.S. Tax Compliance Certificate**"), and (y) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or successor form); or

(4)    to the extent a Foreign Lender is not the beneficial owner, IRS Form W-8IMY (or successor form), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate, IRS Form W-8EXP, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more (direct or indirect) partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed originals of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Requirements of Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall deliver updated versions of such form or certification to the Borrower and the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender Party, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(h)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.14(h) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.14(h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.14(h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    In the event it is reasonably necessary to determine whether the Advances are traded on an established market pursuant to United States Treasury Regulation Section 1.1273-2(f), the Administrative Agent shall use commercially reasonable efforts to assist the Borrower in obtaining any quotations and sales prices for the Advances. The Administrative Agent shall promptly make available to the Lenders by posting on the Platform any such determination made by the Borrower.

(j)    For purposes of this Section 2.14, the term "applicable Requirements of Law" includes FATCA.

Section 2.15    Sharing of Payments, Etc.  If any Lender Party shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 11.07 or any payment made under any insurance policy, credit default swap or other protection against loss arranged by such Lender Party solely for its own account in respect of any Advances or other amounts owing to such Lender Party hereunder) (a) on account of Obligations due and payable to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender Party at such time to (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such interests or participating interests in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; *provided, however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to

the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered; and provided further, that so long as the Advances are outstanding, any excess payment received by any Appropriate Lender shall be shared on a pro rata basis only with other Appropriate Lenders. The Loan Parties agree that any Lender Party so purchasing an interest or participating interest from another Lender Party pursuant to this Section 2.15 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender Party were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be.

Section 2.16    Use of Proceeds.

(a)    The proceeds of the Advances shall be used (and the Borrower represents, warrants, and agrees that it shall use such proceeds) in accordance with the Approved Budget to (i)pay transaction fees and expenses relating to the Facility, and (ii) provide funds for general corporate purposes of the Borrower, in each case, in compliance with Section 6.20.

Section 2.17    Evidence of Debt.

(a)    The Borrower agrees that upon notice by any Lender to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Advances owing to, or to be made by, such Lender, the Borrower shall promptly execute and deliver to such Lender Party, with a copy to the Administrative Agent, a Note, as applicable, in substantially the form of Exhibit B hereto, respectively, payable to such Lender in a principal amount equal to the Commitment of such Lender. All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Register maintained by the Administrative Agent pursuant to Section 11.07(e) shall include accounts (taken together) recording (i) the date and amount of each Borrowing made hereunder, the Type of Advances comprising such Borrowing and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Assumption delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender Party hereunder, and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender Party's share thereof.

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.17(b) above, and by each Lender Party in its account or accounts pursuant to Section 2.17(a) above, shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender Party and, in the case of such account or accounts, such Lender Party, under this Agreement, absent manifest error; *provided*, *however*, that entries in the Register shall control; provided further, that the failure of the Administrative Agent or such Lender Party to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

Section 2.18    Minimizing Additional Costs; Replacement of Lenders.

(a)     [Reserved.]

(b)     If any Lender Party requests compensation under <u>Section 2.12</u>, or if the Borrower is required to pay any additional amount to any Lender Party or any Governmental Authority for the account of any Lender Party pursuant to <u>Section 2.14</u>, or if any Lender Party is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender Party and the Administrative Agent, require such Lender Party to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 11.07</u>), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender Party, if a Lender Party accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender Party shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.14</u>, such assignment will result in a reduction in such compensation or payments. Nothing in this <u>Section 2.18(b)</u> shall be deemed to prejudice any rights that the Borrower may have against any Lender Party that is a Defaulting Lender.

(c)     If any Lender Party (such Lender Party, a "***Non-Consenting Lender***") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of <u>Section 11.01</u> requires the consent of all of the Lender Parties affected and with respect to which the Required Lenders shall have granted their consent, then provided no Event of Default then exists (unless such Non-Consenting Lender grants such consent), the Borrower shall have the right to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Advances and Commitments to one or more assignees reasonably acceptable to the Administrative Agent; provided that (i) any such Non-Consenting Lender must be replaced with a Lender Party that grants the applicable consent, (ii) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and (iii) the replacement Lender Party shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon (and the Borrower shall pay all other Obligations owing to such Non-Consenting Lender). In connection with any such assignment, the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender Party shall otherwise comply with <u>Section 11.07</u>.

Section 2.19     <u>Defaulting Lender Adjustments</u>.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)     <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(b)     <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article IX</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 11.05</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default exists), to the funding of any Advance in respect of which such Defaulting

Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fourth*, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *fifth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Advances in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Advances of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Advances of such Defaulting Lender until such time as all Advances are held by the Lenders pro rata in accordance with the Commitments under the applicable Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this <u>Section 2.19(b)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

ARTICLE III

CONDITIONS TO EFFECTIVENESS AND OF LENDING

Section 3.01    <u>Conditions Precedent to the Closing Date</u>.  <u>Section 2.01</u> and <u>Section 2.03(a)</u> of this Agreement shall become effective on and as of the first date (the "***Closing Date***") on or before April [\_\_\_\_], 2017 on which the following conditions precedent have been satisfied and the obligation of each Lender to make Advances to be applied in accordance with the Closing Date Funds Flow Memorandum, is subject to the satisfaction of such conditions precedent before or concurrently with the Closing Date:

(a)    The Administrative Agent shall have received on or before the Closing Date the following, each dated such day (unless otherwise specified), in form and substance satisfactory to the Administrative Agent (unless otherwise specified) and (except for the Notes) in sufficient copies for each Lender Party:

(i)    Executed counterparts of this Agreement, duly executed and delivered by the Borrower, each Agent, each of the Lender Parties and each other party hereto;

(ii)    The Notes payable to the Lenders to the extent requested by the Lenders pursuant to the terms of <u>Section 2.17(a)</u>;

(iii)    A security agreement in substantially the form of <u>Exhibit D</u> hereto (the "***Security Agreement***"), duly executed by the Borrower and the Collateral Agent together with:

(A)    proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent may deem necessary in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Security Agreement, covering the Collateral described in the Security Agreement,

(B)    completed requests for information, dated on or before the Closing Date, listing all effective financing statements filed in the jurisdictions referred to in <u>clause (A)</u> above that name the Borrower as debtor, together with copies of such other financing statements,

(C)      evidence of the completion of all other recordings and filings of or with respect to the Security Agreement that the Administrative Agent may deem necessary in order to perfect and protect the security interest created thereunder and payment of all filing and recording fees related thereto from the Advance proceeds, and

(D)      evidence that all other action that the Administrative Agent may deem necessary in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Security Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and/or release letters and UCC-3 termination statements);

(iv)      Such real property documents reasonably requested by the Required Lenders (including a memorandum of DIP Order to be filed in the real property records).

(v)      A pledge agreement in substantially the form of Exhibit G hereto (as amended, the "***Pledge Agreement***"), duly executed by the Parent and the Collateral Agent, together with:

(A)      the equity interest certificates representing the Pledged Collateral referred to in the Pledge Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Collateral referred to in the Pledge Agreement, indorsed in blank,

(B)      proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Pledge Agreement, covering the Collateral described in the Pledge Agreement,

(C)      completed requests for information, dated on or before the Closing Date, listing all effective financing statements filed in the jurisdictions referred to in clause (B) above that name the Parent as debtor, together with copies of such other financing statements,

(D)      evidence of the completion of all other recordings and filings of or with respect to the Pledge Agreement that the Administrative Agent may deem necessary or desirable in order to perfect and protect the security interest created thereunder and payment of all filing and recording fees related thereto out of the Advance proceeds, and

(E)      evidence that all other action that the Administrative Agent may deem necessary or desirable in order to perfect and protect the first priority liens, subject to Permitted Liens, and security interests created under the Pledge Agreement has been taken (including, without limitation, receipt of duly executed payoff letters and/or release letters and UCC-3 termination statements);

(vi)      Certified copies of the resolutions, or consents or approvals of the board of directors, members or managers, officers, partners or general partner of each Loan Party, approving the Transaction, the Initial Commodity Agreement and each Transaction Document to which it is or is to be a party and of all documents evidencing other necessary corporate, limited liability company or partnership action and governmental and other third party approvals and

consents, if any, with respect to the Transaction, the Initial Commodity Agreement and each Transaction Document to which it is or is to be a party;

(vii)    A copy of a certificate of the Secretary of State (or analogous governmental entity) of the jurisdiction of incorporation, formation or existence of each Loan Party, dated reasonably near the Closing Date, certifying (A) as to a true and correct copy of the Constituent Documents of such Person and each amendment thereto on file in such Secretary's (or analogous governmental entity's) office and (B) that (1) such amendments are the only amendments to such Person's Constituent Documents on file in such Secretary's office, (2) such Person has paid all franchise taxes to the date of such certificate and (3) such Person is duly incorporated or formed, as applicable, and in good standing or presently subsisting under the laws of the State of the jurisdiction of its incorporation or formation;

(viii)    A certificate of each Loan Party signed on behalf of such Person by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the Constituent Documents of such Person since the date of the Secretary of State's (or analogous governmental entity's) certificate referred to in Section 3.01(a)(x) to the extent applicable, (B) a true and correct copy of the Constituent Documents of such Person as in effect on the date on which the resolutions referred to in Section 3.01(a)(ix) were adopted and on the Closing Date, (C) the due incorporation or organization and good standing or valid existence of such Person as a corporation, limited liability company or partnership organized under the laws of the jurisdiction of its organization and the absence of any proceeding for the dissolution or liquidation of such Person, (D) the truth of the representations and warranties made by such Person in the Loan Documents as though made on and as of the Closing Date and (E) the Initial Commodity Agreement being in full force and effect;

(ix)    A certificate of the Secretary or an Assistant Secretary of each Loan Party certifying the names and true signatures of the officers of such Person authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder;

(x)    Copies of (A) each of the Material Project Contracts and each related Support Instrument in effect as of the Closing Date, duly executed by the parties thereto, together with, to the extent obtained by Borrower after use of commercially reasonable efforts to obtain a Consent and Agreement with respect to each Core Material Project Contract, a Consent and Agreement duly executed by the Collateral Agent and each other Person party to such Core Material Project Contract and (B) a certificate from a Responsible Officer of the Borrower to the effect that (1) the copies of the Material Project Contracts and such Support Instruments delivered pursuant to this Section 3.01(a)(xiii) are true, correct and complete copies of such Material Project Contract or such Support Instrument, as the case may be and (2) no term or condition of any of the Material Project Contracts or such Support Instrument delivered pursuant to this Section 3.01(a)(xiii) has been amended from the form thereof delivered pursuant to this Section 3.01(a)(xiii);

(xi)    An executed copy of the Restructuring Support Agreement (which shall be in full force and effect).

(xii)    A certified hard copy of, and a copy delivered in an electronic/soft medium in a format acceptable to the Administrative Agent, containing, pro forma balance sheets, income statements and cash flow statements with respect to the Borrower in form and

substance satisfactory to the Lender Parties for the twelve month period ending December 31, 2016 (the "***Borrower Financial Statements***");

(xiii)    Copies of all certificates representing the policies, endorsements and other documents required under Section 5.04 to be in effect as of the Closing Date, including, without limitation, evidence of insurance naming the Collateral Agent as additional insured and naming the Collateral Agent as sole loss payee to the extent required by Section 5.04, accompanied by (A) a certificate of the Borrower signed by a Responsible Officer certifying that the copies of each of the certificates and other documents delivered pursuant to this Section 3.01(a)(xvii) are true, correct and complete copies thereof, (B) letters from the Borrower's insurance brokers or insurers, dated not earlier than 15 days prior to the Closing Date, stating with respect to each such insurance policy that (1) such policy is in full force and effect, (2) all premiums theretofore due thereon have been paid or are not in arrears and (3) the underwriters of such insurance have agreed that the policies, when issued, will contain, at a minimum, the provisions required under Section 5.04 and (C) a certificate from the Independent Insurance Consultant in form and substance reasonably satisfactory to the Administrative Agent;

(xiv)    A legal opinion of Latham & Watkins LLP, counsel for the Loan Parties, in form and substance satisfactory to the Agents;

(b)    The Loan Parties shall have established a cash management system satisfactory to the Loan Parties and the Required Lenders; provided that the cash management system approved by the Cash Management Order shall be deemed satisfactory to the Required Lenders.

(c)    All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Loan Parties and the Required Lenders.

(d)    All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the Advances and the approval thereof shall be in form and substance reasonably satisfactory to the Loan Parties and the Required Lenders.

(e)    The Bankruptcy Court shall have entered into the Interim Order within five (5) Business Days following the Petition Date, in form and substance satisfactory to the Loan Parties and the Required Lenders.

(f)    The Collateral Agent, for the benefit of the Lenders, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein and in the Interim Order.

(g)    Other than the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding affecting any Loan Party or the Project pending or, to the Borrower's knowledge as certified by the Borrower, threatened before any Governmental Authority that (i) could reasonably be expected to have, either individually, or in the aggregate, a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Transaction Document, the Initial Commodity Agreement or the consummation of the Transaction.

(h)    Except as disclosed in writing to, and agreed by, the Administrative Agent, all Applicable Governmental Authorizations and third party consents and approvals necessary in connection with the Transaction and the Project shall have been obtained and shall be in full force and effect and not subject to current legal proceedings or to any unsatisfied conditions that could reasonably be expected to

allow material modification or revocation, and no appeals shall be pending with regard to any of the foregoing and all applicable appeal periods with respect thereto shall have expired; and no Requirements of Law shall be applicable that restrains, prevents or imposes materially adverse conditions upon the Transaction or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any Properties now owned or hereafter acquired by any of them.

(i)      The Borrower shall have concurrently paid (or have arranged for the payment thereof in a manner satisfactory to the Administrative Agent) all agreed fees of the Agents, the Lender Parties and all reasonable and documented expenses of the Agents (including the fees and expenses of Stroock & Stroock & Lavan LLP, counsel to the Lender Parties and Houlihan Lokey, financial advisor to the Lender Parties ) and the Lender Parties to the extent payable pursuant to the Fee Letters.

(j)      [Reserved].

(k)      Each Agent and each Lender Party which requested that the Borrower provide all documentation and other information required by bank regulatory authorities under applicable "*know your customer*" and anti-money laundering rules and regulations, including, the Patriot Act at least 10 Business Days prior to the Closing Date shall have received, at least 5 Business Days prior to the Closing Date, such information.

(l)      [Reserved].

(m)      No Default shall have occurred and be continuing.

(n)      The Administrative Agent shall have received a "*life of loan*" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property, in form reasonably acceptable to the Administrative Agent (together with notice about special flood hazard area status and flood disaster assistance, duly executed by the Borrower and any applicable Loan Party and evidence of flood insurance, in the event any improved parcel of Mortgaged Property is located in a special flood hazard area).

(o)      [Reserved];

(p)      [Reserved];

(q)      the Administrative Agent and the Lenders shall have received the Initial Budget (attached as Exhibit E), which shall be in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders;

Section 3.02      Conditions to all Advances.  The obligation of each Lender to make any Advance is subject to the following conditions precedent:

(a)      The representations and warranties of each other Loan Party contained in Article IV or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all respects on and as of the date of such Advance except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) for purposes of this Section 3.02, the representations and warranties contained in Article IV pertaining to financial statements shall be deemed to refer to the most recent statements;

(b)    No default or Event of Default shall have occurred and be continuing, or would result from such proposed Advance or from the application of the proceeds thereof;

(c)    With respect to any Advances made after the Closing Date, the Final Order shall have been entered approving the Facility, in form and substance satisfactory to the Administrative Agent and the Required Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent at the discretion of the Required Lenders.

(d)    The making of such Advance shall not violate any laws and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    There shall not have occurred since the Petition Date any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect.

(f)    The making of such Advance shall comply with the Approved Budget, or shall otherwise have been approved in writing by the Administrative Agent at the direction of the Required Lenders.

Section 3.03    Determinations Under Section 3.01 and Section 3.02.    For purposes of determining compliance with the conditions specified in Section 3.01 and Section 3.02, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the date of such Borrowing or other applicable event specifying its objection thereto and, in the case of Section 3.01 and Section 3.02 such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of the Borrowing.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Section 4.01    Representations and Warranties.    Each Loan Party hereby represents and warrants as follows:

(a)    Each Loan Party (i) is a limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) is duly qualified and in good standing as a foreign company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it so to qualify or be licensed and (iii) upon entry of the Orders, as applicable, has all requisite limited liability company power and authority to own or lease and operate its Properties and to carry on its business as now conducted and as proposed to be conducted, including pursuant to the Transaction Documents and the Permitted Commodity Agreements to which it is party. All of the outstanding Equity Interests in the Borrower have been validly issued, are fully paid and non-assessable and are owned by the Parent free and clear of all Liens other than the Liens created under the Pledge Agreement.

(b)    As of the Closing Date, set forth on Schedule 4.01(b) hereto is a complete and accurate list of all Loan Parties, showing as of the date hereof the jurisdiction of its incorporation, formation or existence, the address of its principal place of business and its U.S. taxpayer identification

number. The copy of the Constituent Documents of each such Person and each amendment thereto provided pursuant to Section 3.01(a)(x) is a true and correct copy of each such document, together with any amendment entered into after the Closing Date in accordance with Section 6.09, each of which is valid and in full force and effect.

(c)       There is no existing option, warrant, call, right, commitment or other agreement to which any Loan Party is party requiring, and there is no membership interest in or other Equity Interest in or other security or instrument of the Borrower outstanding which upon conversion or exchange would require, the issuance by any Loan Party of any additional membership interests or other Equity Interests in any Loan Party or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase a membership interest or other Equity Interest in any Loan Party. As of the Closing Date, 100% of the Equity Interests in the Borrower are owned directly, beneficially and of record, by the Parent.

(d)       Upon entry of the Orders, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party and the Initial Commodity Agreement, and the consummation of the Transaction, are within such Person's corporate, limited liability company or limited partnership (as applicable) powers, have been duly authorized by all necessary corporate, limited liability company or limited partnership (as applicable) action, and do not (i) contravene in any material respect such Person's charter, bylaws, limited liability company agreement, partnership agreement or other Constituent Documents, (ii) violate any Requirements of Law (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award binding on or affecting such Person or any of its Properties or the Project, (iii) except to the extent resulting directly from the commencement of the Chapter 11 Cases, conflict with in any material respect or result in the material breach of, or constitute a material default or require any payment to be made under, any material Contractual Obligations binding on or affecting such Person, or any of its Properties or the Project or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the Properties of such Person or the Project.  Except to the extent resulting directly from the commencement of the Chapter 11 Cases, no Loan Party is in violation of any Requirements of Law order, writ, judgment, injunction, decree, determination or award binding on or affecting such Person or in breach of any Contractual Obligation binding on or affecting such Person.

(e)       Upon entry of the Orders, as applicable, no Governmental Authorization, and no notice to or filing with or consent of any Governmental Authority or any other third party, is required for (i) the due execution, delivery, recordation, filing or performance by any Loan Party of any Loan Document to which it is or will be a party, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection, priority or maintenance of the Liens created under the Collateral Documents, except for (A) those required in connection with the exercise by any Agent or Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents or (B) those which have been duly obtained, taken given or made.

(f)       Upon entry of the Orders, as applicable, no material Governmental Authorization (including Environmental Permits), and no material notice to or filing with or consent of any Governmental Authority or any other third party, is required in connection with the consummation of the Transaction or the ownership or operation of the Project in accordance with Requirements of Law, the Material Project Contracts, the Easement Agreements and as otherwise contemplated by this Agreement, except for (A) the Governmental Authorizations, notices and filings set forth in Schedule 4.01(f) (which schedule shall include, for the avoidance of doubt, all Applicable Governmental Authorizations) or (B) those Governmental Authorizations the failure to obtain which would not have a Material Adverse Effect, all of which either (i) have been duly obtained, taken, given or made, are in full force and effect, are not

subject to any pending appeal, known investigation or similar proceeding and, except as set forth on Schedule 4.01(f), all applicable statutory or regulatory periods to file an appeal have expired and are not subject to any unsatisfied condition or requirement that could reasonably be expected to have a Material Adverse Effect or (ii) are Governmental Authorizations that are not yet Applicable Governmental Authorizations. As of the Closing Date, each Governmental Authorization listed on Schedule 4.01(f) which has not yet been obtained has been specifically identified as such on such Schedule 4.01(f), is not yet an Applicable Governmental Authorization and is reasonably expected to be timely obtainable without undue or disproportionate cost or delay prior to the time that it will become an Applicable Governmental Authorization.

(g)     Upon entry of the Orders, as applicable, as to each Loan Party, this Agreement and each Loan Document have been duly executed and delivered by each Loan Party hereto and thereto. Upon entry of the Orders, this Agreement and each other Loan Document are the legal, valid and binding obligation of each Loan Party hereto or thereto, enforceable against such Loan Party in accordance with its terms, except to the extent the enforceability thereof may be limited by (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

(h)     Other than the Chapter 11 Cases, or as stayed upon commencement of the Chapter 11 Cases, before and after giving effect to the Transactions, there is no action, suit, litigation, proceeding, or to each Loan Party's knowledge, investigation affecting any Loan Party or the Project, including any Environmental Action, pending or, to each Loan Party's knowledge, threatened before any Governmental Authority or arbitrator that (i) as of the Closing Date, involve any Transaction Document, the Initial Commodity Agreement or the Transactions, or (ii) could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(i)     As of the Closing Date, the Borrower Financial Statements delivered pursuant to Section 3.01(a)(xv) fairly present in all material respects the financial condition of the Loan Parties, in each case as at the dates thereof and for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis.

(j)     As of any date on which this representation and warranty is made after the first delivery of the financial statements pursuant to Section 7.02 or Section 7.03, as the case may be, the balance sheet, statement of income and statement of cash flows that have been delivered to the Lender Parties pursuant to Section 7.02 and Section 7.03, fairly present in all material respects the financial condition of the Loan Parties as at the dates thereof and for the periods ended on such dates, all in accordance with GAAP applied on a consistent basis subject, in the case of balance sheets, statements of income and cash flows delivered pursuant to Section 7.03, to normal year-end audit adjustments and the absence of footnote disclosure.

(k)     As of the Closing Date, since December 31, 2016, and at any time this representation and warranty is made thereafter, since the Closing Date, no event or occurrence has occurred and is continuing which has resulted in, or would reasonably be expected to result in, individually or in the aggregate, any Material Adverse Effect (other than the commencement of the Chapter 11 Cases).

(l)     [Reserved.]

(m)     Projections. The projections prepared pursuant to the terms hereof and the Approved Budget are based on good faith estimates and assumptions believed by management of the

Loan Parties to be reasonable and fair in light of current conditions and facts known to Borrower at the time delivered. The management of the Loan Parties believed, as of the date when made, that such projections and Approved Budget were reasonable and attainable in light of the current conditions of the Loan Parties, it being recognized by Lenders, however, that Projections as to future events are not to be viewed as facts or guaranties of future performance, that actual results during the period or periods covered by such Projections may differ from the projected results and that such differences may be material and that the Loan Parties make no representations that such projections will be in fact realized. There is no fact known to any Loan Party which could reasonably be expected to result in a Material Adverse Effect which has not been disclosed herein.

(n)    Each Loan Party is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Advance will be used to (i) purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

(o)    Each Loan Party is not an "investment company," or a company "controlled" by, or an "*affiliated person*" of, or "*promoter*" or "*principal underwriter*" for, an "*investment company*," as such terms are defined in the Investment Company Act of 1940, as amended.

(p)    Each Loan Party is not in violation of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the Patriot Act and the use of the proceeds of the Advances will not violate the Trading with the Enemy Act, as amended or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(q)    Upon entry of the Orders, as applicable, upon making of the filings and taking of the other actions set forth on Schedule 4.01(q), all filings and other actions necessary to perfect the security interests in the Collateral created under the Collateral Documents shall have been duly made or taken. As of the Closing Date, each Loan Party has properly delivered or caused to be delivered to the Collateral Agent all Collateral that requires perfection of the Liens and security interests described above by possession.

(r)    Upon entry of the Orders, as applicable, the Collateral Documents create in favor of the Collateral Agent for the benefit of the Secured Parties a valid and, upon making of the filings and taking of the other actions set forth on Schedule 4.01(q), perfected first priority security interest (subject to Permitted Prior Liens and the Carve Out) in the Collateral, securing the payment of the Secured Obligations.

(s)    Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than Permitted Prior Liens.

(t)    Orders. Each of the Interim Order and the Final Order (from after the date the Final Order is entered) are in full force and effect and have not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and Required Lenders, in their sole discretion, amended or modified and no appeal or leave to appeal of such order has been timely filed or, if timely filed, no stay pending such appeal or leave to appeal is currently effective.

(u)    (i)    Each of the Loan Parties has timely filed, or caused to be timely filed, all federal and other material Tax returns and reports required to have been filed by it, and has paid all

material Taxes it is required to pay to the extent due (other than any such Tax that is subject to Contest). As of the Closing Date and except as set forth on Schedule 4.01(u), there is no proposed Tax assessment against either Loan Parties proposed to such Person in writing or, to such Person's knowledge, threatened, which could reasonably be expected to have a Material Adverse Effect. None of the Loan Parties has been treated as an entity other than a partnership or a disregarded entity for federal, state, local or foreign income or other applicable material state, foreign or local income tax purposes and has never been subject to any material entity-level Tax for federal, state, local or foreign or income tax purposes.

(ii)    None of the Loan Parties has a material liability for the Taxes of any Person (other than such Loan Party) (A) under the United States Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), (B) as a transferee or successor or (C) by contract (other than the Constituent Documents, the Loan Documents, any leases entered into in accordance herewith and the Project Agreements) or otherwise.

(iii)    The Borrower does not intend to treat the Facility (including the incurrence thereof) as being a "reportable transaction" (within the meaning of United States Treasury Regulation Section 1.6011-4).

(iv)    As of the Closing Date, (A) no material Tax Liens have been filed with respect to the assets of the Loan Parties and, except as set forth in Schedule 4.01(u), no material unresolved claim has been asserted in writing with respect to any Taxes of the Loan Parties and (B) no waiver or agreement by the Loan Parties is in force for the extension of time for the assessment or payment of any material Tax, and no request for any such extension or waiver is currently pending.

(v)    As of the Closing Date, there is no ongoing, pending or, to any Loan Party's knowledge, threatened, audit or investigation by any taxing authority of the Loan Parties and there has been no material adjustment proposed in writing by any taxing authority.

(v)    None of the Loan Parties is a party to any tax sharing arrangement (whether or not written) allocating taxes of a consolidated or combined group of which any of the Loan Parties is a member, pursuant to which it may have an obligation to make any payments after the Closing Date.

(w)    (i)    As of the Closing Date, set forth on Schedule 4.01(w)(i) hereto is a complete and accurate list in all material respects of all Real Property which is owned in fee by the Loan Parties, showing, in the case of the Fee Site, the street address or legal description (or other equivalent identification), county or other relevant jurisdiction, and state. Upon entry of the Orders, as applicable, the Loan Parties have good, indefeasible and insurable fee simple title to the Fee Site, free and clear of all Liens, other than Permitted Liens. As of the Closing Date, there are no pending or, to the knowledge of the Loan Parties, proposed material special or other assessments for public improvements or otherwise affecting any material portion of the Fee Site, nor are there any contemplated improvements to the Fee Site that may result in such material special or other assessments.

(ii)    As of the Closing Date, set forth on Schedule 4.01(w)(ii) hereto is a complete and accurate list in all material respects of all leases or easements of Real Property under which the Loan Parties is the lessee or easement holder showing as of the Closing Date the street address or legal description (or other equivalent identification), county or other relevant jurisdiction, state, lessor or easement grantor, and the lessee or easement holder. As of the Closing Date, to each Loan Party's knowledge, each such lease or easement is the legal, valid and binding obligation of the lessor or easement grantor (as applicable) thereof, enforceable in accordance with its terms.

(iii)    As of the Closing Date, set forth on <u>Schedule 4.01(w)(iii)</u> hereto is a complete and accurate list in all material respects of all leases of Real Property under which the Loan Party is the lessor, showing as of the Closing Date the street address or legal description (or other equivalent identification), county or other relevant jurisdiction, state, lessor, and lessee. As of the Closing Date, to the Loan Party's knowledge, each such lease is the legal, valid and binding obligation of the lessee thereof, enforceable in accordance with its terms.

(x)    The Borrower has no Investments, other than Permitted Investments and Investments permitted by <u>Section 6.06</u>.

(y)    Upon entry of the Orders, as applicable:

(i)    Each Loan Party has good record and indefeasible and insurable title in fee simple to, or a valid and insurable leasehold or easement interest in (as applicable), or, in the case of any license or any other right to use Real Property, a valid right to use, all material Real Property rights, including all rights of way, then necessary for the operation, as applicable, of the Project in accordance in all material respects with Requirements of Law, Governmental Authorizations and the Core Transaction Documents, free and clear of any Liens, other than Permitted Liens;

(ii)    Each Loan Party has good, legal and valid title or otherwise has the right to use all material equipment and personal Property, tangible or intangible, which is then-used in the day to day operations of the business of the Loan Parties and which is then-necessary to conduct the business of the Borrower in accordance in all material respects with Requirements of Law, Governmental Authorizations and under the Core Transaction Documents;

(iii)    As of the Closing Date, the Loan Parties have not received any notice of nor have any knowledge of (A) any pending or contemplated event of eminent domain or condemnation or Title Event or (B) any existing or threatened change in the zoning classification in respect of the Site. Neither the business nor the Properties of the Loan Parties are subject to or affected by any strike, lockout or any labor dispute; and

(iv)    As of the Closing Date, except as otherwise depicted on any of the Surveys, no material portion of the Collateral is located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

(z)    The Loan Parties have no deposit or securities accounts other than the Accounts and accounts described in <u>clauses (n)</u> and <u>(q)</u> of the definition of Permitted Liens.

(aa)    All of the services, utilities, equipment and materials or supplies necessary for the Loan Parties to operate and maintain the Project in accordance with Requirements of Law, all Governmental Authorizations and the Core Transaction Documents have been obtained under the Project Agreements or are otherwise available to the Loan Parties at commercially reasonable rates, except to the extent failure to obtain such services, utilities, equipment, materials or supplies could not reasonably be expected to result in a Material Adverse Effect.

(bb)    The Loan Parties have obtained EWG status and is not a "***holding company***" within the meaning of PUHCA or subject to the federal access to books and records provisions of PUHCA.

(cc)    (i)  is the Loan Parties have not subject to regulation as a "***public utility***" as such term is defined in the FPA. Notwithstanding the preceding sentence, the Loan Parties are subject to regulation as a user, owner or operator of the bulk-power system pursuant to Section 215 of the FPA, 16 USC § 824o (2012), and FERC implementing regulations thereunder.

(ii)    The Loan Parties shall operate the Project in such a way that the Project will be able to self-certify as an EWG with the FERC prior to the Project generating electricity, and the Loan Parties shall so self-certify.

(iii)    To the best of the Loan Parties' knowledge, there are no complaints or investigation proceedings, public or non-public, pending with the FERC, the PUCT, ERCOT or IMM seeking abrogation or modification, or otherwise investigating the terms, of a contract for the sale of power and/or capacity by the Loan Parties that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(iv)    Either (A) the Loan Parties have executed and are in compliance with the Interconnection Agreement, the Standard Form Market Participant Agreement and the ERCOT Resource Asset Registration Form submitted to ERCOT or (B) no event or condition exists, and the Loan Parties shall operate the Project so that no event or condition will exist, that would reasonably be expected to prevent the Loan Parties from executing and complying with, prior to generating any electricity, the Interconnection Agreement, the Standard Form Market Participant Agreement and the ERCOT Resource Asset Registration and the Loan Parties shall do so prior to the Project generating electricity. The Loan Parties are not subject to any state laws or regulations respecting rates or the financial or organizational regulation of utilities. No approval is required to be obtained in connection with the Transactions by the Loan Parties from the PUCT, the FERC, or any other state or federal Governmental Authority with jurisdiction over the energy sales, gas purchases or financing arrangements of the Loan Parties.

(v)    The Loan Parties are not subject to any state laws or regulations respecting rates or the financial or organizational regulation of electric utilities or public utilities pursuant to PURA. No approval is required to be obtained in connection with execution of any of the Transaction Documents by the Loan Parties from the PUCT, the FERC, or any other state or federal Governmental Authority with jurisdiction over electric power sales, gas purchases or financing arrangements of the Loan Parties.  None of the Agents nor any Lender Parties nor any "*affiliate*" (as the term is defined in PUHCA) thereof or any of them will, solely as a result of the Loan Parties' ownership of the Project, the sale or transmission of electricity therefrom, or the entering into of any Transaction Document, any Permitted Commodity Agreement or any transaction contemplated hereby or thereby, be subject to, or not exempt from regulation under the FPA, PUHCA, or state Requirements of Law respecting the rates of, or the financial or organizational regulation of, electric utilities, provided that the Project maintains EWG status and except that the exercise by the Agents or the Lender Parties of certain foreclosure remedies allowed under the Transaction Documents may subject the Agents, the Lender Parties and their affiliates (as that term is defined in PUHCA) to regulation under the FPA, PUHCA, or state Requirements of Law respecting the rates of, or the financial or organizational regulation of, electric utilities.

(dd)    As of the Closing Date, set forth on Schedule 4.01(dd) hereto is a complete and accurate list of all Material Project Contracts of the Loan Parties in full force and effect as of the Closing Date. As of the Closing Date, copies of all Material Project Contracts currently in effect have been delivered to the Administrative Agent. As of the Closing Date, the Loan Parties are not in material default and, to the Loan Parties' knowledge, there are no existing material defaults under any Material Project

Contract and no event has occurred or is continuing that gives any Person party thereto the right to terminate any such Material Project Contracts, other than as a direct result of the commencement of the Chapter 11 Cases.

(ee)    (i)  All of the operations and Properties of the Loan Parties comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved, and, to the best of the Loan Parties' knowledge, no circumstances exist that could reasonably be expected to (A) form the basis of an Environmental Action against the Loan Parties or any Agent or Lender Party that could have a Material Adverse Effect or (B) cause any Property of the Loan Parties to be subject to any restrictions on ownership, occupancy, use or transferability under any applicable Environmental Law that could reasonably be expected to have a materially adverse to the Lender Parties.

(ii)    (A) None of the Properties currently owned or operated by the Loan Parties is listed or, to the best of the Borrower's knowledge, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (B) there are no and never have been any underground or above ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed of on any Property currently owned or operated by the Loan Parties that could reasonably be expected to have a Material Adverse Effect; there is no asbestos or asbestos-containing material on any Property currently owned or operated by the Loan Parties in material violation of applicable Environmental Laws; and (C) Hazardous Materials have not been released, discharged or disposed of on any Property currently owned or operated by the Loan Parties.

(iii)    (A) Except as set forth on Schedule 4.01(ee)(iii), the Loan Parties are not undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law, except to the extent as could not reasonably be expected to have a Material Adverse Effect; and (B) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently owned or operated by the Borrower have been disposed of in a manner not reasonably expected to be materially adverse to the Lender Parties.

(ff)    Upon entry of the Orders, as applicable, except as set forth on Schedule 4.01(ff), the Loan Parties have obtained all material Environmental Permits required for ownership and operation of its Property and the Project, other than those Environmental Permits the failure to obtain which would not have a Material Adverse Effect. As of the Closing Date, the Loan Parties have not received any written notification pursuant to any applicable Environmental Law or otherwise has knowledge that any material Environmental Permit is about to be reviewed, made subject to new limitations or conditions, revoked, withdrawn or terminated.

(gg)    No Default has occurred and is continuing.

(hh)    Upon entry of the Orders, as applicable, each Loan Party owns or has the right to use all patents, trademarks, service marks, trade names, domain names, copyrights, licenses and other rights which are then-necessary for the ownership and operation of the Project in accordance with the Transaction Documents, in each case, as to which the failure of the Loan Parties to so own or have the right to use could reasonably be expected to have a Material Adverse Effect. No product, process,

method, substance, part or other material to be sold or employed by the Loan Parties in connection with its business will infringe any patent, trademark, service mark, trade name, domain name, copyright, license or other right owned by any other Person in any matter.

(ii)    <u>Budget</u>. A true and complete copy of the Initial Budget, as approved by the Required Lenders as of the Closing Date, is attached as <u>Exhibit E</u> hereto.

(jj)    Neither the Borrower nor any ERISA Affiliate has (i) any liability relating to or any obligation to make contributions to any "pension plan" (as defined in <u>Section 3(2)</u> of ERISA) or (ii) any liability under, or by operation of, Title IV of ERISA, including, but not limited, to any liability in connection with the termination or reorganization of an "employee benefit plan" (as defined in <u>Section 3(3)</u> of ERISA) subject to Title IV of ERISA or the withdrawal from a multiemployer plan as defined in <u>Section 4001(a)(3)</u> of ERISA.

(kk)    (i)    The Loan Parties have not conducted any business other than the business contemplated by the Transaction Documents and Permitted Commodity Agreements.

(ii)    The Loan Parties are not a general partner or a limited partner in any general or limited partnership, a joint venturer in any joint venture or a member of any limited liability company.

(iii)    The Borrower has no Subsidiaries and Parent has no Subsidiary other than the Borrower.

(iv)    The Loan Parties maintain separate bank accounts and separate books of account from the Sponsor, and all other Persons. The separate liabilities of the Loan Parties are readily distinguishable from the liabilities of the Sponsor and all other Persons.

(v)    The Loan Parties conduct their business solely in its own name in a manner not misleading to other Persons as to its identity.

(vi)    <u>Sanctioned Persons; Anti-Corruption Laws; Patriot Act</u>.

(A)    None of the Loan Parties or the Panda Entities or any of their respective directors, officers or, to the knowledge of the Borrower, employees is subject to any sanctions or economic embargoes administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority in the United States (collectively, "***Sanctions***", and the associated laws, rules, regulations and orders, collectively, "***Sanctions Laws***").

(B)    Each of the Loan Parties and the Panda Entities and their respective directors, officers and, to the knowledge of the Loan Parties, employees is in compliance, in all material respects, with (A) all Sanctions Laws, (B) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "***Anti-Corruption Laws***") and (C) the Patriot Act and any other applicable terrorism and money laundering laws, rules, regulations and orders.  No part of the proceeds of the Facility will be used, directly or indirectly, (I) for the purpose of financing any activities or business of or with any Person or in any country or territory that at such time is the subject of any Sanctions or (II) for any payments to any governmental official or employee, political party, official

of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any Anti-Corruption Law.

(ll)    <u>Security Documents</u>.  This Agreement and the Collateral Documents, taken together with the Interim Order and/or the Final Order, are effective to create in favor of the Collateral Agent for the benefit of the Lenders, legal, valid, enforceable and continuing first priority Liens on, and security interests in, the Collateral pledged hereunder or thereunder, in each case, subject only to Permitted Prior Liens and the payment in full in cash of any amounts due under the Carve-Out.  Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the payment in full in cash of any amounts due under the Carve-Out, which claims shall have recourse to all of the Loan Parties' assets (including avoidance actions and the proceeds thereof).

(mm)    <u>Orders</u>.  Each of the Interim Order (to the extent necessary, with respect to the period prior to the entry of the Final Order) or the Final Order (from and after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and Required Lenders, in their sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(nn)    <u>Commercial Tort Claims</u>.  The only Commercial Tort Claims of any Loan Party existing on the Closing Date are those listed on Schedule 5.27, which sets forth a specific description of such Commercial Tort Claim.

(oo)    <u>Use of Proceeds</u>.  The proceeds of the Advances have at all times been used by the Loan Parties solely in accordance with the terms herein.

(pp)    <u>Bankruptcy Matters</u>.

(i)    The Chapter 11 Cases were commenced on the Petition Date, in accordance with applicable law and proper notice thereof under the circumstances, and proper notice of (x) the motion seeking approval of the Loan Documents and entry of the Orders, as applicable and (y) the hearings for the approval of the Interim Order have been held by the Bankruptcy Court.

(ii)    After the entry of the Orders, as applicable, and pursuant to and to the extent permitted in the Orders, as applicable, the Obligations will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers and other Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c), (upon entry of the Final Order), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, in all respects, to the payment

in full in cash of any amounts due under the Carve-Out and, to the extent contemplated by the Orders, as applicable, the Obligations under this Agreement.

(iii)    After the entry of the Orders, as applicable, and pursuant to and to the extent provided in the Orders, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Loan Parties' pre-Petition Date and post-Petition Date assets, subject, in all respects, to the payment in full in cash of any amounts due under the Carve-Out and, to the extent contemplated by the Orders, the Permitted Prior Liens.

(iv)    After the entry of each Order, such Order is in full force and effect, is not subject to appeal, leave to appeal or reconsideration process (as applicable) and has not been reversed, stayed, modified or amended in any manner without the Lenders' consent.

ARTICLE V

AFFIRMATIVE COVENANTS

So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid, or any Lender Party shall have any Commitment hereunder the Loan Parties will:

Section 5.01    <u>Compliance with Laws, Etc</u>.  Comply with all Requirements of Laws, rules, regulations and orders, except to the extent any failure to comply with any Requirements of Laws, rules, regulations and orders could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    <u>Payment of Taxes, Payment of Obligations</u>,

(a)    Pay and discharge all material Taxes imposed upon it or upon its property before the same shall become delinquent, *provided*, *however*, that the Borrower shall not be required to pay or discharge any such Tax that is subject to Contest that stays the collection or assessment of such Tax and for which adequate reserves have been established on Borrower's books and records in accordance with GAAP.

(b)    Pay and discharge all lawful payment obligations under its Contractual Obligations except (i) where the same is subject to Contest, or (ii) to the extent the failure to pay or discharge such payment obligations could not reasonably be expected to have a Material Adverse Effect.

Section 5.03    <u>Compliance with Environmental Laws</u>.

(a)    Comply, and cause all lessees and other Persons operating or occupying its Properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits except (i) where the necessity of compliance therewith or alleged violation therewith is subject to Contest or (ii) to the extent the failure to so comply could not reasonably be expected to result in a Material Adverse Effect or criminal sanctions against the Borrower or any Agent or Lender Party.

(b)    Obtain, extend and renew all Environmental Permits and Governmental Authorizations necessary for its operations and Properties, except (in the case of any Environmental Permit that is not an Applicable Governmental Authorization) where the failure to obtain, extend or renew could not reasonably be expected to result in a Material Adverse Effect or criminal sanctions against the Borrower or any Agent or Lender Party.

Section 5.04    <u>Maintenance of Insurance</u>.  Maintain insurance against physical loss, public liability, property damage and other risks in accordance with Schedule 5.04. If the Borrower fails to take out or maintain the full insurance coverage required by this <u>Section 5.04</u>, the Administrative Agent may (but shall not be obligated to) take the required policies of insurance and pay the premiums on the same. All amounts so advanced by the Administrative Agent shall become a Secured Obligation and the Borrower shall forthwith pay such amounts to the Administrative Agent, together with interest from the date of payment by the Administrative Agent in accordance with <u>Section 2.08(c)</u>(ii).

Section 5.05    <u>Preservation of Corporate Existence, Etc.</u>  Preserve and maintain its existence, legal structure, legal name, and all material rights (charter and statutory), privileges and franchises necessary or desirable in the conduct of its business.

Section 5.06    <u>Visitation Rights, Etc.</u>

(a)    Upon reasonable prior notice and during normal business hours, permit any of the Agents or any of the Lender Parties, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of, account of, and visit the Properties of, the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any of its officers or directors and with its independent certified public accountants (subject to, in the case of the EPC Contractor, customary "clean-room" restrictions that are reasonably satisfactory to the Administrative Agent); *provided* that prior to the occurrence and continuance of an Event of Default in no event shall there be more than one visit per month by such Agents, Lender Parties or representatives (other than the Independent Engineer who may make such visits and inspections as necessary).

(b)    Not more than once during each calendar quarter, at the written request of the Administrative Agent or the Required Lenders, participate in a telephonic meeting of the Administrative Agent and the Lender Parties to be held at such time as may be agreed to by the Borrower and the Administrative Agent.

Section 5.07    <u>Keeping of Books</u>.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with GAAP.

Section 5.08    <u>Maintenance of Properties, Etc</u>.  (a)  Maintain, preserve and protect (and, as necessary, repair) all of its Properties and equipment that are used or useful in the conduct of the business of the Borrower (x) in good working order and condition, ordinary wear and tear excepted, and (y) in all respects in accordance with Prudent Industry Practices and in a manner that ensures that the conditions set forth in any material warranty provisions of any Contractual Obligation with any supplier or vendor of any equipment incorporated into the Project are not violated, except in each case where failure to do so could not reasonably be expected to have Material Adverse Effect and (b) except as otherwise permitted pursuant to <u>Section 6.05</u>, maintain (x) good, valid, indefeasible and insurable title in all Real Property owned by the Borrower, subject only to Permitted Liens and (y) maintain good and valid interests in all of its other Properties, subject only to Permitted Liens, except, in each case where failure to do so could not reasonably be expected to have Material Adverse Effect.

Section 5.09    <u>Covenant to Give Security</u>.  Upon acquisition of any Property by the Borrower (other than any Excluded Assets, the Planned Shared Facilities and other than any real property with a fair market value of less than $250,000), the Borrower shall, within 3 days after such acquisition, furnish to the Administrative Agent and the Collateral Agent a description of the real Properties so acquired. If in the reasonable judgment of the Administrative Agent or the Collateral Agent, such Property shall not

already be subject to a perfected first priority (subject to Permitted Liens) security interest in favor of the Collateral Agent for the benefit of the Secured Parties, then in each case at the Borrower's expense:

(a)      within 15 days after receipt of request therefor from the Administrative Agent (the "*AA Request*"), duly execute and deliver to the Collateral Agent, and record or file if applicable, such additional deeds of trust, leasehold deeds of trust, Uniform Commercial Code financing statements, pledges, assignments, security agreement supplements and other security agreements as specified by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Collateral Agent, to secure payment of all Secured Obligations and create Liens on all such Properties in favor of Collateral Agent for the benefit of the Secured Parties, subject to the Permitted Liens, and, to the extent obtained by the Borrower using commercially reasonable efforts, to obtain such documents and instruments, any memoranda of leases, any landlord consents, estoppels and consent agreements, estoppel certificates, and such other consents, agreements and confirmations of lessors and third parties as the Administrative Agent or the Collateral Agent may reasonably deem necessary in order to create valid first (subject to Permitted Liens) and subsisting Liens on all such Properties;

(b)      within 30 days after receipt of an AA Request, deliver to the Collateral Agent, upon the request of the Administrative Agent or the Collateral Agent in their reasonable discretion, a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Collateral Agent (it being acknowledged by the parties that Latham & Watkins LLP or Haynes and Boone, LLP shall be deemed to be acceptable) as to (i) such mortgages, deeds of trust, deeds to secure debt, trust deeds, leasehold mortgages, leasehold deeds of trust, leasehold deeds to secure debt, leasehold trust deeds, pledges, assignments, security agreement supplements and security agreements being legal, valid and binding obligations of each Loan Party thereto enforceable in accordance with their terms, (ii) such recordings, filings, notices, endorsements and other actions being sufficient to create valid perfected Liens on such Properties (or, in the case of any mortgage or deed of trust, to provide third parties with constructive notice of the existence of such Liens), (iii) such corporate formalities matters as the Administrative Agent or the Collateral Agent may reasonably request, and (iv) such other matters as the Administrative Agent or the Collateral Agent may reasonably request;

(c)      as promptly as practicable after receipt of an AA Request, deliver to the Administrative Agent and the Collateral Agent with respect to (i) each parcel of Real Property owned or held by the Borrower pursuant to such acquisition, title insurance policies and (ii) each parcel of Real Property owned or held by the Borrower in fee pursuant to such acquisition, in addition to the foregoing, land surveys and engineering, soils and other reports, zoning confirmations and reports and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent; *provided*, *however*, that to the extent that the Borrower shall have otherwise received any of the foregoing items with respect to such Real Property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent and the Collateral Agent; and

(d)      at any time and from time to time, promptly execute and deliver, and cause each other Loan Party to execute and deliver, any and all further instruments and documents and take, and cause each other Loan Party to take, all such other action as the Administrative Agent may reasonably request in order for it and the Collateral Agent to obtain the full benefits of, or to perfect and preserve the Liens of, such guarantees, mortgages, deeds of trust, deeds to secure debt, trust deeds, leasehold mortgages, leasehold deeds of trust, leasehold deeds to secure debt, leasehold trust deeds, pledges, assignments, security agreement supplements and security agreements (other than Excluded Assets and as otherwise contemplated by the Collateral Documents).

Section 5.10      Further Assurances.

      (a)    Promptly upon request by any Agent correct, and cause the Parent to correct, any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof; and

      (b)    Promptly upon request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, deed to secure debt, trust deeds, leasehold mortgages, leasehold deeds of trust, leasehold deeds to secure debt, leasehold trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent , may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by Requirements of Law, subject any Loan Party's Properties, assets, rights or interests  to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party is or is to be a party.

Section 5.11    <u>Enforcement of Contracts</u>.  Seek to enforce the material terms of each Material Project Contract and the Initial Commodity Agreement in accordance with its terms.

Section 5.12    [Reserved].

Section 5.13    <u>Accounts</u>.  Subject to and in accordance with the Cash Management Order, (a) maintain at all times the Accounts, (b) cause all Revenues and other amounts payable to it to be deposited into, or credited to, the Operating Account and (c) cause all funds deposited in the Accounts to be applied in accordance with the terms of the Approved Budget.  Within 30 days after the Closing Date, deliver to the Administrative Agent duly executed deposit account control agreements in favor of the Administrative Agent with respect to the Operating Account in form and substance satisfactory to the Required Lenders.

Section 5.14    [Reserved.]

Section 5.15    <u>Separateness</u>.  Comply with the following:

      (a)    maintain deposit accounts or accounts, separate from those of the Sponsor and any Affiliate of the Sponsor, with commercial banking or trust institutions and not commingle its funds with those of the Sponsor or any such Affiliate of the Sponsor;

      (b)    act solely in its name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

      (c)    conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (including, without limiting the generality of the foregoing, all oral and written communications (if any), including invoices, purchase orders, and contracts);

      (d)    obtain proper authorization from member(s), director(s), manager(s) and partner(s), as required by its Constituent Documents for all of its limited liability company actions;

(e)    comply in all material respects with the terms of its Constituent Documents;

(f)    and at all times maintain at least one independent director who (i) for the five year period prior to his or her appointment as an independent director, has not been, and during the continuation of his or her service as an independent director is not: (A) an employee, director, stockholder, partner, membership interest holder or officer of the Borrower or any of its Affiliates (other than his or her service as an independent director or similar capacity of the Borrower or any of its Affiliates); (B) a customer or supplier of the Borrower or any of its Affiliates (other than an independent director provided by a corporate services company that provides independent directors in the ordinary course of its business); or (C) any member of the immediate family of a Person described in underline clause (A) or (B) and (ii) is reasonably acceptable to the Administrative Agent.

Section 5.16    [Reserved].

Section 5.17    Commodity Hedging.

(a)    Maintain in full force and effect at all times the Initial Commodity Agreement and enforce all rights and remedies thereunder upon any breach by the Initial Commodity Provider (the "***Commodity Hedge Requirement***").

(b)    Maintain at all times the Restructuring Support Agreement in full force and effect with respect to all parties party thereto (including the Loan Parties).

Section 5.18    [Reserved.]

Section 5.19    Sales Authority; EWG, PUCT etc.  Take or cause to be taken all necessary or appropriate actions so that the Borrower will at all times:

(a)    be in compliance with the requirements of PUCT's regulations, including filing annual reports with the PUCT with respect to the amount of energy generated at the Project in accordance with PUCT Substantive Rule §25.91 or its successor; (ii) filing annual reports with the PUCT with respect to new generating facilities in Texas in accordance with PUCT Substantive Rule §25.172(h) and (iii) any other reports that may be required for the operation of the Project as a PGC, unless a failure to comply would not reasonably be expected to have a Material Adverse Effect; and

(b)    maintain its status as an EWG, and comply with all material FERC requirements related to EWG status.

Section 5.20    Operation and Maintenance of the Project.  At all times, operate and maintain the Project, or cause the same to be operated and maintained, in a manner consistent with the Project Agreements and Prudent Industry Practices.

Section 5.21    [Reserved].

Section 5.22    Cash Management  and Cash Management Order. Keep the Cash Management Order in effect at all times on and after the Closing Date.  Maintain a cash management system that is satisfactory to the Loan Parties and the Required Lenders.

Section 5.23    Milestones. The Borrower shall comply with milestones set forth in Schedule 5.23.

Section 5.24    <u>Lender Meetings</u>. On a weekly basis (or less frequently as the Required Lenders shall agree), hold a meeting (by conference call or, at the request of Required Lenders, in person) with the legal counsel and financial advisor to the Lender Parties at which meeting shall be reviewed, among other things, the financial results of Parent and the financial condition of Parent and the Borrower and the actual results versus projections tin the Approved Budget then in effect; provided, however, that following the occurrence of a Default or an Event of Default, such meetings shall be held as often as the Required Lenders shall request.

ARTICLE VI

NEGATIVE COVENANTS

So long as any Advance or any other Obligation of the Loan Parties under any Loan Document shall remain unpaid or any Lender Party shall have any Commitment hereunder, the Loan Parties will not at any time:

Section 6.01    <u>Liens, Etc</u>.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its Properties of any character whether now owned or hereafter acquired, or sign or file, under the Uniform Commercial Code of any jurisdiction, a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except Permitted Liens.

Section 6.02    <u>Debt</u>.  Create, incur, assume or suffer to exist any Debt of the Borrower, except:

(a)    Debt under the Loan Documents and the Prepetition Senior Loan Documents;

(b)    Debt secured by Liens permitted by <u>clause</u> **Error! Reference source not found.** of the definition of Permitted Liens solely in an aggregate principal amount not to exceed the aggregate principal amount outstanding as of the Closing Date;

(c)    Capitalized Leases permitted by <u>clause</u> **Error! Reference source not found.** of the definition of Permitted Liens solely in an aggregate principal amount not to exceed the aggregate principal amount outstanding as of the Closing Date;

(d)    to the extent constituting Debt, Debt in respect of the Interest Rate Agreements;

(e)    to the extent constituting Debt, Debt in respect of the Permitted Commodity Agreement;

(f)    trade or other similar Debt incurred in the ordinary course of business consistent with past practice (but not for borrowed money):

(i)    not more than 60 days past due; or

(ii)    being Contested;

(g)    [Reserved];

(h)    to the extent constituting Debt, obligations for the deferred purchase price of services pursuant to <u>Section 3.7.3.1</u> of the LTP Contract in an aggregate amount (including any amounts deferred and subsequently paid or otherwise satisfied) not to exceed $5,000,000;

(i)        to the extent constituting Debt, contingent obligations under or in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees, indemnification obligations, obligations to pay insurance premiums, take or pay obligations and similar obligations in each case incurred in the ordinary course of business and not in connection with Debt for Borrowed Money; and

(j)        to the extent constituting Debt, Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business; *provided* that such Debt is extinguished within 5 Business Days of its incurrence.

Section 6.03        Nature of Business.  Engage in any business other than the direct or indirect acquisition, development, expansion, ownership, operation, management, maintenance, use and/or financing of the Project and activities incidental to the foregoing.

Section 6.04        Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it.

Section 6.05        Sales, Etc. of Assets.  Sell, lease, transfer or otherwise dispose of any of its Property, or grant any option or other right to purchase, lease or otherwise acquire, any of its Property, except:

(a)        sales of (or the granting of any option or other right to purchase, lease or otherwise acquire) electric capacity, energy, ancillary services, excess natural gas, excess fuel, excess fuel transportation or emission allowances or credits in the ordinary course of business consistent with past practice to the extent not prohibited by Section 6.14;

(b)        sales, transfers or other dispositions in the ordinary course of its business of Property that is obsolete, worn-out, damaged, surplus or not used or useful in the business of the Borrower; provided that to the extent that the Net Cash Proceeds received by the Borrower in any Fiscal Year in connection with such sales, transfers or dispositions exceeds $200,000 such amount shall constitute Asset Sale Proceeds and be applied to prepay the Advances;

(c)        the liquidation, sale or use of Cash and Cash Equivalents in the ordinary course of business and consistent with past practice and Permitted Investments;

(d)        sales of assets as otherwise expressly permitted pursuant to the O&M Agreement as in effect on the Closing Date in an aggregate fair market value not to exceed $1,000,000;

(e)        [Reserved];

(f)        to the extent constituting a sale of assets, disposition or transfer of assets, under or pursuant to any Permitted Lien described in clauses (n), (q)(ii), (q)(iii) and (w) thereof;

(g)        [Reserved];

(h)        transfer and conveyance of the Infrastructure Improvements (as defined in the Economic Development Agreement);

(i)        sales or discounts without recourse of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(j)        transfers of condemned property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement, in each case, (x) the proceeds of which are used to prepay the Advances and (y) only to the extent such transfers of property will not result in a Default under Section 9.01(o);

(k)        [Reserved];

(l)        grants of easements, leases, subleases, licenses or sublicenses of property in the ordinary course of business consistent with past practice and which do not materially interfere with the business of the Borrower or which would otherwise constitute Permitted Liens.

Section 6.06    Investments in Other Persons.  Make or hold any Investment except:

(a)        Investments by the Borrower in Cash, Cash Equivalents or Permitted Investments;

(b)        Investments existing on the date hereof and described on Schedule 4.01(x); and

(c)        Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business.

Section 6.07    Restricted Payments.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such or issue or sell any Equity Interests (such actions, "***Restricted Payments***").

Section 6.08    Transactions with Affiliates.  Conduct any transactions otherwise permitted under the Loan Documents with any of its Affiliates other than (a) on terms that are fair and reasonable and no less favorable to the Borrower than it would obtain in a comparable arm's length transaction with a Person not an Affiliate and consented to by the Required Lenders, (b) the Panda Agreements, the Restructuring Support Agreement, each as in effect on the Closing Date and (c) any payments made pursuant to Section 6.07.

Section 6.09    Amendments of Constituent Documents.  Without the prior written approval of the Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed), amend its Constituent Documents other than amendments that do not materially and adversely impair the rights and remedies of any Agent or any Secured Party under the Pledge Agreement.

Section 6.10    Accounting Changes.  Make or permit any change in its (a) accounting policies or reporting practices, except as permitted by GAAP or (b) Fiscal Year, in each case unless such change is acceptable to the Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 6.11    Prepayments of Debt.  Prepay, repay redeem, cash collateralize, purchase, defease or otherwise satisfy in any manner, or make any payment in violation of any subordination terms

of, any Obligations, except the payment of the Advances in accordance with the terms of this Agreement and any payment set forth in the Approved Budget (subject to the Permitted Variances).

Section 6.12    Amendment of Material Project Contracts, Etc.

(a)    Terminate, amend or consent to the termination or amendment of any Material Project Contract;

(b)    Terminate or consent to the termination of the Initial Commodity Agreement with Section 5.17 or directly or indirectly, amend, modify or change in any manner any term or condition thereof, give any consent, waiver or approval thereunder in respect of any term or condition or, waive any default thereunder or breach of any term or condition of the Initial Commodity Agreement;

(c)    Terminate or consent to the termination of the Shared Facilities Agreement or amend, modify or change in any manner any material term or condition thereof;

(d)    Amend, modify or change in any manner any material term or condition of the EPC Contract.

Section 6.13    Partnerships, Formation of Subsidiaries, Etc.

(a)    Become a general partner in any general or limited partnership or joint venture or a member in any limited liability company (other than Parent being a member in the Borrower); or

(b)    organize or own any Subsidiary.

Section 6.14    Speculative Transactions.  Enter into after the Closing Date any transaction involving commodity swaps, options or futures contracts or any similar transactions (including take-or-pay contracts, long term fixed price off take contracts and contracts for the sale of power on either a financial or physical basis).

Section 6.15    Capital Expenditures.  Make any Capital Expenditures, other than in compliance with the Approved Budget.

Section 6.16    Additional Project Agreements.  Enter into, become a party to or become liable under any Material Project Contract entered into after the Closing Date, including any Additional Project Agreement.

Section 6.17    Lease Transactions.  Enter into any transaction for the lease of any Property as lessee, whether an operating lease, Capitalized Lease or otherwise other than (a) the leases set forth on Schedule 4.01(w)(i) or Schedule 4.01(w)(ii), (b) [reserved], (c) leases of automobiles, office equipment and other real or personal property under which the aggregate annual lease payments by the Borrower do not exceed $250,000 in the aggregate in any Fiscal Year, and (d) [Reserved], and (e) leases in respect of the Shared Facilities, as defined in and pursuant to the Shared Facilities Agreement as in effect on the date hereof.

Section 6.18    ERISA Plans.  Except as would not be expected to have a Material Adverse Effect, (a) incur any liability relating to, or incur any obligation to, make contributions to any "pension plan" (as defined in Section 3(2) of ERISA) or (b) incur any liability under or by operation of Title IV of ERISA, including, but not limited to, any liability in connection with the termination or reorganization of

an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title IV of ERISA or the withdrawal from a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

Section 6.19    <u>Accounts</u>.    Open or have any deposit or securities accounts other than the Accounts.

Section 6.20    <u>Use of Proceeds</u>.    Except as otherwise provided herein or approved by the Administrative Agent (at the direction of the Required Lenders), use any cash or the proceeds of any Advances in a manner or for a purpose inconsistent with this Agreement, the Orders and the Approved Budget (subject to the Permitted Variances); provided, that no cash or the proceeds of any Advances may be used by the Loan Parties in connection with: (i) the payment of any principal of the Prepetition Senior Loan Debt, and (ii) investigating (including by way of examination and/or discovery proceedings), initiating, asserting, joining, commencing, supporting or prosecuting any claims, causes of action, adversary proceedings or other litigation against the Lenders, the Agents, the Prepetition Senior Loan Agent and the Prepetition Senior Loan Lenders, and each of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (1) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (2) any so-called "lender liability" claims and causes of action; (3) any action with respect to the validity, enforceability, priority and extent of the Prepetition Senior Loan Debt or the Advances; (4) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Senior Loan Debt or the Advances; or (5) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the Lender Parties hereunder or under the Loan Documents, or for any purpose that is prohibited under the Bankruptcy Code, in each case, other than an aggregate amount not to exceed $25,000 that may be used by, or to reimburse, the fees, costs or expenses of, the Committee solely in connection with the investigation of the prepetition claims of the holders of the Prepetition Senior Loan Debt or their affiliates; provided, that, during the Remedies Notice Period, nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge an Event of Default.

Section 6.21    <u>Chapter 11 Cases</u>.

(a)    Other than the claims and Liens of the Agents arising from this Agreement, and other than the adequate protection claims of the Prepetition Senior Loan Agent arising from the Prepetition Senior Loan Agreement to the extent set forth in the Orders, as applicable, and except for the Carve-Out and in respect of Permitted Prior Liens, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other Superpriority Claim which is pari passu with, or senior to the claims and Liens of, the applicable Agents and Lenders.

(b)    Make or permit to be made any amendment or change to the Orders, as applicable, without the consent of the Required Lenders.

(c)    Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against any Agent, any Lender, the Prepetition Senior Loan Agent or any Prepetition Senior Loan Lender with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Senior Loan Agreement, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby; provided, that during the Remedies Notice Period, nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge an Event of Default.

(d)     Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing and (b) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget or otherwise with the consent of the Required Lenders.

(e)     File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors without consulting with the Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required Lenders in their sole discretion)) notice and the opportunity to review and comment on each such motion.

ARTICLE VII

REPORTING COVENANTS

So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Lender Party shall have any Commitment hereunder, the Borrower will furnish to the Agents and the Lender Parties:

Section 7.01     <u>Default and Material Adverse Effect Notice</u>.  As soon as possible and in any event within three Business Days after any officer of a Loan Party becomes aware of the occurrence of (a) each Default or (b) any event, development or occurrence specific to the Borrower or the Project that is not a matter of general public knowledge and that has had, or could reasonably be expected to have, a Material Adverse Effect continuing on the date of such statement, a statement of the Chief Financial Officer of the Borrower setting forth details of such Default or event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

Section 7.02     <u>Annual Financials</u>.  As soon as available and in any event within 120 days after the end of each Fiscal Year, a copy of the annual audit report for such year for the Borrower, including therein a balance sheet of the Borrower as of the end of such Fiscal Year and a statement of income and a statement of cash flows of the Borrower for such Fiscal Year, in each case accompanied by an opinion as to such audit report of BDO USA, LLP or other independent public accountants of nationally recognized standing reasonably acceptable to the Administrative Agent together with a certificate of the Chief Financial Officer of the Borrower stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

Section 7.03     <u>Scheduled Financials</u>.  As soon as available and in any event within 45 days after the end of each of the first three quarters of each Fiscal Year, a balance sheet of the Borrower as of the end of such quarter and a statement of income and a statement of cash flows of the Borrower for the period commencing at the end of the previous fiscal quarter and ending with the end of such fiscal quarter and a statement of income and a statement of cash flows of the Borrower for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by the Chief Financial Officer of the Borrower as having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has

occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto.

Section 7.04    [Reserved].

Section 7.05    Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting the Borrower of the type described in Section 4.01(h).

Section 7.06    Creditor Reports.  Promptly after the furnishing thereof, copies of any material statement or report furnished to any holder of Debt securities of the Borrower pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lender Parties pursuant to any other section of this Article VII.

Section 7.07    Agreement Notices, Etc.  Promptly upon receipt thereof, (a) copies of all notices, requests and other documents received by the Borrower under or pursuant to any Material Project Contract, Easement Agreements or Governmental Authorization regarding or related to (i) any material breach or default asserted by any party thereto or (ii) any other event that could reasonably be expected to materially impair the value of the interests or the rights of the Borrower thereunder or otherwise have a Material Adverse Effect, (b) copies of any material amendment, modification or waiver of any Material Project Contract or Easement Agreement, (c) copies of any amendment, modification or waiver of any provision of any Constituent Document of the Borrower, (d) copies of any Additional Project Agreement, Material Commodity Agreement or Replacement Project Contract entered into by the Borrower after the date hereof to the extent not previously delivered, and (e) from time to time upon request by the Administrative Agent, such information and reports regarding the Material Project Contracts, Permitted Commodity Agreements, Governmental Authorizations obtained in respect of the Project and such instruments, indentures and loan and credit and similar agreements as the Administrative Agent may reasonably request.

Section 7.08    Environmental Conditions.    Promptly after receipt of notice or obtaining knowledge thereof, notice of any Environmental Action involving or of any non-compliance by the Borrower with any Environmental Law or Environmental Permit or the release of any Hazardous Material that could (i) reasonably be expected to have a Material Adverse Effect or could reasonably be likely to result in any material liability to, or criminal sanctions against, the Borrower or any Agent or Lender Party or (ii) cause any Real Property described in the Mortgages to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law.

Section 7.09    Additional Reporting.

(a)    Not later than 5:00 p.m. on Friday of each calendar week, the Borrowers shall deliver to Agent and each Lender a variance  report (each, a "*Weekly Report*") setting forth in reasonable detail the actual cash flows for the immediately preceding calendar week with respect to each line item in the Approved Budget; provided that each Weekly Report delivered during the week after a Test Date shall also set forth such cash flows for the Test Period most recently ended, together with the percentage, if any, by which such actual cash flows for each line item exceeded or were less than the cash flows set forth in the Approved Budget for such Test Period and a certification that no disbursements have been made inconsistent with the Approved Budget.  There shall be a weekly teleconference between the Borrower and the Lenders to discuss the Weekly Report, including a management discussion and analysis of permanent versus timing differences for any variances form the Approved Budget.

(b)     As soon as available and in any event not later than 5:00 p.m. New York City time on the Friday of each calendar week, an update to the Approved Budget then in effect, in form and substance satisfactory to the Required Lenders, for the subsequent 13-week period following such Business Day (it being understood that such update to the Approved Budget then in effect shall be limited to only the addition of the subsequent new 13th week); provided that no approval of the Required Lenders shall be required with respect to any proposed update to the Approved Budget to the extent the previously approved line items therein remain unchanged for the same period set forth in the Approved Budget then in effect.

Section 7.10     Insurance.  (i) As soon as available and in any event within 30 days after the end of each annual policy renewal date, a certificate of a Responsible Officer of the Borrower, certifying that (x) the insurance requirements of Schedule 5.04 have been implemented and the Borrower's insurance policies are being complied with in all material respects and (y) the Borrower has paid all insurance premiums then due and payable, and (ii) promptly after obtaining knowledge of any early cancellation or material change in the terms, coverage or amounts of any insurance described in Schedule 5.04, a statement a Responsible Officer of the Borrower setting forth the details of such cancellation or change.

Section 7.11     Lien Waivers.  Promptly upon receipt thereof, deliver to the Administrative Agent duly executed and acknowledged lien waivers and releases from the EPC Contractor and each of its Major Subcontractors for all work, services and materials, including equipment and fixtures of all kinds, done, previously performed or furnished for the construction and development of the Project.

Section 7.12     Operating Reports.  Deliver to the Administrative Agent, as soon as available, but in any event no later than forty-five (45) days after the end of each fiscal quarter, commencing with the first fiscal quarter of 2017, a summary of operations for each such fiscal quarter and a summary of the calendar year-to-date operations, in each case including comparisons to the Annual Budget, including information in reasonable detail concerning: (a) generating output of the Project during such fiscal quarter, (b) Commodity Agreements in effect during such fiscal quarter and any deliveries or payments made thereunder,

(a)     any adjustments made to any pricing formula or component thereof in any Commodity Agreement during such fiscal quarter, (d) the mark to market exposure of the Borrower under any Commodity Agreement to which the Borrower is a party as of the last day of such fiscal quarter, (e) Revenues generated during such fiscal quarter, (f) O&M Costs during such fiscal quarter, (g) any Capital Expenditures or Major Maintenance Expenditures made during such fiscal quarter, (h) the Borrower's most recent cash planning forecast by month covering at least the next six months, (i) any material developments during such fiscal quarter in the operations of the Project which have had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (j) a description of compliance and non-compliance with Applicable Governmental Authorizations, and (k) without duplication of any of the foregoing, a description of any material defects or material malfunctions at the Project and factors affecting actual or expected O&M Costs and Revenues.

Section 7.13     Notices, Etc.  Promptly notify the Administrative Agent of:

(a)     the assertion under any Material Project Contract of the occurrence of any event of force majeure the duration of which is in excess of 96 hours and, to the extent requested by the Administrative Agent and available to the Borrower, copies of any invoices, statements, supporting documentation, schedules, data or affidavits delivered under such Material Project Contract;

(b)     the occurrence of any Loss Event or Title Event, in each case, whether or not insured;

(c)     any notice of cancellation of, or non-renewal of, or material change in the insurance policies maintained by or on behalf of the Borrower in respect of the Project;

(d)     any material change in accounting policies or financial reporting practices by the Borrower (other than changes required by GAAP);

(e)     [Reserved];

(f)     any notice of demand under any Support Instrument issued in respect of any Material Project Contract;

(g)     any dispute or material correspondence between the Borrower and any Governmental Authority involving the revocation, modification, failure to renew or the like of any Applicable Governmental Authorization or the imposition of additional conditions with respect thereto, to the extent if adversely determined could reasonably be expected to have a Material Adverse Effect;

(h)     any forced outage in respect of the Project in excess of 96 hours;

(i)     the termination of any Material Project Contract; and

(j)     upon obtaining knowledge thereof, any transfer or disposition of any direct ownership interest in the Parent, including information regarding transferees in respect of any transfers by the Person that directly owns an interest in the Borrower below a corporate taxpayer level.

Section 7.14     <u>Other Information</u>.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower as any Agent, or any Lender Party through the Administrative Agent, may from time to time reasonably request.

ARTICLE VIII

FINANCIAL COVENANTS

So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Lender Party shall have any Commitment hereunder, the Loan Parties will:

Section 8.01     <u>Fixed Costs.</u>  With respect to the Test Period ending on each Test Date, not, without the written consent of the Required Lenders, make disbursements in respect of (x) Fixed Costs and (y) the line-item "Estate Professionals" (the "***Estate Professional Costs***"), in each case, during such Test Period, in an aggregate amount which would exceed by more than twenty percent (20.0%) the aggregate amount of Fixed Costs and Estate Professional Costs, as applicable, in the Approved Budget for such Test Period (the "***Permitted Variances***").

Section 8.02     <u>Minimum Liquidity</u>.  As of each Test Date, not permit Minimum Liquidity to be less than (x) prior to the Final Order Funding Date, $4,000,000 and (y) after the Final Order Funding Date, $8,000,000.

ARTICLE IX

EVENTS OF DEFAULT

Section 9.01    <u>Events of Default</u>.  If any of the following events (each an "***Event of Default***") shall occur and be continuing:

(a)    (i) the Borrower shall fail to pay any principal of any Advance when the same shall become due and payable or (ii) the Borrower shall fail to pay any interest on any Advance, or any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three Business Days after the same shall become due and payable; or

(b)    any representation or warranty made by any Loan Party under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made unless, if such misstatement (and the effect thereof) is capable of being cured, the Borrower cures such misstatement (and any effect thereof) within 30 days of becoming aware thereof; or

(c)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in <u>Section 2.16</u>, <u>Section 5.05</u>, <u>Section 5.06</u>, <u>Section 5.13</u>, <u>Section 5.15</u>, <u>Section 5.17</u>, <u>Section 5.22</u>, <u>Section 5.23</u>, <u>Section 5.24</u>, <u>Section 5.26</u>, <u>Section 5.28</u>, <u>Article VI</u>, <u>Section 7.01</u> or <u>Article VIII</u>; or

(d)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in <u>Section 5.04</u>, <u>Section 5.20</u>, <u>Section 7.02</u>, <u>Section 7.03</u>, <u>Section 7.04</u> or <u>Section 7.12</u> and such failure shall remain unremedied for ten days after the earlier of the date on which (i) any officer of the Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party; or

(e)    any Loan Party shall fail to perform or observe any term, covenant or agreement contained in any Loan Document on its part to be performed or observed (other than any term, covenant or agreement contemplated by <u>Section 9.01(a)</u> through (d) above and Section 9.01(q) below) if such failure shall remain unremedied for 30 days after the earlier of the date on which (i) any officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party; or

(f)    the Borrower shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Debt of the Borrower that is outstanding in a principal amount of at least $5,000,000 either individually or in the aggregate (but excluding Debt outstanding hereunder), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, and the effect of such event or condition is the acceleration of such Debt or the maturity of such Debt, or such Debt shall be declared to be due and payable or required to be prepaid or redeemed, in each case described in this clause (f) with such breaches not subject to the automatic stay in the Chapter 11 Cases; or

(g)    [reserved];

(h)    any unsatisfied judgments or orders, either individually or in the aggregate, for the payment of money in excess of $1,000,000 shall be rendered against any Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; *provided*, *however*, that any such judgment or order shall not give rise to an Event of Default under this <u>Section 9.01(h)</u>(ii) if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance in

favor of such Loan Party from an insurer that is rated at least "*A*" by A.M. Best Company, which policy covers full payment thereof (other than the greater of the applicable deductible or $1,000,000) and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order; or

(i)        any non-monetary judgment or order shall be rendered against any Loan Party that could reasonably be expected to have a Material Adverse Effect, and there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)        any provision of any Loan Document after delivery thereof pursuant to <u>Section 3.01</u> or <u>Section 5.09</u> shall for any reason cease to be valid and binding on or enforceable against any Loan Party or any such Person shall so state in writing; or

(k)        any Collateral Document or financing statement in respect thereof after delivery thereof pursuant to <u>Section 3.01</u> or <u>Section 5.09</u> shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby; or

(l)        Any Core Material Project Contract shall terminate or otherwise cease to be valid and binding on any party thereto (except upon expiration in accordance with its terms or full performance by such party of its obligations thereunder) and such termination or cessation has resulted in or could reasonably be expected to result in a Material Adverse Effect; or

(m)        The Initial Commodity Agreement shall terminate or otherwise cease to be valid and binding on any party thereto (except upon expiration in accordance with its terms or full performance by such party of its obligations thereunder); or

(n)        the Borrower shall voluntarily abandon the operation and maintenance of the Project; or

(o)        any portion of the Project is damaged, seized or appropriated without fair value being paid therefor (by insurance or otherwise) such as to allow replacement of such Property and/or prepayment of the Secured Obligations and to allow the Borrower to continue satisfying its Obligations under this Agreement and the other Core Transaction Documents, in each case after giving effect to any cash contributions to the common equity of the Borrower (other than pursuant any Equity Cure Contributions) made to the Borrower after the Closing Date and applied to such replacement and/or prepayment; or

(p)        the Parent shall (i) directly conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations or other activity other than those related to its ownership of the Equity Interests in the Borrower and the performance of its Obligations under the Loan Documents to which it is a party including (A) activities associated with the making of capital contributions to the Borrower (B) the issuance of Equity Interests in connection with its ownership of the Borrower and (C) any activities expressly related to conducting the Chapter 11 Cases in accordance with the Restructuring Support Agreement or (ii) directly own, lease, manage or otherwise operate any Property other than the ownership of Equity Interests in the Borrower; or

(q)        the Borrower shall fail to perform or observe any term, covenant or agreement contained in <u>Section 5.19</u>, and such failure has resulted in or could reasonably be expected to result in a Material Adverse Effect, and such failure shall remain unremedied for thirty (30) days after the earlier of

the date on which (i) any officer of the Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party; or

> (r)    There shall have occurred any of the following in the Chapter 11 Cases:

> (i)    the bringing of a motion by any Loan Party in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash; (ii) to grant any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (iii) except as provided in this Agreement, the Interim Order or the Final Order, as the case may be, to use cash collateral of the Agents under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (iv) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Loan Party) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Agent and the Lenders hereunder or their interest in the Collateral;

> (ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which does not provide for either (x) the repayment of all Obligations under this Agreement in full in cash on the "Closing Date" of such plan or (y) such other treatment of the Obligations in a manner acceptable to the Required Lenders, or the termination of any Loan Party's exclusive right to file and solicit acceptances of a plan of reorganization;

> (iii)    the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not (i)(a) contain a provision for repayment in full in cash of all of the Obligations under this Agreement on or before the Closing Date of such plan or plans and (b) provide for the continuation and current priority of the Liens and security interests granted to the Agent for the benefit of the Lenders until the Obligations have been paid in full or (ii) provide for such other treatment of the Obligations in a manner acceptable to the Required Lenders;

> (iv)    the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the Interim Order or the Final Order in any case without the prior written consent of the Required Lenders;

> (v)    the Final Order is not entered within thirty (30) days (or such other period as the Required Lenders may agree to in writing) following the date of the Interim Hearing;

> (vi)    the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance reasonably acceptable to the Required Lenders, or (ii) as set forth in the Approved Budget (subject to the Permitted Variances);

> (vii)    the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Loan Party, for an order seeking the appointment of, in either case without the consent of the Required Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or

reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the Agents or the Lenders or against the Prepetition Senior Loan Agent or Prepetition Senior Loan Lenders under the Prepetition Senior Loan Documents, or the Agents or Lenders under the Loan Documents; or the sale without the Administrative Agent's and the Required Lenders' consent, of all or substantially all of any Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations;

(viii)    the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of the Borrowers hereunder, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of the Borrowers hereunder;

(ix)    the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)    the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Collateral Agent and the Prepetition Senior Loan Agent;

(xi)    the entry of an order in the Chapter 11 Cases, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii)    the failure of any Loan Party to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order, subject to any applicable grace or cure periods;

(xiii)    the challenge by any Loan Party to the validity, extent, perfection or priority of any liens granted under the Prepetition Senior Loan Documents or the Loan Documents;

(xiv)    the remittance, use or application of cash collateral of the Loan Parties other than in accordance with the Cash Management Order and the Orders;

(xv)    the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the applicable Agent, on behalf of itself and the Lenders without the consent in writing of the Required Lenders;

(xvi)    the filing of a motion by any Loan Party requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Lenders' claims or with the claims of the Prepetition Senior Loan Lenders under the Prepetition Senior Loan Documents or the Lenders under the Loan Documents, except (i) in connection with Permitted Prior Liens, (ii) in respect of the Carve-Out, (iii) under the Adequate Protection Provisions, or (iv)

to the extent the claim relates to new financing that provides for the repayment of all Obligations under this Agreement irrevocably in full in cash on the closing of such new financing;

(xvii)    the entry of an order precluding the Collateral Agent or the Prepetition Senior Loan Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties;

(xviii)    any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt;

(xix)    the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order or any provision thereof without the consent of the Required Lenders;

(xx)    the payment of or granting adequate protection (except pursuant to the Adequate Protection Provisions) with respect to any Prepetition Senior Loan Debt (other than with respect to payment permitted under any "first day order" in form and substance satisfactory to the Lenders or as set forth in the Interim Order or the Final Order);

(xxi)    an application for any of the orders described in this Section 9.01(g) including, without limitation, clauses (i), (iii), (iv), (viii), (ix), (x), (xi) or (xv) shall be made by a Person other than the Administrative Agent or the Lenders and such application is not, to the extent requested by Administrative Agent or the Lenders, contested by any Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(xxii)    the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or

(xxiii)    termination of the Restructuring Support Agreement; or

(xxiv)    the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Orders, the Liens granted under the Collateral Documents and the Collateral;

then, and in any such event, the Administrative Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Commitments of each Lender Party and the obligation of each Lender to make Advances to be terminated, whereupon the same shall forthwith terminate, (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower, (iii) may apply, set off or execute upon any amounts on deposit in any Account or any proceeds (or direct the Depositary and/or the Collateral Agent to do the same), or any other moneys of the Borrower on deposit with the Administrative Agent or any other Lender Party in the manner provided in the Uniform Commercial Code and other relevant statutes and decisions and interpretations thereunder with respect to cash collateral, (iv) may liquidate Insurance Proceeds (including any permitted investments made with such proceeds) in such manner as the Required Lenders shall deem reasonably and prudent under the circumstances and apply the same (A) to curing such Event of Default, and any Insurance Proceeds remaining thereafter, or (B) toward payment of all other Secured Obligations of the Borrower in connection with the exercise of the Lenders' remedies pursuant to this Section 9.01 and (v) exercise any

and all rights and remedies available under any of the Loan Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral pursuant to the Collateral Documents and applicable law (including the Bankruptcy Code);

Section 9.02    Bankruptcy Code and Other Remedies.

(a)    Bankruptcy Code Remedies. During the continuance of an Event of Default, subject to the Remedies Notice Period, the Administrative Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 9.01) and in any other instrument or agreement securing, evidencing or relating to any Obligation, all rights and remedies of a secured party under the Bankruptcy Code or any other applicable law.

(b)    Disposition of Collateral. Without limiting the generality of the foregoing, the applicable Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Interim Order, or, the Final Order and any notice required by law referred to below, including compliance with the Remedies Notice Period) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Interim Order or the Final Order)), during the continuance of any Event of Default (personally or through its agents or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party or any other Person notice or opportunity for a hearing on the Collateral Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) Sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Lender Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any Deposit Account or Securities Account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account or Securities Account pursuant to the related Control Agreement.  The Collateral Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against the Obligations), free of any right or equity of redemption of any Loan Party, which right or equity is hereby waived and released.

(c)    Management of the Collateral. Each Loan Party further agrees, that, during the continuance of any Event of Default, subject to the Remedies Notice Period, (i) at the Collateral Agent's request, it shall assemble the Collateral and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Collateral Agent also has the right to require that each Loan Party store and keep any Collateral pending further action by the Collateral Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Collateral Agent is able to sell any Collateral, the Collateral Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent and (iv) the Collateral Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Lender Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Collateral Agent shall not have any obligation

to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of the Collateral Agent.

(d)    <u>Proceeds to be Turned over to and Held by Collateral Agent</u>.  Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, subject to the Remedies Notice Period, all proceeds of any Collateral received by any Loan Party hereunder in cash or Cash Equivalents shall be held by such Loan Party in trust for the Collateral Agent and the other Lender Parties, segregated from other funds of such Loan Party, and shall, promptly upon receipt by any Loan Party, be turned over to the Collateral Agent in the exact form received (with any necessary endorsement). All such proceeds of Collateral and any other proceeds of any Collateral received by the Collateral Agent in cash or Cash Equivalents shall be held by the Collateral Agent in a Deposit Account or Securities Account. All proceeds being held by the Collateral Agent in a Deposit Account or Securities Account (or by such Loan Party in trust for the Collateral Agent) shall continue to be held as collateral security for the Obligations and shall not constitute payment thereof until applied as provided in this Agreement.

(e)    <u>Deficiency</u>.  Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Collateral Agent or any other Lender Party to collect such deficiency.


ARTICLE X

THE AGENTS

Section 10.01    <u>Authorization and Action</u>.

(a)    Each Lender Party hereby appoints WSFS to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.

(b)    Each Lender Party hereby appoints WSFS to act on its behalf as the Collateral Agent hereunder and under the other Loan Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such other actions and powers as are reasonably incidental thereto, including acting as the agent of such Lender Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations.

(c)    The provisions of this <u>Article X</u> are solely for the benefit of the Agents and Lender Parties and, except as provided in <u>Section 10.11</u>, the Borrower shall not have rights as a third party beneficiary of any of such provisions. In performing its functions and duties hereunder, no Agent assumes, and shall not be deemed to have assumed, any obligation towards or relationship of agency or trust with or for the Borrower.

(d)    No Agent shall have, by reason hereof or of any of the other Loan Documents, a fiduciary relationship in respect of any Lender Party or any other Person (regardless of whether or not a Default has occurred), it being understood and agreed that the use of the term "agent" herein or in any

other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied obligations arising under any agency doctrine of any applicable law, and that such term is used as a matter of market custom; and nothing herein or in any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or of any of the other Loan Documents except as expressly set forth herein or therein. Without limiting the generality of the foregoing, no Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.

Section 10.02    Agents Individually.

(a)    Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender Party as any other Lender Party and may exercise the same as though it were not an Agent and the term "*Lender Party*" or "*Lender Parties*" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity. Each such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lender Parties.

(b)    Each Lender Party understands that WSFS and each of their respective Affiliates are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (such services and businesses are collectively referred to in this Section 10.02 as "*Activities*") and may engage in the Activities with or on behalf of one or more of the Loan Parties or their respective Affiliates. Furthermore, WSFS and their respective Affiliates may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for their own account or on behalf of others (including the Loan Parties and their Affiliates and including holding, for their own account or on behalf of others, equity and similar positions in the Borrower or its respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of one or more of the Loan Parties or their Affiliates. Each Lender Party and the Borrower understand and agree that in engaging in the Activities, WSFS and their respective Affiliates may receive or otherwise obtain information concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents), which information may not be available to any of the Lender Parties that are not Affiliates of WSFS. Except for documents expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lender Parties, neither any Agent or any of their respective Affiliates shall have any duty or responsibility to provide, and shall not be liable for the failure to provide, any Lender Party with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower or any Affiliate of the Borrower that may come into the possession of any Agent or any Affiliate thereof or any employee or agent of any of the foregoing.

(c)    Each Lender Party and the Borrower further understand that there may be situations where parts of WSFS and/or WSFS's customers (including the Loan Parties or their Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Lender Parties hereunder and under the other Loan Documents. Each Lender Party and the Borrower agree that none of WSFS nor any of their Affiliates are required to restrict their activities as a result of WSFS acting as an Agent (or in any other capacity) hereunder and under the other Loan Documents, and that WSFS and their respective Affiliates may undertake any Activities without

further consultation with or notification to any Lender Party or the Borrower. None of (i) this Agreement nor any other Loan Document, (ii) the receipt by WSFS of Confidential Information nor (iii) any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) owing by any Agent or any of their respective Affiliates to any Lender Party or the Borrower that would prevent or restrict WSFS or any of their respective Affiliates from acting on behalf of customers (including the Loan Parties or their Affiliates) or for their own account. Each Lender Party and the Borrower agree that none of any Agent nor any of their respective Affiliates is under a duty to disclose to any Lender Party or the Borrower or use on behalf of the Lender Party or the Borrower any information whatsoever about or derived from the Activities or to account for any revenue or profits obtained in connection with the Activities.

Section 10.03    Duties of Agents; Exculpatory Provisions.

(a)    The Agents' duties hereunder and under the other Loan Documents are solely mechanical and administrative in nature and no Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent shall be entitled to refrain from the taking of any action (including the failure to take an action) in connection herewith or with any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Required Lenders (or such other Lenders as may be required, or as such Agent shall believe in good faith to be required, to give such instructions under Section 11.01) and, upon receipt of such instructions from the Required Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions; *provided* that such Agent shall not be required to take any action that, in its opinion, could expose such Agent to liability or be contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under the Bankruptcy Code or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of the Bankruptcy Code.

(b)    No Agent nor any of its Related Parties shall be liable to the Lender Parties for any action taken or omitted by such Agent under or in connection with any of the Loan Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. No Agent shall be deemed to have knowledge of any Default or the event or events that give or may give rise to any Default unless and until written notice describing such Default and such event or events is given to such Agent, at its notice address set forth in Section 11.02 herein, by the Borrower or any Lender Party.

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the perfection or priority of any Lien or security interest created or purported to be created by the Collateral Documents or (v) the satisfaction of any condition set forth in Article  III or elsewhere herein, other than (but subject to the foregoing clause (ii)) to confirm receipt of items expressly required to be delivered to such Agent. No Agent nor any of their Related Parties shall be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by any Agent, the Borrower or any other Person given in, pursuant to or in connection with any Loan Document. Notwithstanding anything herein to the contrary, the Administrative Agent shall not have any liability arising from, or be responsible for any loss, cost or

expense suffered by the Borrower or any Lender Party as a result of, confirmations of the amount of outstanding Advances or the component amounts thereof.

(d)     Nothing in this Agreement or any other Loan Document shall require any Agent to carry out any "*know your customer*" or other checks in relation to any person on behalf of any Lender Party and each Lender Party confirms to each Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by any Agent.

Section 10.04     Reliance by Agents.

(a)     (i) Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any telephonic notice, electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise provided by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or provider thereof) and on opinions and judgments of attorneys (who may be attorneys for the Borrower), accountants, experts and other professional advisors selected by it; and (ii) no Lender Party shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other Lenders as may be required, or as such Agent shall believe in good faith to be required, to give such instructions under Section 11.01).

(b)     Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Without limiting Section 3.03, in determining compliance with any condition hereunder to the making of any Advances, that by its terms must be fulfilled to the satisfaction of a Lender Party, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender Party prior to the making of such Advances.

Section 10.05     Delegation of Duties.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents, co-agents or trustees appointed by such Agent. Each Agent and any such sub-agent, co-agent or trustee may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. Each such sub-agent, co-agent or trustee and the Related Parties of each Agent and each such sub-agent, co-agent or trustee shall be entitled to the benefits of all provisions of this Article X and Article XI (as though such sub-agents were the "*Administrative Agent*" or the "*Collateral Agent,*" as the case may be, under the Loan Documents) as if set forth in full herein with respect thereto.

Section 10.06     Resignation of Agents; Removal of Administrative Agent.

(a)     Any Agent may at any time give notice of its resignation as to any or all of the Facility to the Lender Parties and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor Agent to the Facility. If no such successor shall have been so appointed by the Required Lenders and no such successor shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (such 30-day period, the "*Lender Party Appointment Period*"), then the retiring Agent may on behalf of the Lender Parties, appoint a successor Agent meeting the qualifications set forth above. In addition and without any obligation on the part of the retiring Agent to appoint, on behalf of the Lender Parties, a successor Agent, the retiring Agent may at any time upon or after the end of the Lender Party

Appointment Period notify the Borrower and the Lender Parties that no qualifying Person has accepted appointment as successor Agent and the Closing Date of such retiring Agent's resignation which Closing Date shall be no earlier than three Business Days after the date of such notice. Upon the resignation Closing Date established in such notice and regardless of whether a successor Agent has been appointed and accepted such appointment, the retiring Agent's resignation shall nonetheless become effective and (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents as to such Facility and (ii) all payments, communications and determinations provided to be made by, to or through the retiring Agent in respect of the Facility shall instead be made by or to each Lender Party directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section 10.06(a). Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent as to the Facility, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents as to the Facility (if not already discharged therefrom as provided above in this Section 10.06(a)). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article X and Section 11.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent in respect of the Facility.

Section 10.07    Non-Reliance on Agents and Other Lender Parties.

(a)    Each Lender Party represents and warrants to each Agent, each other Lender Party and each of their respective Related Parties that it (i) possesses such knowledge and experience in financial and business matters that it is capable, without reliance on any Agent, any other Lender Party or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, accounting and other financial matters) of entering into this Agreement, making Advances and other extensions of credit hereunder and under the other Loan Documents and in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risk and (iii) has determined that entering into this Agreement and making Advances and other extensions of credit hereunder and under the other Loan Documents is suitable and appropriate for it.

(b)    Each Lender Party acknowledges that it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Loan Documents and that it has, independently and without reliance upon any Agent or any other Lender Party or any of their respective Related Parties and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender Party also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to be solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Loan Documents, including, but not limited to:

(i)    the financial condition, status and capitalization of the Borrower;

(ii)    the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Loan Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Loan Document;

(iii)    determining compliance or non-compliance with any condition hereunder to the making of Advances; and

(iv)    the adequacy, accuracy and/or completeness of any information delivered by any Agent and any other Lender Party or by any other Person under or in connection with this Agreement or any other Loan Document, the transactions contemplated by this Agreement and the other Loan Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Loan Document.

(c)    Each Lender, by delivering its signature page to this Agreement, an Assignment and Assumption and funding its Advances on the Closing Date and/or providing its Commitment on the Closing Date shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, the Required Lenders or any other Lenders, as applicable, on the Closing Date.

Section 10.08    No Other Duties, Etc.  Anything herein to the contrary notwithstanding, none of the Administrative Agent or the Collateral Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as an Agent or a Lender hereunder.

Section 10.09    Indemnification.

(a)    Each Lender severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share (determined as provided below) of any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents, the Chapter 11 Cases or any action taken or omitted by such Agent or under the Loan Documents (collectively, the "***Indemnified Costs***"); *provided*, *however*, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 11.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 10.09 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)    [Reserved.]

(c)    For purposes of this Section 10.09, each Lender's ratable share of any amount shall be determined, at any time, according to the aggregate principal amount of the Advances outstanding at such time and owing to such Lender (or, if no Advances are outstanding with respect to the Facility, then according to the Commitments of the Lenders under that Facility). The failure of any Lender to reimburse any Agent, promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent, as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent, for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent, for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder,

the agreement and obligations of each Lender contained in this Section 10.09 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 10.10    [Reserved].

Section 10.11    Consultants.

(a)    Independent Engineer.  The Administrative Agent shall be entitled to engage on behalf of the Lender Parties, at the sole cost and expense of and with the consent of the Borrower (it being agreed that the Borrower shall have no approval rights under this Section  10.11(a) if a Default or an Event of Default has occurred and is continuing) an Independent Engineer. As of the date hereof, the Independent Engineer is [ICF][3] Engineering, LLC.

(b)    Independent Insurance Consultant.  The Administrative Agent shall be entitled to engage, on behalf of the Lender Parties, at the sole cost and expense of and with the consent of the Borrower (it being agreed that the Borrower shall have no approval rights under this Section 10.11(b) if a Default or an Event of Default has occurred and is continuing) an Independent Insurance Consultant, to be engaged pursuant to an engagement letter with a commercially reasonably scope acceptable in form and substance to the Administrative Agent.

(c)    Independent Power Market Consultant.  The Administrative Agent shall be entitled to engage on behalf of the Lender Parties, at the sole cost and expense of and with the consent of the Borrower (it being agreed that the Borrower shall have no approval rights under this Section 10.11(c) if a Default or an Event of Default has occurred and is continuing) an Independent Power Market Consultant, to be engaged pursuant to an engagement letter with a commercially reasonable scope acceptable in form and substance to the Administrative Agent.

(d)    Scope.  The scope of work of the Independent Engineer, Independent Insurance Consultant and the Independent Power Market Consultant shall be as set forth in the relevant engagement letter and otherwise in accordance with the provisions of the Loan Documents relating to the roles of the Independent Engineer, Independent Insurance Consultant and Independent Power Market Consultant.

Section 10.12    Credit Bidding. The Loan Parties and the Lenders hereby irrevocably authorize Collateral Agent, based upon the instruction of the Required Lenders, to (A) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code or other bankruptcy laws, including under Section 363 of the Bankruptcy Code, (B) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9-620 thereof or the Bankruptcy Code, or (C) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Collateral Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Collateral Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid

---

[3] NTD: Company please confirm.

shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (ii) the Collateral Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles and in connection therewith the Collateral Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.

ARTICLE XI

MISCELLANEOUS

Section 11.01    <u>Amendments, Etc.</u>

(a)    Subject to <u>Sections 11.01(b)</u>, <u>(c)</u> and <u>(d)</u> below, no amendment or waiver of any provision of this Agreement or any other Loan Document (other than any Fee Letter, the provisions of each of which may be amended or waived in accordance with its terms without the consent of the Required Lenders or any other Person not a party to such Fee Letter), nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders and in the case of any amendment, such Loan Party, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that:

(i)    no amendment, waiver or consent shall, unless in writing and signed by all of the Lender Parties, do any of the following at any time:

(A)    [Reserved],

(B)    (i) amend the definition of "Required Lenders" or (ii) change the number of Lenders or the percentage (or any related definition) of (x) the Commitments or (y) the aggregate unpaid principal amount of the Advances that, in each case, shall be required for the Lenders or any of them to take any action hereunder or under any other Loan Document,

(C)    release all or substantially all of the Collateral in any transaction or series of related transactions, or

(D)    amend this <u>Section 11.01</u>,

(ii)    no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each affected Lender Party specified below for such amendment (and the Borrower in the case of any amendment), waiver or consent, do any of the following at any time:

(A)    increase the Commitments of a Lender Party without the consent of such Lender Party;

(B)    reduce the principal of, or stated rate of interest (other than the waiver of Default Interest) on, the Advances owed to a Lender Party or any fees or other

amounts stated to be payable hereunder or under the other Loan Documents to any Lender Party without the consent of such Lender Party;

(C)    postpone any date scheduled for any payment of principal of, or interest (other than the waiver of Default Interest) on, the Advances pursuant to Section 2.05 or Section 2.08 or any date fixed for any payment of fees hereunder in each case payable to a Lender Party without the consent of such Lender Party;

(D)    [reserved];

(E)    reduce the amount (whether as a percentage rate or fixed dollar amount) of, or postpone the date of, any amounts required to be applied to prepay the Advances in accordance with the Loan Documents, without the consent of such Lender Party.

provided further, that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents;.

(b)    [Reserved].

(c)    Notwithstanding the other provisions of this Section 11.01;

(A)    the applicable Agents may (but shall have no obligation to) amend or supplement the Loan Documents without the consent of any other Agent or Lender Party for the purpose of (i) curing any ambiguity, defect or inconsistency, (ii) making any change that would provide any additional rights or benefits to the Lender Parties or that does not adversely affect the legal rights hereunder of any Agent or Lender Party, and (iii) making, completing or confirming any grant of Collateral permitted or required by this Agreement or any of the Loan Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the Loan Documents.

Section 11.02    Notices, Etc.

(a)    All notices and other communications provided for hereunder shall be either (x) in writing (including facsimile or other electronic communication) and mailed, faxed, emailed or delivered, provided that in the case of the Administrative Agent, such notice in writing shall be faxed or (y) as and to the extent set forth in Section 11.02(b) and in the proviso to this Section 11.02(a), in an electronic medium and delivered as set forth in Section 11.02(b):

If to the Borrower:

Panda Temple Power, LLC
5001 Spring Valley Road, Suite 1150 West
Dallas, Texas 75244
Tel: (972) 361-2000
Fax: (972) 455-3890
Email: edaniels@pandafunds.com
Attention: General Counsel

If to any Lender:

At its address specified in its Administrative Questionnaire

If to the Collateral Agent or Administrative Agent:

Wilmington Savings Fund Society, FSB,
Administrative Agent's Principal Office:
500 Delaware Avenue, 11th Floor
Wilmington, Delaware  19801
Attention:  Panda Temple
Telecopier: (302) 421-9137
Email: kmoore@wsfsbank.com

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention: Jayme Goldstein, Esq., Alex Cota, Esq. and Jon Canfield, Esq.
Telecopier: (212) 806-6006
email: jgoldstein@stroock.com, acota@stroock.com, and jcanfield@stroock.com

or, as to the Borrower or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent; *provided, however*, that materials and information described in <u>Section 11.02(b)</u> shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent. The Borrower shall deliver all notices required to be delivered to each Lender Party hereunder at the address set forth on <u>Schedule I</u> hereto or as otherwise specified to the Borrower by the respective Lender Party. All such notices and other communications shall, when mailed, sent by facsimile, or e-mailed, be effective when deposited in the mail, transmitted by facsimile or sent by electronic communication, respectively, except that notices and communications to any Agent pursuant to <u>Article II</u>, <u>III</u> or <u>X</u> shall not be effective until received by such Agent, as applicable. Delivery by facsimile or e-mail in pdf format of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or any other Loan Document shall be effective as delivery of an original executed counterpart thereof.

(b)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a Conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or the Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower. In addition, the Borrower agrees to continue to provide the

Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent. The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders and actual or prospective assignees, participants or other transferees by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "***Platform***").

(c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "***AGENT PARTIES***") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender Party agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents. Each Lender Party agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(e)    The Borrower hereby acknowledges that certain of the Lenders may be "***public-side***" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "***Public Lender***"). The Borrower hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lender Parties to treat such Communications as either publicly available information or not material information (although it may contain sensitive business information and remains subject to the confidentiality undertakings of <u>Section 11.10</u>) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a

portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(f)    EACH LENDER PARTY ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT AN ISSUER FROM PURCHASING OR SELLING SECURITIES OF SUCH ISSUER OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON. EACH LENDER PARTY AGREES TO COMPLY WITH REQUIREMENTS OF LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION. Each Lender Party that is a Non-Public Lender confirms to the Administrative Agent that such Lender Party has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender Party to take delivery of Restricting Information (as defined below) and maintain its compliance with Requirements of Law and its respective contractual obligations with respect to confidential and material non-public information. A Public Lender may elect not to receive Communications and information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and information, collectively, "*Restricting Information*"), in which case it will identify itself to the Administrative Agent as a Public Lender. Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent Parties, any Lender Party or the Borrower concerning the Facility in which Restricting Information may be discussed. No Agent Party, however, shall by making any Communications and information (including Restricting Information) available to a Lender Party (including any Public Lender), by participating in any conversations or other interactions with a Lender Party (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender Party (including any Public Lender) may make to limit or to not limit its access to the Communications and information. In particular, no Agent Party shall have, and the Administrative Agent, on behalf of all Agent Parties, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender Party (including any Public Lender) has elected to receive Restricting Information, such Lender Party's policies or procedures regarding the safeguarding of material nonpublic information or such Lender's compliance with Requirements of Laws related thereto. Each Public Lender acknowledges that circumstances may arise that requires it to refer to Communications and information that might contain Restricting Information. Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information) on such Public Lender's Administrative Questionnaire. Each Public Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Public Lender's designee's e-mail address to which notice of the availability of Restricting Information may be sent by electronic transmission. Each Public Lender confirms to the Administrative Agent and the Lender Parties that are Non-Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lender Parties may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information. Nothing in this Section 11.02(f) shall modify or limit a Lender Party's (including any Public Lender) obligations under Section 11.10 with regard to Communications and information and the maintenance of the confidentiality of or other treatment of Communications or information.

Section 11.03    No Waiver; Remedies.  No failure on the part of any Lender Party or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan

Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 11.04    Costs and Expenses; Indemnification.

(a)    The Borrower agrees to pay on demand (i) all reasonable costs and expenses of each Agent and each Lender Party in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for each Agent and each Lender Party with respect thereto, with respect to advising such Agent as to their respective rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with the Borrower or with other creditors of the Borrower arising out of any Default or any events or circumstances that may result in a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of each Agent and each other Lender Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation or any bankruptcy, insolvency or other similar proceeding (including, without limitation, the fees and expenses of counsel for the Agents and each other Lender Party with respect thereto).

(b)    The Borrower agrees to indemnify, defend and save and hold harmless each Agent and each other Lender Party, and each of their Affiliates and their respective officers, directors, partners, employees, agents and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including reasonable fees and expenses of counsel) (collectively, "***Claims***") that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facility, the actual or proposed use of the proceeds of the Advances, the Transaction Documents, the Permitted Commodity Agreements or any of the transactions contemplated hereby or thereby, or (ii) the actual or alleged presence of Hazardous Materials on any Property of the Borrower or any Environmental Action relating in any way to the Borrower, and without regard to the exclusive or contributing negligence of such Indemnified Party, except, in each case, to the extent such Claim is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnified Party's gross negligence or willful misconduct. Any indemnification for fees, disbursements and other charges of counsel in connection with any single claim shall be limited to one (1) counsel to the Indemnified Parties (exclusive of one local/regulatory counsel to the Indemnified Parties in the State of Texas), unless the interests of the Indemnified Parties are sufficiently divergent, as determined by the Indemnified Parties in good faith and upon a reasonable basis, in which case one (1) or more additional counsel may be appointed;. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 11.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, equity holders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto. The Borrower also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise **or based on its or their exclusive or contributory negligence or otherwise**) to the Borrower or its Affiliates or to any equity holders or creditors of the Borrower or its Affiliates arising out of, related to or in connection with any aspect of the Transaction or the Permitted Commodity Agreements, except only for direct (as opposed to special, indirect, consequential, exemplary

or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted directly from an Indemnified Party's gross negligence or willful misconduct. This Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim. Notwithstanding any other provision of this Agreement, the Borrower shall not be required to indemnify any Indemnified Party for any losses, claims, damages or liabilities arising solely out of disputes as between the Indemnified Parties that are not based on any act or omission of the Borrower or any of the Borrower's Affiliates.

(c)     Notwithstanding any other provision of this Agreement, no Indemnified Party shall be responsible or be liable for damages arising from the unauthorized use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission systems.

(d)     Each Agent and each other Lender Party hereby agrees that promptly after its determination that it may seek any indemnification from the Borrower in respect of any action, claim, suit, investigation, proceeding or notice relating to any Claim it shall give written notice to the Borrower thereof (to the extent legally permitted to do so); provided that the failure to deliver any such notice shall not relieve the Borrower from any of its indemnification Obligations under Section 11.04(b). Each Agent, and each other Lender Party further agrees that (x) it shall act in a commercially reasonable manner in respect of any action, claim, suit, investigation, proceeding or notice brought against it in respect of any Claim and (y) that it shall consult with the Borrower during the course of any litigation (to the extent it is legally permitted to do so) and prior to entering into any settlement in respect of any Claim; provided that notwithstanding any such consultation in no event shall the Borrower's consent be required in connection with any settlement thereof. The foregoing shall in no way affect any rights, remedies or defense at law or equity that the Borrower may have as an indemnitor in respect of any indemnification sought by Indemnified Party pursuant to Section 11.04(b).

(e)     If any payment of principal of, or Conversion of, any LIBOR Advance is made by the Borrower to or for the account of a Lender Party other than on the last day of the Interest Period for such Advance as a result of a payment or Conversion pursuant to Section 2.07, Section 2.10(b)(i) or Section 2.12(d), acceleration of the maturity of the Advances pursuant to Section 9.01 or for any other reason, or by an Eligible Assignee to a Lender Party other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 11.07 as a result of a demand by the Borrower pursuant to Section 2.12(d), or if the Borrower fails to make any payment or prepayment of an Advance for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.05, Section 2.07 or Section 9.01 or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Advance.

(f)     If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender Party, in its sole discretion.

(g)     Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained

in Section 2.12 and Section 2.14 and this Section 11.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

Section 11.05    Right of Set-off.    Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 9.01 to authorize the Administrative Agent to declare the Advances due and payable pursuant to the provisions of Section 9.01, each Agent and each Lender Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender Party or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender Party shall have made any demand under this Agreement and although such Obligations may be unmatured. Each Agent and each Lender Party agrees promptly to notify the Borrower after any such set-off and application; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Agent and each Lender Party and their respective Affiliates under this Section 11.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender Party and their respective Affiliates may have.

Section 11.06    Binding Effect.    Subject to Section 3.01, this Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have received an executed signature page to this Agreement of each Initial Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender Party and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.

Section 11.07    Assignments and Participations.

(a)    Subject to the conditions set forth below in Section 11.07(b), any Lender Party may assign to one or more Persons (other than any natural person) all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Advances owing to it and the Note or Notes held by it); with the prior written consent of the Administrative Agent.

(b)    Assignments shall be subject to the following additional conditions:

(i)    except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender Party, an Affiliate of any Lender Party or an Approved Fund of any Lender Party or an assignment of all of a Lender Party's rights and obligations under this Agreement, the aggregate amount of the Commitments (or Advances) being assigned to any Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Assumption with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, so long as no Default shall have occurred and be continuing at the time of effectiveness of such assignment, the Borrower) under the Facility;

(ii)    each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of the Facility;

(iii)    each assignee Lender shall be required to (x) be a lender under Prepetition Senior Loan Agreement as of the date hereof and (y) become a party to the

Restructuring Support Agreement prior to the assignment of any Advances and/or Commitments to such assignee Lender becoming effective; and

(iv)    the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Assumption, together with any Note or Notes (if any) subject to such assignment.

(c)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Assumption, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have the rights and obligations of a Lender Party hereunder and (ii) the Lender Party assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights (other than its rights under Section 2.08, Section 2.10, Section 2.14 and Section 11.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Lender Party's rights and obligations under this Agreement, such Lender Party, shall cease to be a party hereto).

(d)    By executing and delivering an Assignment and Assumption, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Assumption, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any Lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender, as the case may be.

(e)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 11.02 a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Lender Parties, the Commitment under the Facility of each Lender Party, and principal amount (and stated interest) of the Advances owing under the Facility to each Lender Party from time to time (the "***Register***"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties shall treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement. The

Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(f)     Upon its receipt of an Assignment and Assumption executed by an assigning Lender Party and an assignee, together with any Note or Notes (if any) subject to such assignment and a processing and recordation fee of $3,500 (which may be waived by the Administrative Agent in their sole discretion), the Administrative Agent shall, if such Assignment and Assumption has been completed and is in substantially the form of Exhibit A hereto and such assignment is permitted pursuant to this Section 11.07, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent. In the case of any assignment by a Lender Party, within five (5) Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) a new Note to such Eligible Assignee in an amount equal to the Commitment (or, if the Commitments have terminated, the Advances) assumed by it under the Facility pursuant to such Assignment and Assumption and, if any assigning Lender Party that had a Note or Notes prior to such assignment has retained a Commitment hereunder under the Facility, a new Note to such assigning Lender Party in an amount equal to the Commitment (or, if the Commitments have terminated, the Advances) retained by it hereunder. Such new Note or Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit B, as applicable, hereto, as the case may be.

(g)     Each Lender Party may sell participations to one or more Persons (other than any Loan Party or any of their Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments and the Advances owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that (i) such Lender Party's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Advances or any fees or other amounts payable hereunder, (other than a waiver of Default Interest) in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Advances or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral. The Borrower agrees that each participant shall be entitled to the benefits of Section 2.12 and Section 2.14 (subject to the requirements and limitations therein, including the requirements under Section 2.14(f) (it being understood that the documentation required under Section 2.14(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment. Each Lender Party that sells a participation, or grants any rights to an SPC pursuant to Section 11.07(l) shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and SPC and the principal amounts (and stated interest) of each participant's and SPC's interest in the loans or other obligations under the Loan Documents (the "*Participant Register*"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent

manifest error, and such Lender Party shall treat each Person whose name is recorded in the Participant Register as the owner of such participation or SPC interest for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h)     Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this <u>Section 11.07</u>, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender.

(i)     Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Advances owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board.

(j)     Notwithstanding anything to the contrary herein, any Lender Party may pledge or grant a security interest in all or any portion of such Lender Party's rights hereunder (including, without limitation, the Advances owing to it and the Note or Notes (if any) held by it) without the consent of, or notice to or any other action by, any other party hereto, to secure the obligations of such Lender Party or any of its Affiliates to any Person providing any loan, letter of credit or other extension of credit to or for the account of such Lender Party or any of its Affiliates and any agent, trustee or representative of such Person.

(k)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Advances owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this <u>Section 11.07</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled (directly or indirectly through consent rights, veto rights or otherwise) to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(l)     Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "***SPC***") the option to provide all or any part of any Advance that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Advance and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Advance, the Granting Lender shall be obligated to make such Advance pursuant to the terms hereof. The making of an Advance by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Advance were made by such Granting Lender. Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, (ii) no SPC shall be entitled to the benefits of <u>Section 2.12</u>, <u>Section 2.13</u> or <u>Section 2.14</u> (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding

commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its interest in any Advance to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Advances to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This Section 11.07(l) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Advances are being funded by the SPC at the time of such amendment.

Section 11.08    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by facsimile or electronic format (i.e., "pdf" or "tif") of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

Section 11.09    [Reserved].

Section 11.10    Confidentiality.  Neither any Agent nor any Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to (i) such Agent's or such Lender Party's Affiliates or (ii) (A) any Person advised or managed by such Agent, Lender Party or Affiliate of such Agent or Lender Party, (B) any Person providing any loan, letter of credit or other extension of credit to or for the account of such Lender Party or any of its Affiliates and any agent, trustee or representative of such Person, and their respective officers, directors, partners, employees, agents, counsel, auditors, bank examiners and advisors, (C) actual or prospective Eligible Assignees and participants and (D) any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to the Borrower and its obligations, and in each case of this clause (ii) only on a confidential basis other than with respect to examiners or other Governmental Authorities with regulatory oversight over such party where confidential treatment may not be available, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender Party, (d) to any rating agency when required by it, provided that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender Party, (e) in connection with any litigation or proceeding to which such Agent or such Lender Party or any of its Affiliates may be a party to the extent such Confidential Information is relevant thereto or to the extent such Confidential Information is otherwise required to be disclosed by compulsory legal process, (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document or (g) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Advances. In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to (i) market data collectors, (ii) similar services providers to the lending industry, and (iii) service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents.

Section 11.11    Patriot Act Notice.  Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party and co-investor, which information includes the name and address of such Loan Party and other information that

will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Borrower shall provide such information and take such actions as are reasonably requested by any Agent or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with the Patriot Act.

Section 11.12    <u>Jurisdiction, Etc.</u>    SUBJECT TO <u>CLAUSE (E)</u> OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT. BY EXECUTING AND DELIVERING THIS AGREEMENT, THE BORROWER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS (OTHER THAN WITH RESPECT TO ACTIONS BY ANY AGENT IN RESPECT OF RIGHTS UNDER ANY COLLATERAL DOCUMENT TO THE EXTENT GOVERNED BY A REQUIREMENT OF LAW OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO); (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE LOAN PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 11.02</u>; (D) AGREES THAT SERVICE AS PROVIDED IN <u>CLAUSE (C)</u> ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE BORROWER IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY REQUIREMENTS OF LAW OR TO BRING PROCEEDINGS AGAINST THE BORROWER IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY EACH PARTY HERETO.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS ARTICLE XI, (I) THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS AND (II) THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS; PROVIDED, THAT NOTHING IN THIS ARTICLE XI SHALL AFFECT THE RIGHT OF THE AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY OR ANY COLLATERAL IN ANY OTHER JURISDICTION.

Section 11.13    <u>Governing Law</u>.  This Agreement and the Notes and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Notes and the transactions contemplated hereby or thereby shall be governed by, and construed in accordance with, the law of the State of New York without regard to the conflict of law rules thereof (other than Section 5-1401 of the New York General Obligations Law), and, as may be applicable, the Bankruptcy Code, without giving effect to the conflict of laws principles.

Section 11.14    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER

OF THIS TRANSACTION, THE PERMITTED COMMODITY AGREEMENTS OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION OR THE PERMITTED COMMODITY AGREEMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 11.14 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE ADVANCES MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 11.15    [Reserved].

Section 11.16    Reinstatement.  To the extent that any Lender Party receives any payment by or on behalf of the Borrower, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to the Borrower or to its estate, trustee, receiver, custodian or any other party under any Bankruptcy Laws or otherwise, then to the extent of the amount so required to be repaid, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the Secured Obligations as of the date such initial payment, reduction or satisfaction occurred.

Section 11.17    No Immunity.   To the extent that the Borrower may be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Agreement or any other Loan Document, to claim for itself or its revenues, assets or Properties any immunity from suit, the jurisdiction of any court, attachment prior to judgment, attachment in aid of execution of judgment, set-off, execution of a judgment or any other legal process, and to the extent that in any such jurisdiction there may be attributed to such Person such an immunity (whether or not claimed), the Borrower hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the fullest extent permitted by the law of the applicable jurisdiction.

Section 11.18    Severability.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of any provision in any other jurisdiction.

Section 11.19    Complete Agreement.   **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AND COMPLETE AGREEMENT OF THE PARTIES HERETO, AND ALL PRIOR NEGOTIATIONS, REPRESENTATIONS, UNDERSTANDINGS, WRITINGS AND STATEMENTS OF ANY NATURE ARE HEREBY SUPERSEDED IN THEIR**

**ENTIRETY BY THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.**

Section 11.20  <u>Usury Savings Clause</u>.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to the Borrower.

Section 11.21  <u>Waiver</u>.  The Borrower hereby irrevocably and unconditionally waives, to the maximum extent not prohibited by law, all rights of rescission, setoff, counterclaim, and other defenses in connection with the repayment of the Obligations of the Borrower under the Loan Documents.

Section 11.22  <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.23  <u>No Fiduciary Duty</u>.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this <u>Section 11.23</u>, the "*Lenders*") may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and

agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

Section 11.24    <u>Obligations Several; Independent Nature of Lenders' Rights</u>.  The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 11.25    <u>Independence of Covenants</u>.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default if such action is taken or condition exists.

*Signature Pages Follow.*

**<u>EXHIBIT B</u>**

**BUDGET**

**<u>Exhibit B</u>**

**Fee Letters**

Senior Secured Super-Priority Priming Debtor-In-Possession Credit Facility
Fee Letter
April __, 2017


Panda Temple Power, LLC (the "<u>Borrower</u>" or "you")
5001 Spring Valley Road, Suite 1150 West
Dallas, Texas 75244
Attention: General Counsel

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement dated as of the date hereof (as amended, restated, extended, renewed, supplemented, reaffirmed or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among the Borrower, Panda Temple Power Intermediate Holdings II, LLC, as Parent, the lenders from time to time party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the lenders (in such capacities, the "<u>DIP Agent</u>"). This fee letter ("<u>Fee Letter</u>") is the Closing Fee Letter referred to in the Credit Agreement and, as such, constitutes a "Loan Document" for all intents and purposes under the Credit Agreement. Unless otherwise noted, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement. For the purposes hereof, "<u>Lender</u>" means any financial institution or other entity that is listed on the signature pages to the Credit Agreement as a "<u>Lender</u>", together with its successors and assigns under the Credit Agreement.

As consideration for the agreements and commitments under, and other transactions contemplated by, the Credit Agreement, and other good and valuable consideration, you agree to pay the fees set forth below in accordance with the terms hereof.

> *Put Option Payment.* The Borrower shall pay to the DIP Agent, on account for, and for the benefit of, each Lender, 2.0% of the initial aggregate principal amount of their respective, aggregate Commitments on the Closing Date (the "<u>Put Option Payment</u>") upon the entry of the Interim Order by the Bankruptcy Court and payable in full in cash. Such Put Option Payment shall be (x) fully earned upon execution of this Fee Letter and (y) for the Borrower's right to call the aggregate Commitments.

In addition, you agree to pay the other fees and expenses specified in the Credit Agreement promptly in accordance with the provisions thereof. You agree that the fees set forth above are fully earned on the dates described above and shall constitute "Secured Obligations" under and as defined in the Credit Agreement.

You agree that, once paid, the fees or any part thereof payable hereunder and under the Credit Agreement shall not be refundable under any circumstances. Except as expressly set forth above, all fees payable hereunder and under the Credit Agreement shall be paid in immediately available funds, shall be in addition to reimbursement of our out-of-pocket expenses and shall not otherwise be subject to reduction by way of set-off or counterclaim. You agree that we may,

Panda Temple Power, LLC.
April [__], 2017
Page 2

in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any other person or entity.

By your signature below, you agree, except as required by law, that this Fee Letter is for your confidential use only and that the terms, conditions and other contents will not be disclosed by you to any person or entity other than your employees, officers, directors, shareholders, accountants, attorneys, and other advisors, in each case in connection with the transactions contemplated hereby and who are informed by you of the confidentiality provisions hereof and who are directed by you to abide by such provisions. Subject to the immediately preceding sentence, this Fee Letter may not be disclosed in whole or in part to any person or entity without the Lenders' prior written consent; *provided*, *however*, it is understood and agreed that after your acceptance of this Fee Letter, you shall be permitted (x) to file this Fee Letter (redacted in a manner satisfactory to the Lenders) on the public docket of the United States Bankruptcy Court for the District of Delaware, (y) so long as it is filed under seal, to file the unredacted Fee Letter in filings with the Bankruptcy Court and (z) with the prior agreement of the Lenders or their professional advisors (at the direction of the Lenders), to disclose the aggregate amount of fees provided for in this Fee Letter in the manner so agreed.

The Borrower's agreement under this Fee Letter shall be legally binding upon and enforceable against the Borrower and its successors and permitted assigns, may be enforced by the DIP Agent and its successors and permitted assigns, and shall be enforceable without regard to any act, event or circumstance except as expressly set forth herein.

This Fee Letter may not be amended or waived except by an instrument in writing signed by the parties hereto. This Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York, including, without limitation, Section 5-1401 and 5-1402 of the New York General Obligations Law. This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

*[Remainder of page intentionally left blank]*

2

We have enclosed two copies of this Fee Letter.  Please have an authorized signatory execute both copies of this Fee Letter and return one copy to us.

Very truly yours,


WILMINGTON SAVINGS FUND SOCIETY, FSB, as DIP Agent




By: _____
    Name:
    Title:

NY 76592375v3

**ACCEPTED AND AGREED**

**THE BORROWER:**

PANDA TEMPLE POWER, LLC

By: _____

      Name:

      Title:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, DE 19801

April __, 2017

Panda Temple Power, LLC
5001 Spring Valley Road, Suite 1150 West
Dallas, Texas 75244
Attention:  General Counsel

Panda Temple Power, LLC
$20,000,000 Senior Secured Super-Priority Priming Debtor-In-Possession Credit Facility
Fee Letter

Ladies and Gentlemen:

This letter agreement (this "Fee Letter") sets forth certain fees and expenses payable to Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and as collateral agent (in such capacities, the "Agent") under that certain Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement, dated as of April ___, 2017 (as amended, restated, extended, renewed, supplemented, reaffirmed or otherwise modified from time to time, the "Credit Agreement"), by and among Panda Temple Power, LLC, as borrower and as a debtor and debtor-in-possession in the Chapter 11 Cases (the "Borrower"), the other Loan Parties signatory hereto, the Lenders party thereto from time to time and the Agent.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Credit Agreement.  This Fee Letter is the "Fee Letter" referred to in the Credit Agreement and, as such, constitutes a "Loan Document" under the Credit Agreement.

The Borrower hereby agrees to pay directly to the Agent, for its own account, all fees and expenses set forth on Schedule A hereto.  All fees of the Agent shall be fully earned on each day that such fee is payable.

The Borrower also acknowledges that the costs and expenses of the Agent for which they will be responsible pursuant to, and in accordance with, the Credit Agreement, include, without limitation, all costs and expenses arising out of or relating to the hiring of third party consultants, legal counsels, financial advisors and other consultants in connection with the Credit Agreement and the other Loan Documents including, without limitation, all fees of Stroock & Stroock & Lavan LLP, as counsel for the Agent, and any local counsel necessary to enforce the rights and remedies of the Agent hereunder and under the Loan Documents.

All fees and reimbursement of expenses, costs and professional fees hereunder and under the Loan Documents shall be paid by the Borrower in dollars and in immediately available funds. Any fee due on a date that is not a Business Day shall be due and payable on the next succeeding Business Day. The Borrower hereby agrees that, once paid, the fees, expenses and costs, or any

part thereof, will not be refundable under any circumstances and shall not be subject to reduction by way of setoff or counterclaim.

The Borrower agrees that this Fee Letter and its contents are subject to the confidentiality provisions of the Credit Agreement.

Failure by any party to enforce any of the provisions hereof shall not be construed as a waiver of such provisions or of the right thereafter to enforce such provisions.  If any provisions of this Fee Letter shall be held to be invalid, void, or unenforceable, the remaining provisions hereof shall not be affected or impaired and such remaining provisions shall remain in full force and effect.

This Fee Letter has been prepared through the joint efforts of all of the parties.  Neither the provisions of this Fee Letter nor any alleged ambiguity shall be interpreted or resolved against any party on the ground that such party's counsel drafted this Fee Letter, or based on any other rule of strict construction.  Each of the parties hereto represents and declares that such party has carefully read this Fee Letter and that such party knows the contents thereof and signs the same freely and voluntarily.

This Fee Letter shall be binding on and shall inure to the benefit of the Agent and the Borrower and their respective successors and permitted assigns.

THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS FEE LETTER.

THIS FEE LETTER SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED IN ALL RESPECTS BY, THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

Each party hereto hereby irrevocably and unconditionally (a) submits for itself and its property in any legal action or proceeding relating to this Fee Letter or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the United States Bankruptcy Court for the District of Delaware and the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof and (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

This Fee Letter may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Fee Letter by fax or electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Fee Letter.

[SIGNATURE PAGE TO FOLLOW]

Please indicate your agreement with the foregoing terms and provisions by countersigning this Fee Letter and returning to us executed counterparts hereof.

Very truly yours,

WILMINGTON SAVINGS FUND
SOCIETY, FSB

By: _____
    Name:
    Title:

Agreed and accepted to
As of the date first written above:

PANDA TEMPLE POWER, LLC

By: _____
    Name:
    Title:

## SCHEDULE A

**Fees for Services as Agent on the**
**PANDA TEMPLE POWER, LLC**
**$20,000,000 SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION**
**Credit Facility**

I.      **Annual Administration Fee:**                                    **$40,000.00**

The annual administration fee (the "<u>Administration Fee</u>") encompasses the day to day discharge of our duties and responsibilities in acting as Agent under the Credit Agreement.  The Administration Fee is due and payable annually in advance, with the first year's payment due on the Closing Date, and continuing on each anniversary of the Closing Date until the Lenders' Commitments are discharged, all Obligations under the Credit Agreement and the other Loan Documents have been paid in full and the Facility has been terminated.  The Administration Fee covers maintenance of the registrar records and files, establishment of necessary cash account, distribution of covenant compliance and reporting items, responses to inquiries from all parties-in-interest, and receipt and distribution of debt service payments.

II.     **Extraordinary Administration:**

Extraordinary administration fees may be charged from time to time in connection with services of the Agent outside the scope of the services set forth above, including, without limitation, services in connection with document amendments, supplements, forbearances or waivers, extraordinary collateral release or substitutions, or participation and correspondence with parties-of-interest in steering or other committees formed in connection with a restructuring under the Loan Documents. Extraordinary administration fees may also apply for pursuits of any remedies provided to the Agent under the operative documents which may arise as a result of defaults or events of default under the Credit Agreement.

III.    **Expenses:**

In addition to the fees listed above, all out-of-pocket expenses will be billed and payable at cost.  Out-of-pocket expenses include, but are not limited to, costs and expenses relating to overnight couriers, reasonable and documented fees and expenses of counsel, and the reasonable and documented fees and expenses of other agents and professionals retained by Wilmington Savings Fund Society, FSB, settlement charges for delivery of physical securities, and reasonable and documented travel costs and expenses of those representatives of Wilmington Savings Fund Society, FSB required to attend the closing.